**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

KEITH LaMAR,

                      :

        Petitioner,               Case No. 1:04-cv-541

                      :      District Judge Thomas M. Rose

    -vs-                   Magistrate Judge Michael R. Merz

TODD ISHEE, Warden,

                      :

        Respondent.

---

## REPORT AND RECOMMENDATIONS

On April 11, 1993, inmates at the Southern Ohio Correctional Facility in Lucasville, Ohio, violently took control of one of the cell block complexes at that facility and held it for eleven days. During the siege, a number of inmates and one correctional officer were murdered. Petitioner Keith LaMar[1] was convicted of five of the inmate murders and sentenced to death for four of them in 1995. LaMar now petitions this Court for a writ of habeas corpus alleging the following twenty-five grounds for relief:

> 1.    The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material to guilt or punishment.

---

[1]Various documents in the record and state court decisions refer to Petitioner as "LaMar" or "Lamar." For consistency sake, this Court uses "LaMar" throughout this Report and Recommendations.

2.    The Due Process Clause of the federal constitution entitles an accused to a trial before an impartial judge.

3.    Keith LaMar was selectively prosecuted for this offense and the only inmate charged with a capital offense for killings of inmates alone {not a prison guard} thereby denying Mr. LaMar his constitutional rights under the Fifth and Fourteenth Amendments to the U[nited] S[tates] Constitution.

4.    Keith LaMar was denied his right to a fair trial as, [sic] guaranteed by the United States Constitution, when the trial court refused to sever the Weaver count from the remaining charges even though they occurred at different times and under different circumstances.

5.    When a trial court unreasonabley [sic] and arbitrarily restricts a defendant's voir dire examination prejudicial error occurs in that the defendant is denied the right to a fair and impartial jury in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

6.    Mr. LaMar was denied his right to a fair and impartial jury when the trial court failed to excuse a juror who was an "automatic death penalty juror," thereby violating the Sixth and Fourteenth Amendments to the United States Constitution.

7.    The trial court erroneously allowed the prosecuting attorney to use his peremptory challenges to exclude the only two African-American jurors on Mr. LaMar's venire.

8.    Admission of gruesome and misleading photos when their prejudicial effect outweighs their probative value denys [sic] Petitioner a fair trial, due process and a reliable determination of his guilt and sentence as

guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

9.    The admission of highly prejudicial hearsay evidence in violation of the Ohio evidence rules denys [sic] Petitioner his federal constitutional rights to a fair trial and his right to cross-examine witnesses against him.

10.    As a matter of law, there is insufficient evidence to convict Petitioner of many of the charges thereby denying the Petitioner due process of law.

11.    The trial court erred in allowing the admission of evidence of uncharged other acts by the defendant.

12.    A capital defendant is denied his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the prosecutor repeatedly engages in improper argument and other misconduct prior to and throughout the trial.

13.    The trial court erred in failing to grant a mistrial, or in the alternative, to dismiss the jury when the prosecutor repeatedly argued inappropriately regarding mitigating factors which acted to deny Mr. LaMar the individualized sentencing determination required by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U[nited] S[tates] Constitution.

14.    It is prejudicial error to admit all evidence submitted by the state in the guilt-innocence phase into the mitigation phase when much of the evidence was not relevant to any specific aggravating circumstance.

15.    The trial court erred in instructing the jury during the sentencing phase by (A) failing to inform the jury [that]

-3-

a solitary juror could prevent the death sentence and (B) in placing undue influence on the requirement of unanimity such that Mr. LaMar's death sentences lack the reliability required by the Eighth and Fourteenth Amendments to the U[nited] S[tates] Constitution.

16. Repeatedly instructing that a jury's verdict is only a recommendation violates the Fifth, Eighth and Fourteenth Amendments to the U[nited] S[tates] Constitution.

17. The trial court failed to instruct the jury that it must make a finding on the alternative theories on the felony murder specification thus violating the Fourteenth Amendment to the United States Constution.

18. When a capital defendant is charged and convicted under alternative theories of aggravated murder pursuant to Ohio Rev. Code Ann. Section 2903.01, he may only be sentenced on one of the counts, the other count is vacated.

19. Trial counsel's performance fell below the prevailing professional norms and prejudice[d] Mr. LaMar thereby violating Mr. LaMar's right to the effective assistance of counsel.

20. The trial court erred when it failed to comply with the dictates of R.C. 2929.03 by weighing non-statutory aggravating circumstances, by relying on evidence that was not a part of the record, by discounting the mitigating factors and by failing to articulate the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors.

21. Evidence that has been uncovered since the trial of theis [sic] case, and presented to the trial court by way of a

-4-

new trial motion, indicate that Mr. LaMar is "actually innocent" of many of the charges against him and to leave his convictions and sentences in tact [sic] would violate his constitutional rights to due process, a fair trial, effective assistance of counsel and a reliable sentencing determination as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U[nited] S[tates] Constitution.

22.    Appellate counsel was [sic] ineffective in their representation by failing to present all meritorious issues for appeal, thereby violating Mr. LaMar's right to the effective assistance of appellate counsel as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

23.    Ohio App. R. 26(B), on its face and as applied to Keith LaMar denied Mr. LaMar due process and equal protection of the law as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the Constitution of the United States.

24.    The Fifth, Eighth and Fourteenth Amendments to the United States Constitution guarantee a convicted capital defendant a fair and impartial review of his death sentence. The statutorily mandated proportionality process in Ohio does not comport with this constitutional requirement and thus is fatally flawed.

25.    The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution establish the requirements for a valid death penalty scheme. . . . Ohio's statutory provisions governing the imposition of the death penalty, do not meet the prescribed constitutional requirements and are unconstitutional, both on their face and as applied.

(Petition, Doc. No. 31.) Respondent has filed his return of writ (Doc. No. 32), LaMar has

-5-

filed his Traverse (Doc. No. 43), and the matter is now ripe for decision.

## FACTS

The facts leading to LaMar's convictions were summarized by the Ohio Supreme

Court as follows:

> On the afternoon of April 11, 1993, a group of Muslim inmates seized control of cellblock "L" ("L-Block") at [the Southern Ohio Correctional Facility ("SOCF")]. The rioting inmates took several guards hostage and locked inmates considered "snitches" into various cells in the L-6 section of L-Block. The Muslim inmates maintained control of unit L-6 while two other dominant groups – the Aryan Brotherhood (a racist group of white inmates) and the Black Gangster Disciples (a prison gang) – controlled other units within L-Block.

> On the day of the riot, LaMar was an SOCF inmate serving a sentence of eighteen years to life for a 1989 murder conviction. LaMar, who was not a Muslim, did not plan or participate in the prison takeover and was in the prison recreation yard when the riot began. . . . [A]fter the commotion began, LaMar and two other inmates, Louis Jones and Derek Cannon, went . . . inside L-Block to check the personal belongings in their respective cells. When the three were unable to get back outside because the Muslims had closed access to and from L-Block, LaMar said to Jones and Cannon, "Ain't no need in us staying in here getting caught up in something we're not a part of. Let's kill all the snitches and get out to the yard."

> LaMar approached Cecil Allen, a leader of the Muslim group of inmates, and asked, "if we kill the snitches, could we be let out to the yard so we don't be a part of this?" Allen consulted with the Muslim leadership and returned a few minutes later to tell LaMar that the "orders has [sic] been granted to kill the snitches."

After Allen granted permission to "kill the snitches," LaMar, Jones, and Cannon walked around the L-Block corridor to enlist other inmates to help them. Eventually, the group recruited Hiawatha Frezzell . . ., Eric Scales . . ., Derrick Mathews, Rasheem Matthews, Albert Young . . ., and Gregory Curry to join the newly formed death squad. LaMar's group proceeded to unit L-2, where they retrieved bats, shovels, and weight bars to use as weapons. The men also wore masks fashioned from T-shirts, towels, and bandannas.

After arming and disguising themselves, LaMar and his group returned to L-6. Inmate Timothy Grinnell was operating the console that controlled the cell doors within L-6. LaMar led his group to the upper tier of the cellblock and instructed Grinnell to open a cell occupied by Andre Stockton. After Grinnell complied with the demand, LaMar and Curry entered the cell and beat Stockton with a shovel and a baseball bat. Other members of the group dragged Stockton from the cell and participated in the beating.

After beating Stockton, the group went downstairs to the lower tier of L-6. LaMar yelled at Grinnell to open the cells occupied by inmates Ellis Walker and Darrell Depina. After Walker refused to comply with LaMar's command to come out of the cell, LaMar and Curry dragged him to the main floor of the cellblock and beat him repeatedly. Other members of the death squad also participated in Walker's beating. LaMar then ordered Depina out of his cell. When Depina refused, LaMar entered the cell and hit him several times before dragging him to the main floor, as he had done with Walker. LaMar continued to beat Depina with a baseball bat, striking him several times. Other members of LaMar's group joined in beating Depina, who died from his injuries.

When LaMar finished beating Depina, he ordered Grinnell to open a cell occupied by Bruce Vitale. When Vitale refused to come out of the cell, LaMar hit him on the head with a shovel. LaMar continued beating Vitale on the head and at one point

knocked a tooth out of Vitale's mouth. Vitale tried to defend himself by crawling under the bed, but LaMar and Curry dragged him out of the cell and continued the beating, joined by other members of the death squad. At one point, LaMar told Jones, "I didn't bring you all in here to stand around," when he noticed that Jones was not participating in the assault. Vitale was still alive when the group left him but died after Frezzell and another member of LaMar's group stabbed and beat him again.

LaMar continued on to a nearby cell occupied by Thomas Taylor, another suspected snitch. Before LaMar could order Taylor's cell opened, a Muslim inmate named Harris intervened and told LaMar that Taylor was under Muslim protection. LaMar angrily pushed Harris out of the way, saying, "If he [Taylor] is in there, he's a snitch. Fuck it. Kill him." After Taylor told LaMar that he was not a snitch, Taylor agreed to spare Taylor's life, but only if Taylor would kill Albert Staiano, who was locked in an adjacent cell. To save his own life, Taylor agreed. LaMar ordered Taylor's and Staiano's cells opened and commanded one of the other inmates to give a baseball bat to Taylor. Staiano tried to run from his cell, but fell to the ground when Frezzell tripped him. Taylor hit Staiano over the head several times with the baseball bat and then, after the bat broke, with a fire extinguisher. Other death-squad members, not including LaMar, joined in the assault and stabbed Staiano repeatedly. When the beating ended, LaMar ordered Taylor to return to his cell. Taylor eventually pleaded guilty to involuntary manslaughter for his role in Staiano's death.

The death squad's next stop was a cell occupied by Michael Trocadero and four to five other inmates. LaMar ordered Grinnell to open the cell, but Grinnell refused, saying that the Muslim leadership did not want those inmates killed. As LaMar and his group began to leave L-6, it [sic] passed the cell of William Svette, an elderly inmate who used a walker to move himself around. Svette, who appeared to have been

-8-

beaten earlier, cursed the death squad with obscenities and racial epithets. On LaMar's order, Grinnell opened Svette's cell, where LaMar and Curry beat Svette over the head with a baseball bat and a shovel. LaMar started to leave the cell but returned to beat Svette again after noticing that Svette's legs were moving.

Svette remained alive after the death squad left his cell. A short time later, on Grinnell's instructions to make sure all of the victims in L-6 were dead, inmate Eric Girdy struck Svette across the head twice more with a baseball bat. Svette continued to live after Girdy's beating and was still alive after inmate Robert Bass, on orders from one of the Muslim inmates, dragged Svette's body to a ramp near a prison recreation area. Svette eventually died after yet another inmate, Freddie Frakes, beat him . . . again with a baseball bat.

After finishing their rampage, LaMar and the others left L-Block and joined the large contingent of inmates gathered in the recreation yard. Many of the participants in the L-6 killings remained together and discussed what had transpired. During this time, LaMar saw inmate Dennis Weaver in the recreation yard and told Curry, "I wish Weaver was in there. I'd have killed him, too."

Early the following morning, law enforcement officers surrounded the approximately three hundred inmates gathered in the recreation yard and herded them to a gymnasium on the SOCF grounds, where the inmates were handcuffed and taken to various cells around the prison. LaMar occupied a cell in K-Block with nine other inmates: Scales, Frezzell, Weaver, William "Geno" Washington, Jeffrey Mack, Michael Childers, Ricky Rutheford, William Bowling, and John Malveaux. These ten inmates remained in the cell without incident for the rest of the day.

The next day, however, tensions began rising in the cell. LaMar and Scales began harassing Weaver, accusing him of

-9-

being a snitch and telling him that "all snitches should be killed." Weaver denied being a snitch and urged his fellow cellmates to protest what he perceived as mistreatment of the inmates who were not involved in the riot. LaMar became incensed by Weaver's comments, yelled "shut up, snitch," punched Weaver in the face, and relegated him to a corner of the cell. Scales and Mack also joined in the attack on Weaver. LaMar later ordered that Weaver, Malveaux, Bowling, and Childers be tied up.

Later that day, LaMar announced to the cellmates that "I want Mr. Weaver dead. I want that snitch dead right now." LaMar then accused Bowling of being a snitch and threatened to kill Bowling if Bowling did not kill Weaver. LaMar untied Bowling, handed him some string, and watched Bowling choke Weaver. LaMar also threatened Rutheford, who then aided Bowling in the assault by holding Weaver's feet. LaMar became inpatient with Bowling's progress and told Childers, "[I]f you want to live, if you ain't no snitch, then you help kill him." LaMar then untied Childers, who complied with LaMar's order by choking Weaver, using the ropes with which LaMar had tied Childers's wrists. When Childers began hitting and kicking Weaver, LaMar told him to "just strangle him" because LaMar wanted "to make it look like he hung hisself." LaMar aided Childers by stuffing toilet paper and pieces of plastic down Weaver's throat in an effort to silence him. Weaver eventually died while Childers was choking him.

After Weaver died, LaMar instructed Bowling and Malveaux to move the body to a corner of the cell. He also ordered them to tie a string from a cell mattress around Weaver's neck "and hook it to the coat hook to make it look like a suicide. . . ." [B]efore corrections officers removed Weaver's body, LaMar instructed everyone in the cell to tell them that Weaver had killed himself.

*State v. LaMar*, 95 Ohio St. 3d 181, 181-84, 767 N.E.2d 166, 2002-Ohio-2128 ¶¶ 2-16 (2002).

LaMar was charged with aggravated murders of Darrell Depina, William Svette, Albert Staiano, Bruce Vitale, and Dennis Weaver in a nine-count indictment, the first eight counts of which included four death penalty specifications; the ninth count included three death penalty specifications.  (Appendix, Vol. 1 at 9-21.)  LaMar was found guilty of all counts and specifications.  (Appendix, Vol. 6 at 18-68.)  After a mitigation hearing, the jury recommended that LaMar be sentenced to death for the murders of Depina, Svette, Vitale, and Weaver, and to a sentence of life imprisonment with parole eligibility after serving a full thirty years in prison for the murder of Staiano.  (Appendix, Vol. 6 at 86-100.)  After a thorough review of the evidence presented in both the guilt and mitigation phases of LaMar's trial, the trial court adopted the jury's sentencing recommendations.  (Appendix, Vol. 6 at 144-60.)

## PROCEDURAL HISTORY

### Direct Appeal

On November 10, 1998, LaMar filed his brief in the Court of Appeals for Lawrence County, Ohio, advancing nineteen assignments of error.  (Appendix, Vol. 7 at 76-276.) None of his claims of error succeeded, and the court of appeals affirmed the trial court on August 13, 1998.  *State v. LaMar*, No. 95CA31, 1998 WL 514548 (Ohio App. 4th Dist. Aug. 13, 1998) (unreported).

Next, LaMar proceeded to the Ohio Supreme Court advancing twenty propositions

of law. (Appendix, Vol. 10 at 81-274.) The state supreme court rejected each of LaMar's claims and affirmed the court of appeals on May 15, 2002. *State v. LaMar*, 95 Ohio St. 3d 181, 767 N.E.2d 166, 2002-Ohio-2128 (2002). LaMar then requested that the Ohio Supreme Court reconsider its decision (Appendix, Vol. 12 at 259-67), but that request was summarily denied on July 3, 2002, *State v. LaMar*, 96 Ohio St. 3d 1441, 770 N.E.2d 1050, 2002-Ohio-3344 (2002) (table). LaMar's petition for a writ of certiorari was subsequently denied by the United States Supreme Court, which concluded his direct appeal. *LaMar v. Ohio*, 537 U.S. 1057 (2002) (mem.).

**Post-conviction**

At the same time he was pursuing his direct appeal, LaMar filed a petition for post-conviction relief in the Lawrence County Court of Common Pleas, consisting of twenty-three claims for relief. (Appendix, Vol. 13 at 46-90.) Nearly all of LaMar's post-conviction claims were dismissed by the trial court on the ground that they either were or could have been presented to the state courts on direct appeal, and that they were consequently barred by the doctrine of *res judicata* from being raised in LaMar's post-conviction proceedings. (Appendix, Vol. 14 at 280-92.) The remaining few claims were dismissed because they were either claims that were not properly raised in post-conviction proceedings, the challenged law was not in effect during LaMar's trial, or the claim was unsupported by

evidence outside the record as Ohio law requires. *Id.*

LaMar appealed the trial court's decision to the court of appeals, raising two assignments of error. (Appendix, Vol. 15 at 145-62.) The appellate court affirmed the trial court, *State v. LaMar*, No. 98 CA 23, 2000 WL 297413 (Ohio App. 4th Dist. Mar. 17, 2000) (unreported), and further appeal to the Ohio Supreme Court was not allowed, *State v. LaMar*, 89 Ohio St. 3d 1452, 731 N.E.2d 1140 (2000) (table). The Supreme Court of the United States also declined to accept LaMar's petition for a writ of certiorari. *LaMar v. Ohio*, 531 U.S. 1055 (2000) (mem.).


**Motions for New Trial**

LaMar filed numerous motions seeking leave to file a motion for a new trial in the state court. (Appendix, Vol. 6 at 104-8, filed on July 13, 1995; Vol. 6 at 117-20, filed August 16, 1995, and supplemented at *id.*, at 129-30 on August 21, 1995, and at *id.*, at 164-69 on September 1, 1995; Vol. 6 at 125-28, filed August 21, 1995; Vol. 18 at 15-17, filed December 6, 2000; and Vol. 18 at 89-92, filed January 7, 2002.) Although there are in the record three copies of the same entry denying one of LaMar's motions, the entry itself does not provide any indication of the motion to which it relates. (*See* Appendix, Vol. 6 at 269-71, filed October 25, 1995.) Since each of the other four motions were overruled by the court (Appendix, Vol. 6 at 272, overruling the August 16, 1995, motion and its supplements; Vol.

6 at 268, overruling the August 21, 1995, motion; Vol. 18 at 39, overruling the December 6, 2000, motion; and Vol. 18 at 155, overruling the January 7, 2002, motion) the Court assumes the July 13, 1995, motion was overruled by the three October 25, 1995, entries not linked to any specific motion.

The trial court held a hearing on the December 6, 2000, motion prior to denying it, and LaMar subsequently appealed to the state court of appeals, which affirmed the trial court. *State v. LaMar*, No. 01CA17, 2002 WL 31518186, 2002-Ohio-6130 (Ohio App. 4th Dist, May 8, 2002) (unreported). Further appeal to the Ohio Supreme Court was not allowed. *State v. LaMar*, 96 Ohio St. 3d 1513, 775 N.E.2d 856, 2002-Ohio-4950 (2002) (table).

**Application to Reopen Direct Appeal**

On November 19, 2003, LaMar filed an application to reopen his direct appeal in the state court of appeals pursuant to Ohio R. App. Proc. 26(B), claiming his appellate counsel provided ineffective assistance by failing to raise six assignments of error on direct appeal. (Appendix, Vol. 21 at 8-17.) The court of appeals found that LaMar had not demonstrated good cause for filing his application well beyond the 90-day period allowed by Ohio R. App. Proc. 26(B), and that LaMar's ignorance of the law and procedures involved in filing an application to reopen did not justify the late filing. (Appendix, Vol. 21 at 160-64.) LaMar took an appeal to the Ohio Supreme Court (Appendix, Vol. 22 at 17-40), but that

court affirmed the court of appeals for the reasons stated in the appellate court's opinion (Appendix, Vol. 22 at 269). LaMar's subsequent motion for reconsideration, (Appendix, Vol. 22 at 270-79), was summarily denied, *State v. LaMar*, 103 Ohio St. 3d 1466, 815 N.E.2d 680, 2004-Ohio-5056 (2004) (table).

**Federal Habeas Corpus**

LaMar filed his verified Petition for a writ of habeas corpus on November 2, 2004. (Doc. No. 31.) Respondent filed a return of writ on November 12, 2004, (Doc. No. 32), and LaMar filed his Traverse on April 15, 2005, (Doc. No. 43). The matter is now ripe for decision.

## ANALYSIS

Since LaMar filed his Petition for a writ of habeas corpus well after the effective date of the Anti-terrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, the amendments to 28 U.S.C. § 2254 embodied in that Act are applicable to his Petition. (*See* Petition, Doc. No. 31.) The Sixth Circuit has summarized the standard of review under the AEDPA as follows:

> Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) . . . , a federal court
>
> may not grant a writ of habeas to a petitioner in state

custody with respect to any claim adjudicated on the merits in state court unless (1) the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" . . . or (2) the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

*Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir.2002) (quoting 28 U.S.C. § 2254(d)).

This standard requires the federal courts to give considerable deference to state-court decisions. *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir.1998) ("[the AEDPA] tells federal courts: Hands off, unless the judgment in place is based on an error grave enough to be called unreasonable.") (citation and quotation marks omitted).

The first line of analysis under [the] AEDPA involves the consistency of the state-court decision with existing federal law. A state-court decision is considered "contrary to . . . clearly established Federal law" if it is "diametrically different, opposite in character or nature, or mutually opposed." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (emphasis and quotation marks omitted). Alternatively, to be found an "unreasonable application of . . . clearly established Federal law," the state-court decision must be "objectively unreasonable" and not simply erroneous or incorrect. *Id*. at 409-11.

The second line of analysis under [the] AEDPA concerns findings of fact made by the state courts. [The] AEDPA requires federal courts to accord a high degree of deference to such factual determinations. "A federal court is to apply a presumption of correctness to state court findings of fact for habeas corpus purposes unless clear and convincing evidence is offered to rebut this presumption. The [federal] court gives

> complete deference to the . . . state court's findings of fact
> supported by the evidence."  *McAdoo v. Elo*, 365 F.3d 487,
> 493-94 (6th Cir.2004) (citations omitted).

*Nields v. Bradshaw*, 482 F.3d 442, 449 (6th Cir. 2007)(parallel citations omitted).  It is with these principles in mind that this Court considers the merits of LaMar's grounds for relief.

**First Ground for Relief**

In his first ground for relief, LaMar contends the prosecution improperly withheld evidence favorable to him in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Kyles v. Whitley*, 514 U.S. 419 (1995).  (Petition, Doc. No. 31 at 54-70.)  Respondent acknowledges that the claim was adjudicated on the merits in the state courts, but argues it is nevertheless meritless.  (Return of Writ, Doc. No. 32 at 43-44.[2])  In his Traverse, LaMar repeats the contentions he set forth in his Petition basically word for word, then argues that the trial court and prosecutor played "hide-the-ball" with the undisclosed evidence in violation of *Brady*, *Kyles*, and *Banks v. Dretke*, 540 U.S. 668 (2004).  (Traverse, Doc. No. 43 at 38.)  In addition, LaMar claims the state court's decision was contrary to *Kyles* because the court failed to cumulate the alleged *Brady* violations.  *Id.*

The Sixth Circuit Court of Appeals has summarized the law governing *Brady* claims as follows:

---

[2]Respondent's Return of Writ addresses LaMar's claims in a summary or outline form, an approach that is singularly unhelpful to the Court, strongly discouraged, and in fact will be rejected, in the future.

Under *Brady v. Maryland*, the government has a constitutional obligation to furnish a criminal defendant with any exculpatory evidence related to the defendant's guilt or possible punishment. 373 U.S. at 87. "[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. Thus, in order to comply with *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)) (internal quotation marks omitted).

The prosecutor's duty to disclose under *Brady* encompasses impeachment evidence as well as exculpatory evidence. *Id*. at 280 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)); *Hawkins v. Coyle*, 547 F.3d 540, 556 (6th Cir. 2008). "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

"A successful *Brady* claim requires a three-part showing: (1) that the evidence in question be favorable; (2) that the state suppressed the relevant evidence, either purposefully or inadvertently; (3) and that the state's actions resulted in prejudice." *Bell v. Bell*, 512 F.3d 223, 231 (6th Cir. 2008). . . .

Evidence is deemed material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682; *accord Johnson v. Bell*, 525 F.3d 466, 475 (6th Cir. 2008) (citing *Strickler*, 527 U.S. at 289-90. As the Supreme Court has further explained:

-18-

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

> *Kyles*, 514 U.S. at 434. Therefore, "favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Cone v. Bell*, 129 S.Ct. 1769, 1783 (2009) (quoting *Kyles*, 514 U.S. at 435).

*Robinson v. Mills*, 592 F.3d 730, 735 (2010).

The factual foundation for LaMar's claim was most concisely set forth in the state court of appeals' opinion on direct appeal as follows:

> LaMar received approximately seventy summaries of information provided by inmates to investigators when the trial court read the information at a March 6, 1995 hearing. The trial court identified the inmates who provided the information for eight of the approximately seventy summaries. The state did not identify the specific sources of the remaining individual summaries but did deliver a list of forty-three inmates who could have provided the remaining information. . . .

> LaMar also focuses on certain summaries or transcripts of inmate statements that he did not discover until after trial. These inmates implicate other individuals in the killings, but no inmate exculpates LaMar or denies LaMar's involvement. LaMar also claims that information provided to the state by Daniel Davidson suggests that LaMar did not cause the death of Depina and Vitale.

-19-

*State v. LaMar*, No. 95CA31, 1998 WL 514548 at *8-9 (Ohio App. 4th Dist. Aug. 13, 1998)(unreported). That court rejected LaMar's assignment of error, concluding that the information contained in the various summaries, statements, and transcripts of interviews was not material and consequently was not required to be disclosed. *Id*. In addition, the possibility of additional witnesses testifying in accordance with the witnesses LaMar presented at his trial rendered their testimony merely cumulative and did not undermine confidence in the outcome of the trial. *Id*.

The state supreme court agreed as follows:

> Assuming *arguendo* that the prosecution "suppressed" the evidence LaMar complains of within the meaning of *Brady*, we find no due process violation. On the record before us, we find no reasonable probability of a different trial outcome had the defense received the full statements [in lieu of the summaries disclosed at the March 6, 1995, hearing]. Many of the statements identified LaMar as a participant in the murders. And statements identifying other inmates as participants did not exculpate LaMar because each victim had been attacked by multiple assailants. . . . Finally, with respect to murders in cellblock L-6, none of the statements assisted LaMar's alibi defense (i.e., that LaMar was in the recreation yard at the time of the killings). In short, nothing in the contents of the statements "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.
>
> As a separate *Brady* claim, LaMar argues that the trial court should have found a *Brady* violation and granted his motion for a new trial after defense counsel discovered that the prosecution had provided incomplete inmate statements . . . . [H]owever, the statements were not material to LaMar's case

within the meaning of *Brady*. We therefore reject this argument.

In his final *Brady* claim LaMar claims that he should have received a new trial in light of the evidence the defense discovered after trial. . . .

We reject this *Brady* claim for reasons similar to the ones we stated above. While . . . [the] statements identified other inmates, none of them exonerated LaMar. At best, . . . [the] statements established that there were several persons who joined in beating the L-6 victims to death. The state's theory all along was that LaMar was one of many assailants who participated in murdering the victims in L-6. Therefore, the existence of this evidence does not undermine our confidence in the trial outcome.

*State v. LaMar*, 95 Ohio St. 3d 181, 187-89, 767 N.E.2d 166, 2002-Ohio-2128 at ¶¶ 28-31 (2002) (footnote and parallel citations omitted).

Parenthetically, with respect to the summarized inmate statements read into the record at the March 6 hearing, the state supreme court acknowledged that "[b]ecause the defense knew before trial of the contents of inmate statements and the names of the inmates who gave them, there is arguably no *Brady* violation as a matter of law." *Id*. at 187 n. 2. It has long been recognized that "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one," *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977), and that as such, "the Constitution does not require the prosecutor to share all useful information with the defendant," *United States v. Ruiz*, 536 U.S. 622, 629 (2002), *citing Weatherford*, 429 U.S. at 559. Also, the state must actually suppress evidence in its

-21-

possession for a *Brady* violation to occur.  *Elmore v. Foltz*, 768 F.2d 773, 777 (6th Cir. 1985).

The Sixth Circuit Court of Appeals has observed, that "'*Brady* generally does not apply to

delayed disclosure of exculpatory information, but only to complete failure to disclose,'"

noting also, however, that delay violates *Brady* only "'when the delay itself causes

prejudice.'"  *O'Hara v. Brigano*, 499 F.3d 492, 502 (6th Cir. 2007), *quoting United States v.*

*Bencs*, 28 F.3d 555, 560 (6th Cir. 1994), and *United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir.

1992), *judgment vacated and remanded on other grounds by Mohwish v. United States*, 507 U.S.

956 (1993).

The summaries were read in open court on March 6, 1995, and at that time, LaMar's

trial was scheduled to begin three weeks later.  After the March 6 hearing, however, the

trial court granted a continuance, setting June 12, 1995, as the trial date, and providing

LaMar with a little more than two additional weeks to prepare for trial in view of the

evidence brought to light at the March 6 hearing.  Not coincidentally, the length of the

continuance coincides precisely with defense counsel's request during the March 6 hearing

where counsel stated, "Your Honor, the Court does not have to grant us a long

continuance. . . . maybe an extra week, an extra two weeks, an extra three weeks . . . ."

(Trial Tr., Vol. 6, Tr. of March 6, 1995, Hrg. at 48.)  Thus, the trial court relied on defense

counsel's representation that one, two, or three weeks would be a sufficient length of time

within which to pursue any exculpatory evidence revealed in the summarized statements.

Later in the hearing, defense counsel expressed satisfaction with the trial court's resolution of the matter which included an order for the prosecution to transmit to the defense a list of inmates who made the summarized statements read during the hearing, some of whom were in protective custody for their own safety.[3] *Id*. at 56. Thus, at least as far as the summarized statements from the March 6 hearing are concerned, LaMar's claim boils down to an argument that the prosecutor was bound by *Brady* to match the inmates to their statements. In light of the trial court's granting the defense's request for a continuance, providing funds for another investigator, and its willingness to appoint "as many investigators as you need" (Trial Tr., Vol. 6, Tr. of March 6, 1995, Hrg. at 49), it is difficult to imagine how LaMar might demonstrate prejudice from the prosecutor's failure to match particular inmates to specific statements, and indeed he has not done so. LaMar makes basically a futility argument in his post-evidentiary hearing brief respecting his ability to have appointed additional investigators on the ground that the prosecution indicated it would oppose additional investigators at the time it disclosed the list of inmates names. (Petitioner's Post-Evid. Hrg. Brief, Doc. 170 at 36; Evid. Hrg. Ex. 28 at 1.) The trial court, however, had expressed its intention to grant any defense request for additional

---

[3]LaMar acknowledges that the prosecutor provided the list of names the next day, stating that it is attached as an exhibit to his motion for a new trial, but provides no reference to the record *in this case*. (Petition, Doc. No. 31 at 57.)

Also, LaMar presents a bare-bones claim in his nineteenth ground for relief, addressed below, that his trial counsel provided ineffective assistance in not pursuing the alleged *Brady* issue more vigorously. (Petition, Doc. No. 31 at 151.)

investigators, as noted above.  Defense counsel was provided with all the time and funds they requested to interview the inmates on the list provided by the prosecutor and follow up on the summarized statements prior to trial.

Additionally, the state court concluded that even assuming *Brady* was applicable and the prosecution suppressed evidence, no due process violation occurred because there was no reasonable probability that the outcome of the trial would have been different had LaMar received the statements in question.  *LaMar*, 95 Ohio St. 3d at 187-88, ¶¶ 28-31. Instead, it found that many of the statements inculpated LaMar and others failed to eliminate LaMar as one of the inmates participating in the murders.  *Id*. at ¶ 28. None supported LaMar's defense theory that he was in the recreation yard when the murders took place.  *Id*.  After thorough review of the evidence LaMar presented in the state court when he moved for a new trial because of the alleged *Brady* issues, this Court does not find the state court's decision contrary to or an unreasonable application of federal law as revealed by the holdings of the United States Supreme Court.

As observed above, defense counsel had resources at their disposal with which to pursue interviewing the inmates on the prosecutor's list of names and summaries of those inmates' statements the defense characterizes as exculpatory.  Whether defense counsel pursued those leads or not is irrelevant to the *Brady* analysis:  they could have, and if they did not it may raise a question of their effectiveness (a matter addressed in LaMar's

-24-

nineteenth ground for relief), but it does not implicate *Brady*.  If the information was available to the defense from another source, then the prosecutor's withholding of the information, if indeed it was withheld at all, is not a violation of the law articulated in *Brady*.  "There is no *Brady* violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source."  *Owens v. Guida*, 549 F.3d 399, 415 (6th Cir. 2008), *quoting Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998)(internal quotations omitted).  In addition, that the prosecutor matched the inmates' names with their summarized statements in other cases, as LaMar alleges, does not transform the nature of the statements into exculpatory evidence. (*See* Appendix, Vol. 6 at 122-24, LaMar's Motion for a New Trial Under *Brady v. Maryland*, Exhibit B; and Vol. 6 at 131-132, LaMar's Supplement to Motion for a New Trial Under *Brady v. Maryland*, attachment.)

As for the alleged *Brady* material discovered after LaMar's trial, LaMar contended in the state court that the investigation reports from police interviews of inmate Willie Kastner, and the transcripts of interviews with inmates David Hackett, Tyrone Golphin, Gerald Kelly, William Turner, and Daniel Davidson constitute material exculpatory evidence that should have been disclosed to him prior to trial.  (Appendix, Vol. 6 at 164-259.)  As noted above, the state supreme court found that none of those statements exonerated LaMar in the murder of Vitale, Depina, Staiano, and Svette.  *LaMar*, 95 Ohio St.

3d at 188-89, ¶¶ 30-31.

This Court observes that the names of Willie Kastner, David Hackett, Tyrone Golphin, Gerald Kelly, William Turner, and Daniel Davidson all appear on the list of names associated with the summarized statements read into the record at the March 6 hearing.  (Appendix, Vol. 6 at 121.)  That list of names was provided to the defense on March 7, several weeks prior to LaMar's trial, giving LaMar ample opportunity to interview those individuals.  Since the information LaMar contends was withheld by the prosecutors was available to him from another source, to wit, taking the trial court up on its stated intent to provide all the investigators the defense desired to interview the forty-three individuals named on the list, no *Brady* violation occurred.

Even if that were not the case, however, the statements contain little that would have been non-cumulative and favorable to LaMar's defense.  All that can be said of inmate Kastner's remarks as reported on the investigative summaries, is that he implicated someone other than LaMar in Vitale's murder.  (Appendix, Vol. 6 at 171-80.)  Implicating one person, however, is not the same as exonerating another in all cases, and especially not in a case such as this because it is known that each victim had several attackers.  Inmate Hackett stated that he had seen a group of inmates attacking other inmates and dragging their bodies out of L-6.  *Id*. at 184-88.  Although he identified inmates named "A.J.," "Zeus," and "Frog" as participants, *id*. at 190, 196, that information is not exculpatory of LaMar for

the same reason Kastner's statements were not exculpatory. Tyronne Golphin stated that he heard Svette was killed because he wouldn't come out of his cell, but did not claim to have seen the attack and did not name any of Svette's attackers. *Id*. at 201. Golphin also identified Edward Julious as one of Vitale's several attackers. *Id*. at 212-13. Nothing in his statement exonerates LaMar, however. Gerald Kelly provided information about Depina's and Staiano's whereabouts prior to their being taken into L-6 by other inmates, but had no information about their murders. (Appendix, Vol. 6 at 216-20.) William Turner denied seeing anyone attacking an inmate, but he speculated that Vitale's alleged former lover was probably the person who killed Vitale. *Id*. at 233-36. Finally, inmate Daniel Davidson stated he saw inmate Freddie Frakes near the gym, beating two inmates with a baseball bat, one unidentified inmate, and the other being Depina. *Id*. at 239-44. With no stronger evidence than appears in the record, this Court is not convinced that the state supreme court's conclusion that no material exculpatory evidence was withheld by the prosecution was either contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.

In his post-evidentiary hearing brief, LaMar contends that the statements of inmates Daniel Belcher, Samuel Batson, Rubin Brazzell, Michael Trocadero, Michael Jones, Jeffrey Simmons, and James Edinbaugh were also withheld from LaMar in violation of *Brady*. (Post-Evidentiary Hrg. Brief, Doc. No. 170 at 30-35.) Each of those names also appears on

the list of inmates whose summarized statements were read in court prior to LaMar's trial. (Appendix, Vol. 6 at 121.) Thus, what was true of David Hackett, Tyrone Golphin, Gerald Kelly, William Turner, and Daniel Davidson, *supra*, is also true of Daniel Belcher, Samuel Batson, Rubin Brazzell, Michael Trocadero, Michael Jones, Jeffrey Simmons, and James Edinbaugh. With the trial court's offer to provide LaMar with "as many investigators as you need" (Trial Tr., Vol. 6, Tr. of March 6, 1995, Hrg. at 49), and the list of inmates as well as the substance of their allegedly exonerative summarized statements, LaMar had an opportunity to make use of the information he claims the prosecutors withheld. That he chose not to does not reflect on the prosecutor's conduct.

Contrary to LaMar's argument in his post-evidentiary hearing brief, the information contained in the statements at issue (those of inmates Belcher, Batson, Brazzell, Trocadero, Jones, Simmons, and Edinbaugh) provide no basis for granting his Petition for a writ of habeas corpus on *Brady* grounds. Belcher, for instance, first stated that he did not see any inmates being assaulted (Evid. Hrg. Ex. 14 at 12[4]), then that he saw an inmate drop a weight on Svette's head when Svette was outside of his cell, *id*. at 13, that the inmate had his face covered and Belcher did not know who he was, *id*. at 14, and finally, after being shown photographs of a number of inmates, that inmate John Powers was the one who attacked Svette with the weight, *id*. at 15. Belcher stated that Svette retreated to his cell after Powers'

---

[4]The exhibit is not page numbered, but Belcher's comment appears at the twelfth page of the document. The same is true for all the transcripts of statements submitted as exhibits during the evidentiary hearing.

attack (Evid. Hrg. Ex. 14 at 14). The information provided by Belcher corroborates the testimony offered at trial of inmate Anthony Walker. Walker testified that Svette had already been beaten by someone else when LaMar beat Svette in the head with a bat. (Trial Tr. at 2279.) Thus, that Svette had been attacked by someone prior to being beaten by LaMar was in the record at trial.

The transcript of inmate Batson's interview is nearly impossible to mine for useful information. Batson does not name many inmates in his description of what he saw during the riot, and when he does, he does not provide the name of the victim. (Evid. Hrg. Ex. 16.) In an unidentified officer's summary of interviews with Batson, however, the officer indicates that Batson identified inmates Douglas, Outlaw, Matthews, and Robinson as being involved in the murders of Albert Staiano and Darrell Depina. (Evid. Hrg. Ex. 15.) As for the Staiano murder, the prosecution's theory all along was that LaMar ordered Staiano's murder, not that he had actually wielded the weapon that was used to kill him. (Testimony of Anthony Walker, Trial Tr. at 2273-75, 2331; Testimony of Thomas Taylor, Trial Tr. at 2403-9, 2485-99, 2579-80; Testimony of Louis Jones, Trial Tr. at 2737-40.) In fact, Thomas Taylor admitted to killing Staiano, was charged with his murder, ultimately pled guilty to involuntary manslaughter, was convicted, and sentenced to ten to twenty-five years in prison for Staiano's murder. (Trial Tr. at 2408-9.) And with respect to Depina's murder, testimony was presented at trial that confirmed that LaMar was accompanied by

about four other men when Depina was beaten to death, and that LaMar was not the only one attacking Depina.  (Trial Tr. at 2475-78.)  Ample evidence was presented at trial that indicated LaMar did not commit any murder alone, and that he was accompanied by anywhere between four and eight or more other inmates who participated in the murders. (Trial Tr. at 2166, 2257, 2262, 2265, 2268, 2323, 2376, 2400, 2464, 2471, 2477, 2716.)  Thus, Batson's statement identifying four inmates who participated in the Staiano and Depina murders sheds no new light on LaMar's involvement, and is not necessarily favorable or exculpatory evidence.

In his statement, Ruben Brazzelle stated that he saw his cellmate, Flannigan, and another inmate, Barnes, attack Svette, and that Barnes delivered a "death blow" to Svette right in front of Svette's cell in L-6.  (Evid. Hrg. Ex. 18 at 2-3.)  Evidence presented at trial indicated that Svette was still alive when he was carried out of L-6 and that Freddie Frakes delivered the final blows to his head.  (Trial Tr. at 2176-78, 2206-14, 2287.)  In addition, nothing in Brazzelle's statement contradicts the evidence presented at trial that LaMar was the instigator of Svette's murder and the leader of the group that attacked him.  (Trial Tr. at 2165, 2265-79, 2376, 2401, 2475, 2480, 2607, 2704, 2711, 2718-43.)  Brazzelle's statement does not call into question the reliability of the verdicts in LaMar's case.

The summaries of statements inmate Michael Trocadero made to officers indicated that Trocadero stated Robert Goodgame was involved in the murder of Albert Staiano, that

among the inmates who formed a group to murder the inmates in L-6 were Charles

Outlaw, Emanuel Newell, Anthony Copeland, Albert Young, and James Robinson, that

Lavelle Pasco and Terry Page were part of a group of inmates who attacked William Svette,

and that Timothy Williams was in a position to see the group who murdered Albert

Staiano. (Evid. Hrg. Ex. 19.) In the transcript of his recorded statement, Trocadero

described what he saw in L-6 when the murders of Staiano, Depina, and Svette took place.

(Evid. Hrg. Ex. 20 at 7-15.) Trocadero stated that he did not see LaMar kill, but there were

so many inmates moving around at that time that he could only name the inmates he

actually knew, and he did not know LaMar. *Id*. at 9. LaMar was part of the group around

the inmates who were murdered, but Trocadero said he did not know what part LaMar

played in the killings. *Id*. Trocadero estimated that there were approximately twelve men

involved in the killings he saw, and another fifteen following the group from killing to

killing but not participating in the murders. *Id*. He repeated that he could not say whether

LaMar was directly involved in the murders. *Id*. at 10. Trocadero identified LaMar,

Charles Outlaw, James Robinson, Pasco, Robert Goodgame or inmate Lavelle (he was not

sure which), inmate Grinnell, and an inmate he knew only by the name of "Wolfdog" as

some of the inmates making up the group doing the killing. *Id*. at 9-14. The information

in Trocadero's statement is neither favorable nor unfavorable to LaMar since Trocadero

identified LaMar as being part of the group that murdered Staiano, Depina, and Svette, but

he also said he could not say what part LaMar played in the killings. Once again, that Trocadero identified inmates other that LaMar as being involved in the murders does not lessen his culpability since by all accounts none of the murders were committed by a single inmate.

Michael Jones stated he was an eyewitness to Svette's murder by Freddie Frakes on the ramp in the L-corridor where Svette's body was placed after he was severely beaten in or near his cell and thought dead. (Evid. Hrg. Ex. 21.) That same evidence, however, was presented at trial through another witness' testimony. (Testimony of Robert Bass, Trial Tr. at 2177.) Evidence at trial also established that LaMar had already beaten Svette in the head with a bat prior to Frakes' attack, and that Svette's head was split open after LaMar's attack. (Trial Tr. at 2279-85.) In addition, Svette's breathing was labored after LaMar and his group left the area of Svette's cell. *Id*. at 2287. Testimony at trial also showed that Eric Girdy hit Svette in the head with a bat twice after LaMar's attack and before Frakes' blows. *Id*. at 2289. Since the evidence LaMar claims is *Brady* material was presented at trial, albeit through a witness other than Jones, the information in Jones' statement would have been merely cumulative to that already before the jury. As such, the likelihood that Jones' statement would have had any impact at all on the verdicts in LaMar's case is extremely low.

Inmate Jeffrey Simmons' statement was summarized by officers as well. Simmons

indicated that he saw inmates Terry Neal, Louis Jones, Timothy Williams, and Greg Beauchamp participate in the murders of Vitale, Depina, and Staiano. (Evid. Hrg. Ex. 25.) He also reported that an inmate by the last name of Nelson was involved in Depina's and Staiano's murders as well. *Id*. Simmons identified Freddie Frakes, Louis Jones, Timothy Williams, and Greg Beauchamp as Svette's killers. *Id*. As with other inmates' reports of individuals other than LaMar participating in the murders of those four inmates, evidence that LaMar did not commit the murders alone is neither favorable nor exculpatory. More to the point, however, is the fact that defense counsel were in possession of Simmons' statements prior to trial, had visited Simmons in prison, had become aware that Simmons had "some mental illness issues," and had information that Simmons was on psychotropic drugs. (Evid. Hrg. Tr. at 346, 358-61; Deposition of Herman Carson, Exhibit A, Discovery Packet B at 10.) Defense counsel were also aware that Simmons had inculpated LaMar in Svette's, Vitale's, and Depina's murders. (Deposition of Herman Carson, Exhibit A, Discovery Packet B at 13.) Consequently, defense counsel determined it would be risky to call Simmons as a witness. *Id*. at 361.

Inmate James Edinbaugh also spoke with the investigating authority following the riot. He described how Depina and Vitale were taken from the L-block corridor to L-6 soon after the inmates took control of the L-block. (Evid. Hrg. Ex. 32 at 1-6.) Edinbaugh stated that the inmates who were killed in L-6 were all killed by roaming groups of eight

-33-

individuals.  *Id*. at 2.  Some of the inmates populating those roaming groups were "little Mack" Matthews, Blackmon, Curry, "Chilly Will" Nelson, Freddie Frakes, and O'Neil.  *Id*. at 3-4.  According to Edinbaugh, O'Neil manned the control panel while the rest of the inmates went from cell to cell killing Svette, Vitale, Depina, then Staiano.  *Id*. at 14-25.  After the killings, Blackmon was walking up and down the hallway with the other participants in the murders following him.  *Id*. at 32.  Edinbaugh never mentioned LaMar in his statement.  This evidence that there were individuals other than LaMar involved in the murders of Svette, Vitale, Depina, and Staiano is not material to LaMar's guilt since none of the murders for which LaMar was convicted was perpetrated by a single individual.  As has been noted above, evidence of different inmates' involvement in the murders is neither favorable or unfavorable to LaMar.  Consequently, nothing in Edinbaugh's statement undermines confidence in the verdicts returned in LaMar's case.

In his post-evidentiary hearing brief, LaMar includes in his argument a claim that inmate/prosecution witness Anthony Walker was provided special privileges in exchange for his testimony against LaMar at trial.  (Doc. No. 170 at 66-67.)  In support, he cites Walker's February 3, 2006, deposition.  *Id*. *citing* Anthony Walker Deposition, Doc. No. 98.  LaMar's first ground for relief in his Petition, however, does not make any mention of Walker or any other inmate receiving special treatment in exchange for testimony.  (Petition, Doc. No. 31 at 54-70.)  According to the Rules Governing Habeas Corpus Cases

under 28 U.S.C. § 2254, Rule 2(c)(1), a claim in habeas corpus must be raised in the Petition, and may not be raised in the first instance in a post-evidentiary hearing brief. Accordingly, LaMar's argument is not one this Court may consider. Even if that were not the case, however, LaMar's claim is based on thin evidence. While it is true that Walker stated he was provided all the cigarettes he wanted when he was in the Oakwood correctional facility awaiting LaMar's trial, he also repeatedly states that he was promised nothing prior to his testimony (Walker Deposition, Doc. No. 98 at 33, 55); that his agreement, signed after LaMar's trial, stated that he would never be sent back to Lucasville and that he would not serve time in a maximum security facility, *id*. at 51-52; that he was not coerced into testifying, *id*. at 53; and that he believed whatever recommendations the state made on his behalf amounted to nothing, and in fact did more harm than good, *id*. at 57-59, 66. In addition, Walker maintained that he had testified truthfully at LaMar's trial. *Id*. at 42, 65.

LaMar also makes the following inartful argument in his post-evidentiary hearing brief:

> During the [evidentiary hearing], [prosecutor] Mr. Piepmeier was also asked if they investigated the mental health background of any of the inmates, he said no. (EH, p. 141[.]) This was in spite of the fact that they had concerns about some of the inmates and if they were lucid. (EH, p. 142[.]) When asked if he was aware a witness heard voices, would that be *Brady* evidence, he said it would depend on what it had to do with. (Id.) [Prosecutor] Mr. Tieger indicated he did not recall

> doing any mental health background check. (EH, p. 170[.])
> [Prosecutor] Mr. Anderson did not do any checks and did not
> think the information would be exculpatory, no impeachment.
> (EH. p[p]. 205-206[.]) He based his assessment of if the witness
> had any mental health problems by his witness interview, in
> spit eof [sic] the fact he was not trained in those issues. (EH,
> pp. 206-207[.])

(Doc. No. 170 at 39.) A claim in habeas corpus can only be presented in the petition,

Habeas Rule 2(c)(1), and LaMar failed to do so in his Petition. In addition, the ersatz claim

fails to state a claim that is cognizable in habeas corpus since it does not identify any

inmate or witness whose mental health should have been a concern of the prosecutors, and

makes no reference to any part of the record that might support even the most generous

interpretation of the convoluted allegations excerpted above. Nor has LaMar identified any

United States Supreme Court case in which the Court has held that a prosecutor is under

a duty to perform mental health background checks on prospective witnesses as a matter

of course. There is a reason for that, however, and that is because no such case exists.

LaMar has argued that material exculpatory evidence was withheld by the

prosecution in violation of *Brady v. Maryland*. This Court has reviewed the alleged *Brady*

material, considered each statement individually and cumulatively, and agrees with the

state supreme court that "nothing in the contents of the statements 'could reasonably be

taken to put the whole case in such a different light as to undermine confidence in the

verdict.' *Kyles*, 514 U.S. at 435." No matter how many other individuals were involved in

the murders that took place in L-6 and in the cell that LaMar shared with nine other inmates in the K block, the evidence of LaMar's guilt produced at trial was overwhelming. Thus, statements that inmate A saw inmates B and C participating did not exculpate LaMar. The state court's conclusion to that effect is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Accordingly, LaMar's first ground for relief should be denied.

**Second Ground for Relief**

In his second ground for relief, LaMar contends the trial judge's conduct at the March 6, 1995, pretrial hearing evidenced a bias against LaMar, and that his trial was consequently contrary to due process. (Petition, Doc. No. 31 at 70-73.) Respondent argues that since LaMar never raised the claim on direct appeal in the state courts, it is procedurally defaulted. (Return of Writ, Doc. No. 32 at 45.) In his Traverse, LaMar claims the Ohio Supreme Court addressed the merits of the claim, thereby absolving him of procedurally defaulting the claim in the court of appeals. (Traverse, Doc. No. 43 at 42-43.)

The Ohio Supreme Court held as follows:

> We first note that LaMar did not raise the issue of judicial bias in his appeal to the court of appeals. He has therefore forfeited this claim. Moreover, LaMar failed to avail himself of the procedures described in R.C. 2701.03, which allows a party to file an affidavit of bias and prejudice with this court seeking disqualification of a biased judge.

> Even if LaMar had raised this issue before the court of appeals, we would find no merit to his contention.  LaMar relies on a general characterization of unfairness and bias by the trial court during the March 6, 1995 pretrial hearing to support his claim, without referring to any specific evidence of bias.  But viewing the transcript as a whole, and taking all of the judge's comments in their proper context, we see nothing to suggest that the trial court harbored a hostile feeling of ill will toward either LaMar or his attorneys during the course of the trial.

*LaMar*, 95 Ohio St. 3d at 189-90, ¶¶ 35-36.

The Ohio Supreme Court's language unequivocally indicates that it rejected LaMar's claim of judicial bias on *res judicata* grounds.  In Ohio, that procedural rule bars the further litigation in a criminal case of issues which were raised previously or could have been raised previously in an appeal.  *State v. Perry*, 10 Ohio St. 2d 175, 226 N.E.2d 104 (1967) paragraph nine of the syllabus.  Thus, because LaMar could have raised his judicial bias claim on direct appeal in the state court of appeals or by seeking recusal of the judge by application to the Chief Justice and did not, the claim was forfeited before LaMar proceeded to the Ohio Supreme Court.  That court acknowledged the forfeiture  and rejected the claim on that basis.  Worded in the subjunctive mood as it is, the state supreme court's brief evaluation of the merits of LaMar's claim does not lessen or destroy the court's reliance on the state procedural rule.  *See McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991).  Consequently, the first two prongs of *Maupin*, that there exists a state procedural rule applicable to LaMar's claim, that he failed to comply with the rule, and that the state

actually enforced the procedural rule, have been met.  *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

The third *Maupin* prong requires that the state procedural rule be an independent and adequate state ground upon which the state court may rest its decision.  *Id*.  The Sixth Circuit Court of Appeals has found Ohio's doctrine of *res judicata* to be just such a rule. *Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002); *Coleman v. Mitchell*, 268 F.3d 417, 427-29 (6th Cir. 2001).  Thus, LaMar must show that there was cause for his default and prejudice therefrom.  As noted above, however, LaMar does not address his procedural default of his claim except to argue that it was adjudicated on its merits, which it was not. Consequently, his claim of judicial bias is procedurally defaulted and he has demonstrated no cause and prejudice to excuse the default.

Even if the claim had been preserved for habeas review, however, it would fail. Rather than demonstrating bias on the trial judge's part, the transcript of the March 6, 1995, pretrial hearing reflects the trial court's firm desire to provide LaMar with ample resources and a fair trial.

Because LaMar failed to raise his judicial bias claim in the state court of appeals, and also because the Ohio Supreme Court relied on an independent and adequate state procedural rule in rejecting it, LaMar has procedurally defaulted his claim.  Having failed to demonstrate cause and prejudice for the default, it is not excused, and his second ground

for relief should consequently be denied.


**Third Ground for Relief**

In his third ground for relief, LaMar contends that he was the only inmate capitally charged for killing inmates whereas the other individuals charged with capital offenses arising out of the riot were all involved in the murder of Robert Vallandingham, a correctional officer at the prison.  (Petition, Doc. No. 31 at 73-80.)  LaMar claims he was singled out for more vigorous prosecution because he is African-American.  *Id*. at 73. Respondent acknowledges the claim is preserved for habeas review, but argues that since LaMar was the one-and-only leader of the "death squad" that killed several inmates, there were no similarly situated defendants, a requirement for a successful claim of selective prosecution.  (Return of Writ, Doc. No. 32 at 42-43.)  LaMar counters that he was unable to meet his burden in the state courts only because he was denied the opportunity to obtain the information needed to prove his claim.  (Traverse, Doc. No. 43 at 50-51.)

In disposing of LaMar's claim on its merits, the Ohio Supreme Court determined that he was not "'similarly situated' with other inmates charged with noncapital offenses." *LaMar*, 95 Ohio St. 3d at 192-93, ¶ 45.  In addition, the state court found LaMar's contention that he was singled out because of his race to be unsupported, and observed that it had recently affirmed the convictions of a white inmate who received the death penalty for

aggravated murders committed during the riot. *Id*. at 193, ¶ 46, *citing State v. Robb*, 88 Ohio St. 3d 59, 723 N.E.2d 1019 (2000).

The United States Supreme Court has described a prosecutor's discretion in charging decisions as follows:

> In our criminal justice system, the Government retains "broad discretion" as to whom to prosecute. *United States v. Goodwin*, 457 U.S. 368, 380, n.11 (1982); *accord, Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248 (1980). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.
>
> . . .
>
> As we have noted . . ., however, although prosecutorial discretion is broad, it is not "'unfettered.' Selectivity in the enforcement of criminal laws is . . . subject to constitutional constraints." *United States v. Batchelder*, 442 U.S. 114, 125 (1979) (footnote omitted). In particular, the decision to prosecute may not be "'deliberately based upon an unjustifiable standard such as race . . . or other arbitrary classification,"' *Bordenkircher v. Hayes*, 434 U.S. . . . [at] 364, *quoting Oyler v. Boles*, 368 U.S. 448, 456 (1962) . . . .
>
> It is appropriate to judge selective prosecution claims

> according to ordinary equal protection standards.  *See Oyler v.*
> *Boyles, supra.*

*Wayte v. United States*, 470 U.S. 598, 607-8 (1985) (parallel citations omitted).  Thus, to succeed on his selective prosecution claim, LaMar must show that the prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose.  *Id*. at 608.  To establish a discriminatory effect where selective prosecution based on race is alleged, the claimant must show that similarly situated individuals of a different race were not prosecuted.  *United States v. Armstrong*, 517 U.S. 456, 465 (1996); *Cornwell v. Bradshaw*, 559 F.3d 398, 411 (2009).

In his Petition, LaMar decried the state courts' refusal to allow him to obtain the information he needed to prove his claim of selective prosecution.  (Doc. No. 43 at 50-51.) He expressed his intention to conduct discovery to gather support for his claim, requested the same, and was permitted to depose the Lucasville Special Prosecutor Mark Piepmeier and trial prosecutors Seth Tieger and William Anderson in relation to his claim of selective prosecution.  (Motion to Conduct Discovery, Doc. No. 44 at 13; Decision and Order Granting in Part and Denying in Part Petitioner's Motion to Conduct Discovery, Doc. No. 51 at 7.)  Neither Piepmeier nor Anderson was asked a single question about how the decision was made to charge LaMar capitally or why he was so charged compared to others LaMar contends were "similarly situated."  (*See* Deposition of Mark Piepmeier, Doc. No. 117; Deposition of William Anderson, Doc. No. 118.)  As for Tieger, whether he was

deposed or not is unknown, but in any case no deposition for him was ever filed. In addition, although all three attorneys were called to testify at the evidentiary hearing in these proceedings, LaMar did not seek to present evidence concerning his selective prosecution claim from those or any other witnesses. (*See* Motion for Evidentiary Hearing, Doc. No. 137.)

LaMar has not supported his claim with any evidence at all to demonstrate that the prosecutorial policy that resulted in his being charged capitally had a discriminatory effect and that it was motivated by a discriminatory purpose, in spite of his expressed intention to do so. (Petition, Doc. No. 43 at 51.) Furthermore, no evidence to support the claim exists in the state court record before this Court.[5] Accordingly, LaMar's third ground for relief should be denied.

**Fourth Ground for Relief**

In his fourth ground for relief, LaMar contends that the aggravated murder charge relating to Dennis Weaver should have been severed from the aggravated murder charges related to the murders of Albert Staiano, William Svette, Darrell Depina, and Bruce Vitale. (Petition, Doc. No. 31 at 80-84.) Respondent counters that the claim was adjudicated on the merits and that nothing in the state supreme court's decision is either contrary to or an

---

[5]Although LaMar refers to several interrogatories alleged to have been returned by the prosecutors in his case prior to his trial, he provides no reference to the record other than to the transcript where the interrogatories, but not their substance, are discussed. (Petition, Doc. No. 31 at 73-80.)

unreasonable application of federal law as determined by the United States Supreme Court,

nor is it based upon an unreasonable determination of the facts.  (Return of Writ, Doc. No.

32 at 34-35.)  LaMar substantively repeats his claim in his Traverse, and attempts to

correlate the federal and Ohio rules relating to severance.  (Traverse, Doc. No. 43 at 52-57.)

There are many problems with LaMar's claim as argued.  First, the claim appears

to be procedurally defaulted because it was never fairly presented to the state courts.

Although LaMar claimed he was denied a fair trial under the United States Constitution

in his brief to the Ohio Supreme Court on direct appeal, his alleged federal claim is not

discussed or identified with any more specificity than that.  (Appendix, Vol. 10 at 208-13.)

His only reference to federal law in his argument to the state court, and indeed in his

Petition before this Court, is to *Dunaway v. United States*, 205 F.2d 23, 27 (D.C.Cir. 1953).

There, the circuit court interpreted the federal rule respecting severance, and never once

mentioned the constitution.  *Id*.

Furthermore, the Ohio Supreme Court rested its decision on state law as well.

*LaMar*, 95 Ohio St. 3d at 193-95, ¶¶ 48-52.  While it is true that the state court cited two

Seventh Circuit cases in its discussion of LaMar's claim, those cases do not address any

constitutional issue in their relevant parts and the language used by the court is similar to

that used in the applicable evidentiary rule.  *Id*., *citing United States v. Turner*, 423 F.2d 481,

483-84 (7th Cir. 1970), and *United States v. Wall*, 225 F.2d 905, 907 (7th Cir. 1955).

In *Picard v. Connor*, 404 U.S. 270 (1971), the Supreme Court stated that exhaustion of a federal claim requires that it be "fairly presented" to the state courts "to give the State an initial 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Id*. at 275. The Sixth Circuit Court of Appeals has observed that

> [T]he ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts well within the mainstream of constitutional litigation.

*Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987), *quoting Daye v. Attorney General*, 696 F.2d 186, 193-94 (2d Cir. 1982). More recently, the Sixth Circuit has observed that even if some of the state cases relied upon by a defendant in his state court processes contain references to a specific constitutional provision, it is not enough to "put state courts on notice that such a claim had been asserted" if the cases were primarily concerned with state law. *McMeans v. Brigano*, 228 F.3d 674, 682 (6th Cir. 2000). In the *Franklin* case, the court held that Franklin's claim that he was denied due process of law and a fair trial was not sufficient to "fairly present" his claim to the state court, stating as follows:

> To fairly present his constitutional argument to the state courts required more than the use of a generalized catch-all phrase which merely alleged the deprivation of a fair trial under the United States Constitution. Such a catch-all provision does not

> adequately apprise the state courts of the constitutional theory to be relied upon at appellate review, especially under circumstances where the only legal theory presented to the state courts was predicated entirely upon state evidentiary law.

*Franklin*, 811 F.2d at 326. *McMeans* similarly failed to "fairly present" his claim to the state courts even though his argument relied on state cases that referred to the Confrontation Clause of the United States Constitution. *McMeans*, 228 F.3d at 682. Merely using talismanic constitutional phrases like "fair trial" or "due process of law" does not constitute raising a federal constitutional issue. *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006).

Here, LaMar merely made mention of the United States Constitution in the caption of his claim in the state court. (Appendix, Vol. 10 at 208.) Even more spare than in Franklin's case, LaMar's caption simply alleged the deprivation of a fair trial under the constitution, without further elaboration or explication. Such does not fulfill the habeas petitioner's obligation to fairly present a claim to the state courts before bringing it to the federal court. *Franklin*, 811 F.2d at 326; *McMeans*, 228 F.3d at 682. Thus, LaMar has not exhausted the claim he advances in his fourth ground for relief.

Here, neither Respondent nor LaMar address the question of procedural default concerning the fourth ground for relief. There is no applicable state remedy known to this Court with which LaMar might present the claim to the state courts at this late date. *See* Ohio Rev. Code § 2953.21, 2953.23 (requiring reliance on evidence from outside the trial court record), and Ohio R. App. Proc. 26(B) (permitting reopening of a direct appeal only

on the ground that appellate counsel were ineffective).  Thus the claim is procedurally defaulted.

As noted above, the Ohio Supreme Court applied state law to LaMar's claim on direct appeal.  (Appendix, Vol. 10 at 208-13.)  As such, this Court "must accept as binding the state supreme court's interpretation of the . . . rules for joinder and severance of criminal charges." *Davis v. Coyle*, 475 F.3d 761, 777 (6th Cir. 2007).

> In considering whether the denial of severance amounted to an error warranting relief in a habeas proceeding, the issue before [this Court] is not whether the failure to sever counts for separate trials was a violation of a state rule of procedure, but whether the failure to sever denied the petitioner due process of law under the Fourteenth Amendment.  *See Corbett v. Bordenkircher*, 615 F.2d 722, 724 (6th Cir. 1980).  In other words, in order to obtain federal habeas relief on [a] claim involving state law, [a] petitioner must show that misjoinder of the counts 'result[ed] in prejudice so great as to deny a defendant his . . . right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986).
>
> . . .
>
> The prejudice that [a petitioner] must demonstrate, however, in order to justify a grant of a writ of habeas corpus is *actual* prejudice, not merely the *potential* for prejudice.  *See Herring v. Meachum*, 11 F.3d 374, 377-78 (2d Cir. 1993).

*Davis*, 475 F.3d 777 (parallel citation omitted).

As Respondent contends, LaMar's argument in his habeas petition does not differ in any substantive way from the claim he presented on direct appeal to the Ohio Supreme

-47-

Court.  It appears, in fact, that substantial portions of the habeas claim have been cut and pasted from the claim presented in the state court.  In defense of that maneuver, LaMar states that "if the claim had not been presented on direct appeal, [Respondent] would have argued that it was defaulted, so of course the arguments are the same as presented to the state court."  (Traverse, Doc. No. 43 at 52 n.6.)  That comment reveals a misunderstanding of the limitations of federal habeas corpus to federal constitutional claims.  As the excerpt from *Davis*, *supra*, succinctly and accurately explains, the issue before the habeas court is not the same as the issue presented to the state court.  Had LaMar fairly presented the federal claim in the state court, for instance, the question there would have been whether the failure to sever the Weaver count from the others was reversible error because it violated the federal constitution.  Had the state court ruled on that question, the sole question before this Court would have been whether the state court's decision was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, a starkly different inquiry than the one before the state court in the first instance.  28 U.S.C. § 2254(d)(1).  Consequently, cutting and pasting the claim as presented to the state court into a habeas petition is ill advised as it does not address the question this Court must consider in habeas review.  That is true even in cases where the argument in the state court fairly presents the federal constitutional claim.

Analogizing the denial of LaMar's motion to sever the counts to federal cases

involving the federal corollary to the Ohio rule respecting severence does not help LaMar either.  (*See* Traverse, Doc. No. 43 at 55.)  Such a tactic does not convert LaMar's claim into one of constitutional magnitude because those cases rely only on a federal rule of procedure and say nothing about the relationship between severence and any federal constitutional provision.

Because LaMar relied so extensively on the argument he presented in the state court, he has failed to identify how the state supreme court's decision contravenes federal law. As such, he has not carried his burden of showing that he was denied due process of law. LaMar's fourth ground for relief should accordingly be denied.

**Fifth Ground for Relief**

In his fifth ground for relief, LaMar contends the trial court's limits on *voir dire* of prospective jurors deprived him of his right to a fair trial and due process of law.  (Petition, Doc. No. 31 at 84-90.[6])  Respondent acknowledges the claim was addressed on its merits in the state court, but argues that LaMar has failed to show how the state court's decision is contrary to or an unreasonable application of federal law.  (Return of Writ, Doc. No. 32

---

[6]Initially, the Court notes that LaMar's references to the record where *voir dire* was allegedly improperly curtailed by the trial court refer to "Vol. I," "Vol. II," "Vol. III," "Vol. V," and "Vol. VI," which are apparently references to the state court record.  (Petition, Doc. No. 31 at 84-86.)  *Voir dire* of prospective jurors in the record before *this* Court, however, does not begin until the seventh volume of the trial transcript, the prior volumes being concerned with pre-trial hearings, etc.  (Appendix, Vol. 7.)  In discussing LaMar's claim, the Court will refer to the record as it exists in the Appendix filed in this case.

at 35.) LaMar claims the Ohio Supreme Court relied solely upon state law in its decision

and that the prosecutor was permitted greater freedom in questioning prospective jurors

than was the defense. (Traverse, Doc. No. 43 at 63-65.)

LaMar's contention that the Ohio Supreme Court did not address the federal claim

contained in his third proposition of law presented to that court on direct appeal is

accurate. *LaMar*, 95 Ohio St. 3d at 190-91, ¶¶ 39-41. He omits, however, that the claim was

also presented to the state court of appeals, and that that court addressed it relying on both

state and federal law. *State v. LaMar*, No. 95CA31, 1998 WL 514548 at *6-7 (Ohio App. 4th

Dist. Aug. 13, 1998) (unreported). Where there has been one reasoned state court judgment

rejecting a federal claim, there is a rebuttable presumption that later unexplained orders

upholding the judgment or rejecting the same claim rest on the same ground. *Ylst v.*

*Nunnemaker*, 501 U.S. 797, 803 (1991). The district court must look at the last state court

disposition providing reasons for the decision. *Joseph v. Coyle,* 469 F.3d 441, 450 (6th Cir.

2006), *citing Schultz v. Page*, 313 F.3d 1010, 1015 (7th Cir. 2002). In Ohio, the state supreme

court is not required to address and discuss in opinion form each proposition of law raised

in a capital case. *State v. Keith*, 79 Ohio St. 3d 514, 517, 684 N.E.2d 47 (1997), *citing State v.*

*Davis*, 76 Ohio St. 3d 107, 110, 666 N.E.2d 1099 (1996), *State v. Allen*, 73 Ohio St. 3d 626, 628,

653 N.E.2d 675 (1995); *accord, State v. White*, 82 Ohio St. 3d 16, 19, 693 N.E.2d 772 (1998);

*State v. Scudder*, 71 Ohio St. 3d 263, 267, 643 N.E.2d 524 (1994); *State v. Poindexter*, 36 Ohio

St. 3d 1, 3, 520 N.E.2d 568, 570 (1988).  Instead, it addresses only those issues that it

determines warrant discussion.  *Keith*, 79 Ohio St. 3d at 517.  It can be assumed, therefore,

that claims of error that the supreme court chooses not to address have been deemed

unworthy of discussion, and that the state court of appeals' decision has been affirmed on

the same ground articulated in the appellate court.  *See Ylst*, *supra*.  Consequently, this

Court must apply the standard set forth in the AEDPA to the state court of appeals'

decision respecting LaMar's jury *voir dire* ground for relief.

The Ohio court of appeals stated as follows:

> LaMar claims . . . that the trial court denied him a fair and
> impartial jury because it restricted voir dire on several issues.
> La Mar cites examples of objections sustained by the trial court
> where he sought to inquire about (1) how a [prospective] juror
> would judge credibility; (2) how a [prospective] juror would
> react if LaMar did not testify at trial; (3) the [prospective]
> juror's understanding of the presumption of innocence, and (4)
> whether a [prospective] juror could follow the court's
> instructions.
>
> The Sixth Amendment to the United States Constitution . . .
> guarantee[s] an accused a fair and impartial jury. . . .
>
> In voir dire, a capital defendant must be allowed to identify
> prospective jurors who have "predetermined the terminating
> issue of his trial, that being whether to impose the death
> penalty."  *Morgan v. Illinois* (1992), 504 U.S. 719, 736.  A
> defendant must also be permitted on some occasions to inquire
> into racial bias.  *Mu'Min v. Virginia* (1991), 500 U.S. 415, 423-
> 424.  As stated by the United States Supreme Court, a trial
> court has "great discretion in deciding which questions should
> be asked on voir dire."  *Mu'Min v. Virginia*, *supra*. . . .

-51-

LaMar cites two instances where the trial court limited questions on the presumption of innocence. In one instance, the trial court did not allow LaMar to question a prospective juror regarding whether the prospective juror had heard of the presumption of innocence. However, LaMar was permitted to ask whether the juror could follow the trial court's instruction on the presumption of innocence and the prospective juror indicated that he thought LaMar was innocent until proven guilty. In the other instance, the trial court did not permit LaMar to inquire into a prospective juror's understanding of the presumption of innocence. Later, however, during the individual portion of the voir dire, the trial court allowed LaMar to inquire into this matter.

LaMar also claims that he was not permitted to inquire into whether a particular juror could follow the court's instructions. However, this juror later indicated that she would follow the court's instructions.

The trial court addressed the fairness issues which LaMar sought to raise by instructing the jury at the close of the evidence regarding (1) how to judge the credibility of witnesses; (2) that the defendant was not required to testify; and (3) the presumption of innocence. Here, LaMar's proposed questions in voir dire regarding credibility and how jurors would react if LaMar did not testify bordered on instructions of law and improper jury indoctrination. Thus, even if the trial court did err by limiting LaMar's inquiry on these issues, we find beyond a reasonable doubt that the error was harmless. *See Chapman v. Calif*[ornia] (1967), 386 U.S. 18, 24.

Moreover, we find that LaMar's examples of the limitations the trial court placed on voir dire do not show that he was denied a fair and impartial jury. Finally, we cannot say that a voir dire which filled 1,960 transcript pages was too limited. *See State v. Lorraine* (1993), 66 Ohio St. 3d 414, 419, 613 N.E.2d 212. Therefore, we find that the trial court did not abuse its

discretion in limiting these questions.

*State v. LaMar*, No. 95CA31, 1998 WL 514548 at *6-7 (Ohio App. 4th Dist. Aug. 13, 1998)

(unreported)(some parallel citations omitted).

The federal law governing LaMar's claim was summarized by the Sixth Circuit

Court of Appeals in *Beuke v. Houk*, 537 F.3d 618, 637 (2008), as follows:

> The Supreme Court has consistently "stressed the wide discretion granted to the trial court in conducting *voir dire* . . . in . . . areas of inquiry that might tend to show juror bias." *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991); *see also Ham v. South Carolina*, 409 U.S. 524, 528 (1973) (noting the "traditionally broad discretion accorded to the trial judge in conducting voir dire"). In the context of *voir dire*, the trial court violates the defendant's constitutional rights only when it restricts a "constitutionally compelled" question. *See Mu'Min*, 500 U.S. at 424-25.  A proffered *voir dire* question is not constitutionally required simply because it "might be helpful in assessing whether a juror is impartial"; instead a question is constitutionally compelled only where the "failure to ask [that] question [] . . . render[s] the defendant's trial fundamentally unfair."  *Id*. at 425-26.

The Supreme Court has also observed that "[t]he Constitution . . . does not dictate a

catechism for *voir dire*, but only that the defendant be afforded an impartial jury."  *Morgan*

*v. Illinois*, 504 U.S. 719, 729 (1992).  Juror impartiality need not be established with

"unmistakable clarity"; *voir dire* is sufficient if it allows the trial judge to form "a definite

impression that a prospective juror would be unable to faithfully and impartially apply the

law." *Wainwright v. Witt*, 469 U.S. 412, 426 (1985).  It is through the lens of these cases and

the AEDPA that this Court must evaluate LaMar's claim that he was denied adequate *voir dire* of prospective jurors, or more properly, that the state court's decision denying his claim of error was contrary to or an unreasonable application of federal law.

Many of LaMar's "clearly legitimate questions" that were successfully objected to by the prosecutors were convoluted and confusing (Appendix, Vol. 8 at 297; Vol. 9 at 461; Vol. 12 at 1755), argumentative (Appendix, Vol. 8 at 442, 448, 459), wildly irrelevant (Appendix, Vol. 7 at 258, 265), or simply unanswerable (Appendix, Vol. 7 at 249-50; Vol. 8 at 559). Several merely required rephrasing in order to overcome the prosecutors' objections. (Appendix, Vol. 7 at 242-45, 302-318; Vol. 8 at 445; Vol. 9 at 1029, Vol. 11 at 1375-6.) Many trespassed into matters of law upon which the jurors had already been instructed, and would be instructed on again before rendering their verdict. (Appendix, Vol. 7 at 113-14, 255; Vol. 8 at 302-5, 313, 442, 445, 448, 458, 461; Vol. 9 at 1020-21, 1029; Vol. 20 at 3830-3903. Questions such as whether a prospective juror believes OJ Simpson to be guilty of his ex-wife's and her friend's murders and if a prospective juror can think of any reason why a defendant might not testify at his own trial are not the sort of questions that are "constitutionally compelled." The prospective juror's answers, whatever they might have been, would have shed no light on his ability to follow the law as given to him or her by the trial court. The same is true of questions asking how inconsistent statements from a witness might affect a prospective juror, or how a juror feels about a particular aspect of

the law; *voir dire* is not about probing the prospective juror's feelings or visceral reaction to the law, but rather establishing whether the prospective juror can abide by the instructions given by the trial court regardless of their personal fondness for or animus toward the law. This is a fairly straight-forward task insofar as formulating questions for prospective jurors is concerned. In any case, argumentative or sarcastic questions are never appropriate in *voir dire*.

LaMar urges this Court to grant him the relief he requests because he alleges the prosecutor was treated more favorably than the defense by the trial court in *voir dire*. (Traverse, Doc. No. 43 at 64-65.) He identifies two instances of the prosecutor overstepping the bounds of proper *voir dire*, and holds them up as proof that he was treated unequally by the trial court. *Id*. The transcript reveals, however, that the prospective jurors were made aware that the first comment by the prosecutor was not evidence, and that a defense objection to the second question asked by the prosecutor was sustained. (Trial Tr., Vol. 7 at 83-4.) Even if comparing the trial court's handling of those two questions to the numerous examples of objected-to defense questions were the proper test for determining a constitutional violation, LaMar's argument is unavailing. The "Judge-always-liked-you-best" argument does not lie in federal habeas corpus.

Eleven of the prospective jurors to whom LaMar's counsel were not permitted to ask certain questions did not serve on his jury, and LaMar has not offered any argument or

evidence as to how he was prejudiced by the trial court's limitation with respect to those prospective jurors.[7] The remaining examples LaMar cites include the question to Juror Irby mentioned above relating to OJ Simpson's guilt.  (Appendix, Vol. 7 at 265.)  In addition, after Juror Irby stated he would not believe a police officer's word automatically, defense counsel asked him why not.  *Id*. at 258.  It was the "why not" question which drew the prosecutor's objection.  The trial court's ruling sustaining the objection was proper since the juror's answer, whatever it might have been, would be irrelevant.  Juror Maynard was asked, "If you're in an elevator and there's only one other person in the elevator and you get off that elevator and that person comes in and says, well, that person slapped me, what would you do in that case if you had not slapped them or touched them?  What would you do?"  (Appendix, Vol. 8 at 297.)  That question is too convoluted and any answer would be irrelevant to the juror's ability to follow the law as instructed by the trial court.  Juror Barber was asked how he would feel if the defense chose not to present any witnesses.  *Id*. at 302.  How a juror might feel is also irrelevant if he can follow the law as it is given to him by the trial court.  In addition, Juror Barber then acknowledged that LaMar did not have to testify, and that she would follow the law as given by the court.  *Id*. at 303-310.  Juror Miller was asked if she was aware that there are elements of every crime, and "You've heard of the presumption of innocence, haven't you?"  *Id*. at 458-59.  The subject of the first

---

[7]Those prospective jurors were Hatten, Day, Maynard, Lewis, Porter, Willis, McFann, Beard, Sheridan, Childers, and Wood.

question is properly reserved for jury instructions, and the form of the second question was improper.  Juror Miller later acknowledged that she could follow the law respecting the presumption of innocence.  *Id*. at 460.  Juror Pratt was asked under what circumstances someone convicted of murder should not be sentenced to death.  (Appendix, Vol. 8 at 559.)  That question, too, is a matter of law properly left for the court to explain to the jurors in its instructions.  In addition, the trial judge observed that it was "kind of a hard question to answer."  *Id*.  Finally, Juror Spurlock was asked how she felt about plea bargains, and when she stated that she did not agree with them, defense counsel asked her why.  (Appendix, Vol. 11 at 1372.)  How a juror feels about plea bargains is irrelevant, as are the reasons for her feelings.  The relevant question would have been whether, in spite of her feelings about plea bargains, Juror Spurlock could follow the trial court's instructions on the law.

The state court concluded that LaMar had not demonstrated his trial was unfair due to the trial court's limitations on his *voir dire* of prospective jurors.  *State v. LaMar*, No. 95CA31, 1998 WL 514548 at *7 (Ohio App. 4th Dist. Aug. 13, 1998)(unreported).  He has not done so in these proceedings, either.  Under the federal law governing LaMar's claim, the state court's decision is neither contrary to nor an unreasonable application of that law.  Accordingly, LaMar's fifth ground for relief should be denied.

**Sixth Ground for Relief**

In his sixth ground for relief, LaMar contends that the trial court failed to excuse a juror who believed the death penalty should be automatically imposed when a defendant is convicted of aggravated murder and attendant aggravating circumstances.  (Petition, Doc. No. 31 at 90-92.)  Respondent argues the claim is both procedurally defaulted and meritless.  (Return of Writ, Doc. No. 32 at 36.)  LaMar contests Respondent's procedural default defense, alleging that although the claim was presented to the state court of appeals and supreme court, neither court addressed it, and that this Court should consider the claim *de novo*.  (Traverse, Doc. No. 43 at 66-69.)

The claim is procedurally defaulted.  LaMar does not contend he raised the issue on direct appeal, as would have been appropriate in the state court since any error relating to the failure to dismiss an "automatic death penalty" juror would be apparent on the record. Instead, he claims to have preserved the issue by raising it in his application to reopen his direct appeal under Ohio R. App. Proc. 26(B).  Under Ohio's rule, however, the only claims that may be raised in an application to reopen a direct appeal are claims that appellate counsel were ineffective.  The underlying claims which are included in the application to demonstrate appellate counsel's ineffectiveness are not "presented" to the appellate court for a merits decision.  Thus, by including the sub-claims underlying an ineffective assistance of appellate counsel claim in an application to reopen, the defendant

acknowledges that the sub-claims were not presented on direct appeal, which results in a procedural default for federal habeas corpus purposes.  Moreover, such a defaulted claim cannot be resurrected by raising it as a claim underlying an application to reopen a direct appeal unless the state appellate court grants the application and reopens the judgment. *Abshear v. Moore*, 546 F.Supp.2d 530, 541 (S.D. Ohio 2008).  "Because claims of ineffective assistance of appellate counsel are based on a different legal theory from the underlying claims, . . . [an] application [to reopen a direct appeal] does not preserve the underlying claims from default."  *Id.*, *citing White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005). Accordingly, LaMar's inclusion of the instant ground for relief as an underlying claim in his application to reopen his direct appeal in the state courts does not preserve it for habeas review, and it is procedurally defaulted.

In rote fashion, LaMar recites that "[t]o the extent that this matters [sic] appears in the record and may have been raised on appeal . . . LaMar was denied the effective assistance of counsel on appeal," which this Court interprets to be his assertion of a cause and prejudice argument intended to excuse default of his claim under *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).  As LaMar's ineffective assistance of appellate counsel claim, set forth in his twenty-second ground for relief below, is meritless, his claim of cause and prejudice fails.  There being no excuse for LaMar's procedural default of his sixth ground for relief, it should be denied.

Even if the claim were preserved, it would not warrant habeas corpus relief.  The

Sixth Circuit has summarized the law relevant to LaMar's claim as follows:

> A capital defendant may challenge for cause any "automatic death penalty" juror - i.e., any juror who would "vote to impose death automatically if the jury found the defendant guilty." *Morgan* [*v. Illinois*], 504 U.S. [719,] 728 [(1992)].  As a general rule, a defendant may excuse a juror for cause if "the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id*. (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)).  Applying this rule in the capital context, "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Id*. at 729.  "Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a juror may challenge for cause any prospective juror who maintains such views." *Id*.
>
> A trial court's finding as to a juror's impartiality is a factual determination entitled to a presumption of correctness under 28 U.S.C. § 2254(d)(1).  See *Bowling v. Parker*, 344 F.3d 487, 519 (6th Cir. 2003); *Miniel v. Cockrell*, 339 F.3d 331, 338-39 (5th Cir. 2003).  "[O]ur review is deferential, respecting the trial judge's proximity to the venire and the determinations of credibility and demeanor that *voir dire* involves." *Wolfe v. Brigano*, 232 F.3d 499, 502 (6th Cir. 2000).  "The question is not whether the trial judge was wrong or right in his determination of impartiality, but merely whether his decision was 'fairly supported by the record.'" *Bowling*, 344 F.3d at 519 (quoting *Witt*, 469 U.S. at 433).

*Williams v. Bagley*, 380 F.3d 932, 953 (2004)(parallel citations and footnote omitted).

LaMar correctly argues that Juror Pratt stated that if someone takes the life of

-60-

another, they should forfeit their own life.  (Trial Tr., Vol. 8 at 545.)  She also expressed

unwillingness to pay taxes to support convicted murderers, *id.*, and stated that once the

defendant was convicted of murder, she would automatically vote for the death penalty

as the appropriate sentence, *id.* at 547.  That is hardly the whole story, however.  Over the

course of twenty-four pages of transcript, Juror Pratt expressed various and contradicting

ideas about the death penalty.  (Trial Tr., Vol. 8 at 545-69.)  At one point in her *voir dire*, in

fact, the trial court excused her based upon her affirmative answer to the court's question

of whether she would "impose the death sentence any time anybody is convicted of an

intentional killing." *Id*. at 563.  The prosecutor immediately requested an opportunity to

rehabilitate Juror Pratt, and under his questioning, she stated that she would not

automatically vote for the death penalty against LaMar if he was convicted of intentional

murder without weighing the aggravating circumstances and mitigating factors. *Id*. at 563-

64.  When the trial court asked why she had just given a different answer to basically the

same question when the court asked it, she explained that she must have misunderstood

the court's question. *Id*. at 564.  The defense was given an opportunity to question Pratt

further as well. *Id*. at 565-67.  Juror Pratt stated that she would consider LaMar's whole life

as well as the events surrounding the murders when deciding on a punishment. *Id*. at 567.

Defense counsel challenged Juror Pratt, but was overruled by the trial court. *Id*. at 569.

      LaMar's ignoring Juror Pratt's statements that cut against his argument, and cherry

picking facts from the state court record that support his argument is not the same as demonstrating that the trial court's decision was "based on an unreasonable determination of the facts in light of the evidence presented" at trial. 28 U.S.C. § 2254(d)(2). Inconvenient though they may be, it is incumbent upon LaMar to confront any unfavorable facts in demonstrating entitlement to habeas corpus relief. Having passed on the opportunity to do so, LaMar has failed to show that the trial court's ruling respecting Juror Pratt was unreasonable. Consequently, even if he had preserved his sixth ground for relief for habeas corpus review, it would fail.

LaMar's sixth ground for relief is procedurally defaulted without excuse, and should be denied.


**Seventh Ground for Relief**

In his seventh ground for relief, LaMar contends two prospective jurors were excused from service on his jury in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). (Petition, Doc. No. 31 at 92-95.) Respondent states the claim has never been presented to the state courts and is procedurally defaulted, as well as meritless. (Return of Writ, Doc. No. 32 at 36.) LaMar makes the same argument respecting Respondent's procedural default defense as he did in his sixth ground for relief. For the reasons stated there, his argument that his claim was presented in the state courts via an Ohio R. App. Proc. 26(B)

application to reopen his direct appeal fails.  Similarly, he suggests that appellate counsel's ineffectiveness provides cause for the default of his claim, by referring the Court to his twenty-second ground for relief.  (Traverse, Doc. No. 43 at 70.)  LaMar fails to demonstrate the ineffectiveness of his appellate counsel therein, however, leaving the default of the instant claim without excuse.  Accordingly, his seventh ground for relief should be denied as procedurally defaulted.

Even if it were preserved, LaMar's claim would fail.  He contends that two prospective jurors, Ramsey and Nelson, were peremptorily challenged by the prosecution because they were the only African-Americans in the venire.  (Petition, Doc. No. 31 at 92-95.)  He argues that four other Caucasian individuals who had issues similar to those of Ramsey and Nelson were not challenged by the prosecution.  *Id*.

A defendant making a *Batson* objection to a prosecutor's challenge against a juror must first show that he is a member of a cognizable racial group.  *Batson v. Kentucky*, 476 U.S. 79, 96 (1986.)  LaMar is African-American.  Second, the defendant must establish a prima facie case of purposeful discrimination, which may be accomplished by, among other things, showing a pattern of strikes against the relevant racial group or the prosecutors's questions and statements during *voir dire* and while articulating his challenge.  *Batson*, 476 U.S. at 96.  Upon making such a showing, the burden shifts to the prosecution, which must "come forward with a neutral explanation for challenging black

jurors." *Batson*, 476 U.S. at 97. In *Batson*, the Court emphasized, however, that "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." *Id*. Finally, "[if] a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." *Purkett v. Elem*, 514 U.S. 765, 767 (1995) (*per curiam*).

Prospective juror Ramsey stated that if the case were to last for three weeks, it would spell disaster for his work because he is the only person who can operate a particular machine at his job, and there are deadlines he has to meet. (Trial Tr. at 238, 335.) Ramsey also stated he could not sit in judgment of LaMar knowing LaMar had a previous conviction for murder, that LaMar was not entitled to a fair trial because of his previous conviction, and that he himself was trying to stay out of prison. *Id*. at 838-39, 841. Ramsey repeatedly indicated that he could not give LaMar a fair trial or sign his name to a death verdict. *Id*. at 841, 843, 844, 847, 850, 852. Perhaps most relevant, Ramsey stated he did not think he could be fair to the state if he were selected as a juror. *Id*. at 853. The prosecution's challenge for cause was overruled. *Id*. at 856-57. When the prosecution's peremptory challenge was objected to by the defense, the prosecution stated that the reasons for the challenge were that Ramsey was the only person who could operate a certain machine at his work, that he would have to go to work both before and after jury duty, that he could not be a fair and impartial juror, and that Ramsey was going on

vacation to help his daughter move in two days. (Trial Tr. at 1724.) While it is true that Ramsey contradicted himself by stating he could listen to the evidence and decide the case based on the facts he heard from the witness stand, *id*. at 854, and that he could be fair, *id*. at 846, the overwhelming timbre of his *voir dire* indicated that he could not be a fair and impartial juror, particularly with regard to the state. Defense counsel argued that Ramsey and Nelson were the only two African-Americans in the jury pool, but that alone does not demonstrate an improper motive attributable to the prosecution in challenging Ramsey, and in fact sounds more in *Taylor v. Louisiana*, 419 U.S. 522 (1975), and *Duren v. Missouri*, 439 U.S. 357 (1979) (cases addressing "fair cross-section" claims), than in *Batson*. Thus, even if LaMar had preserved his *Batson* claim concerning prospective juror Ramsey, the claim would fail.

Initially, prospective juror Nelson stated she could be fair were she to serve on LaMar's jury. (Trial Tr. at 957.) A few days later, however, when *voir dire* was still ongoing, Nelson let it be known to the court that she had learned from an associate pastor at her church that sitting in judgment of others is disfavored for church members who hold leadership positions in the church. *Id*. at 1657. Counsel agreed to conduct additional *voir dire* of Nelson as a result. *Id*. Under questioning, she informed the court that her pastor and an associate pastor had both told her that they did not wish for her to serve on the jury because of her leadership position as a junior pastor in the church. *Id*. at 1658-59. After her

conversations with her religious leaders she said her answers to some of the previous questions had changed, and that if she were faced with law that conflicted with her religious beliefs, her religion would come first. *Id*. at 1660. She stated unequivocally that her pastor would not allow her to serve on the jury, and that she would follow his directions. *Id*. at 1662, 1664. Nelson also feared she would be in danger of losing her "evangelistic papers" if she served as a juror, presumably a disciplinary action within her church. *Id*. at 1670-71. Although clearly ambivalent, Nelson stated that if she served on the jury, she would decide the case. *Id*. at 1671. The prosecutor's challenge for cause respecting prospective juror Nelson was overruled. *Id*. at 1671-73. When the state exercised one of its peremptory challenges against Nelson, defense counsel objected on *Batson* grounds. (Trial Tr. at 1723-24.) The prosecutor defended his challenge stating that prior to the second *voir dire* of Nelson, he had no intention of challenging her, but that her comments in the second round of *voir dire* "changed the whole ball game." *Id*. at 1724-25. Specifically, the prosecutor cited the ramifications Nelson would suffer with her church if she were to sit on a jury, and her statements to the effect that if her pastor asked her about the case, she would answer his questions. *Id*. The trial court agreed and overruled the defense's *Batson* objection. *Id*. at 1725.

A prosecutor's credibility is a necessary consideration for the trial court deciding whether the race-neutral reason offered by the prosecutor is genuine or pretextual. *See Rice*

*v. Collins*, 546 U.S. 333, 341-42 (2006) (observing that where a prosecutor has offered a race-neutral reason for challenging a prospective juror, reasonable minds might disagree about the prosecutor's credibility, but that in habeas corpus, that is not enough to supersede the trial court's credibility determination). As in *Rice*, here LaMar has not demonstrated that the trial court acted contrary to the framework set forth in *Batson*, so the only question respecting prospective juror Nelson is "whether the trial court's factual determination at *Batson*'s third step was unreasonable." *Rice*, 46 U.S. at 342. LaMar has not demonstrated that the trial court's determination, which rests primarily on the court's assessment of the prosecutor's credibility in stating his reasons for challenging Nelson, was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). That Nelson was one of only two African-Americans in the jury pool, and that both were excused after the prosecution's peremptory challenges, does not alone rebut the prosecutor's race-neutral explanations for challenging those two prospective jurors.

LaMar contends other jurors were situated similarly to Ramsey and Nelson, and were not challenged by the prosecutor, however. He argues that juror Zornes, like Ramsey, also expressed concern about the problems jury service would cause for her job. (Petition, Doc. No. 31 at 94.) Zornes indicated it would be difficult for her to be away from her job because there was no one to fill in for her, but she also stated she would not have any problem making sacrifices to serve on the jury. (Trial Tr. at 141.) Later in her *voir dire*, after

she had talked with her employer, Zornes indicated that temporary help could probably be hired to fill in for her, but that she would have to work evenings with that person. *Id*. at 344. While Zornes' employment issues certainly sound somewhat similar to those expressed by Ramsey, she was unequivocal in her ability to fairly and impartially listen to the evidence in LaMar's case and make her decision based on the evidence presented, unlike Ramsey. (Trial Tr. at 233, 336, 340-41.) In addition, Zornes may have been an attractive juror to the prosecution because her aunt had been murdered, which correctly or incorrectly may have caused the prosecutor to think she would be particularly sympathetic to the prosecution's case. *Id*. at 144-46. Thus, Zornes is distinguishable from Ramsey in a rather significant way.

LaMar contends that juror Mays also indicated serving on the jury would cause her employment problems. (Petition, Doc. No. 31 at 94.) Mays indicated she would have to go to work from 5:00am until she had to be in court, then again after court if she was released before 3:30pm, were she to serve on the jury. (Trial Tr. at 405-6.) She acknowledged that staying alert under those conditions would be a challenge for her, but hoped that she would be able to adjust. *Id*. at 407. Like Zornes, and unlike Ramsey, Mays never expressed an inability to be fair to the state, or to be a fair and impartial juror.

LaMar also compares Caucasian jurors Pratt and Rowe to Nelson, contending that the prosecutor did not exercise peremptory challenges against Pratt and Rowe to assist

-68-

them in their private lives as he did Nelson.  (Petition, Doc. No. 31 at 94-5.)  While Pratt did indicate that she was in a volatile marriage and might be returning to Mississippi, she stated that she would be in Ohio for the foreseeable future unless violence erupted again in her marriage.  (Trial Tr. at 389-92.)  She said she would be able give her attention to the trial if she served as a juror.  *Id*. at 392-93.  Nothing about Pratt's situation suggests that she would be anything but a fair and impartial juror, and LaMar does not contend that it does.  Instead, he contends the prosecutor's failure to use a peremptory challenge to allow her to "deal with personal issues" evidences the prosecutor's intentional race-based discrimination in challenging Nelson.  (Petition, Doc. No. 31 at 94.)  Given that a party does not possess unlimited peremptory challenges in any trial, much less a capital trial, it is no surprise that the prosecutor conserved his challenges for those prospective jurors whose ability to be fair and impartial was, in his estimation, compromised.  Indeed, if either party were persuaded to use peremptory challenges to accommodate the myriad "personal issues" that come up during jury *voir dire*, they would soon exhaust them and have none left for those who they determine are unable to fairly perform the duty.

Finally, LaMar contends the prosecutor's failure to challenge juror Rowe evidences the discriminatory intent with which Ramsey and Nelson were challenged.  (Petition, Doc. No. 31 at 94-95.)  Rowe stated she had given birth to a baby by Caesarean section three weeks prior to being called for jury duty, but expressed a willingness to serve on LaMar's

jury contingent upon her ability to find someone to watch her baby and two other children. (Trial Tr. at 1493-94.) Although Rowe had a doctor's excuse stating she was not to drive, the court offered to make sure she was provided with transportation to and from court if she served on the jury. *Id.* at 1867. Rowe was understandably unwilling to leave her baby with anyone other than her mother, and her mother was scheduled for surgery about a week and a half from the date of her *voir dire. Id.* at 1871. To complicate matters further, Rowe would have to be out the door of her home with all three children by 6:00am to be at court on time, and had no one at home to help get the three children ready. *Id.* Nevertheless, she stated she was willing to try to serve on the jury, obstacles notwithstanding. *Id.*

Although the trial judge would have been justified excusing juror Rowe in light of her doctor's excuse, she did express a willingness to try to perform her duties as a juror. It is true that she was not able to complete those duties (she was later excused during the trial, *id.* at 2360), it can hardly be said that any of the other prospective jurors, Nelson included, were in circumstances similar to Rowe's, and Rowe's situation did not compromise her ability to be a fair and impartial juror. In fact, she indicated repeatedly that she could be fair and impartial, *id.* at 1376, 1489-92, 1495-1500, although she occasionally contradicted herself or was confused by the questions posed to her, *id.* at 1382-84, 1390. In contrast, Nelson stated in a contest between her religion and the law, her

religion would guide her, and that she feared she would lose her "evangelistic papers," which was of great concern to her, should she serve on the jury. While it would not have been unreasonable for either party to use a peremptory challenge against juror Rowe, the prosecution's failure to do so does not add weight to LaMar's argument that prospective juror Nelson was challenged because of her race.

LaMar procedurally defaulted his seventh ground for relief and it should be denied for that reason. Even if he had properly preserved the matter for habeas corpus review, however, it would fail.


**Eighth Ground for Relief**

In his eighth ground for relief, LaMar contends he was denied a fair trial because gruesome and misleading photographs were improperly admitted into evidence. (Petition, Doc. No. 31 at 95-101.) Respondent acknowledges the claim is preserved for habeas corpus review, but that it is nevertheless without merit. (Return of Writ, Doc. No. 32 at 36-37.) LaMar claims the Ohio Supreme Court unreasonably found some of the complained-of photographs gruesome but admissible. (Traverse, Doc. No. 43 at 75-81.) To the extent LaMar claims the court failed to address his other arguments, specifically that he was denied due process by admission of the photographs, and that the prejudice from their admission in the guilt phase carried over to the penalty phase, this Court interprets that as an invitation to consider those arguments *de novo*. *Id*. The challenged photographs have not been made a part of the record

in these proceedings.

LaMar presented the instant claim to the Ohio Supreme Court as his fifth proposition of law on direct appeal.  (Appendix, Vol. 10 at 192-98.)  There, he argued that the photographs of the deceased Svette, as well as photographs of all five victims in life were more prejudicial than probative contrary to the relevant state evidentiary rule.  *Id*.  Other than "talismanic consitutitonal phrases" such as "fair trial" and "due process" as well as mentioning the federal constitution in the caption and closing paragraph of his argument in the state court, LaMar relied on state court cases from Ohio and other states to support his claim.  *Id*.  Those state cases in turn relied on state evidentiary rules and did not contain an analysis of any federal constitutional claim relating to the admittance of gruesome photographs at trial.

LaMar also extracted a quotation from *Gardner v. Florida*, 430 U.S. 349 (1977), and included it in his final paragraph of his argument on his state claim, but *Gardner* is factually distinguishable from LaMar's circumstances.  In *Gardner*, the Supreme Court held that a trial court's reliance upon information contained in an undisclosed portion of a presentence investigation report in determining whether to impose a life sentence or death is unconstitutional.  *Id*. at 358-62.  Therefore, aside from the very general proposition that defendants are entitled to fair trials and due process of law at trial, there is little resemblance between Gardner's and LaMar's constitutional claims.  In addition, the entire sentence from which LaMar takes his quotation reads as follows:  "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be,

-72-

and appear to be, based on reason rather than caprice or emotion," *Gardner*, 430 U.S. at 358, which is clearly *dictum*, and not a holding of the United States Supreme Court, to which this Court is limited in evaluating requests for habeas corpus relief under 28 U.S.C. § 2254(d)(1). *Williams v. Taylor*, 529 U.S. 362, 365 (2000). Thus, LaMar failed to cite any federal law relevant to his claim in the state court, and relied instead on state evidentiary rules and state court cases interpreting those rules to present his claim of error to the Ohio Supreme Court.

Nevertheless, the state supreme court agreed with LaMar that two photographs of Svette in death were gruesome, but found that they both "supported the forensic pathologist's testimony that Svette had sustained four major blows to the head and that any of the four was sufficient to cause death." *State v. LaMar*, 95 Ohio St. 3d 181, 195-96, 767 N.E.2d 166, 2002-Ohio-2128 at ¶¶ 54-57 (2002). In addition, the court found the "mugshot-style photographs showing Svette, Staiano, Depina, Vitale, and Weaver while all were still alive . . . relevant and admissible for purposes of identifying the victims." *Id*. at 196, ¶ 57. The state court relied exclusively on the relevant state evidentiary rules and state court cases interpreting those rules in denying LaMar's proposition of law. *Id*. at 195-96, ¶¶ 55-57.

It would not be unreasonable to question whether LaMar has "fairly presented" the instant claim to the state courts, given his bare mention of the federal constitution, his

failure to cite relevant federal law, and his reliance upon state cases interpreting the state evidentiary rules for support.[8]  If it has not been fairly presented to the state courts, then the claim is not exhausted for habeas corpus purposes.  As there is no remaining state remedy available to LaMar with which to pursue the federal claim in the state courts at this late date, the claim would be procedurally defaulted.  None of this is addressed in either party's submissions to this Court.  It would be an intellectual exercise in any case, however, because the claim, even if it had been exhausted and preserved, is meritless on the record before this Court for the simple reason that the allegedly prejudicial photographs have not been transmitted to this Court.  Without the photographs in question, this Court cannot say the state court's determination that the images of Svette in death were gruesome, but that they supported the pathologist's testimony on the cause of death sufficiently to warrant their admission into evidence was objectively unreasonable or based on an unreasonable determination of the facts before the state court.  Nor can this Court conclude that the state court's ruling on the photographs of all five victims in life was contrary to or an

---

[8]LaMar attempts to make his federal claim in his Petition by citing *Spears v. Mullin*, 343 F.3d 1215 (10th Cir. 2003), but that case is factually distinguishable.  (*See* Petition, Doc. No. 31 at 100; Traverse, Doc. No. 43 at 79.)  In *Spears*, the challenged photographs were not introduced in the guilt phase of the trial, but were instead submitted in the penalty phase to show that the victim suffered "conscious physical suffering."  343 F.3d at 1226-27.  The Tenth Circuit Court of Appeals concluded as follows:

> Even if the photographs were minimally relevant to the heinous, atrocious, or cruel aggravator, the photographs' prejudicial effect outweighed their probative value.  Important to this conclusion is the fact that the State waited until the second stage to introduce the photographs.  By contrast, the State introduced comparatively innocuous photographs at the first stage, seeming to deliberately await the second stage to present the more gruesome photographs solely for their shock value.  *Id.* at 1228.

The Ohio Supreme Court found the photographs challenged by LaMar relevant to the cause of death of one victim and the identification of all five victims.

unreasonable application of any holding of the United States Supreme Court. *See Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (stating "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.").

LaMar has failed to demonstrate that the evidence he challenges was "so unduly prejudicial" that it rendered his trial fundamentally unfair. Accordingly, his eighth ground for relief should be denied.

**Ninth Ground for Relief**

In his ninth ground for relief, LaMar contends that the testimony of Robert Bass included inadmissible hearsay evidence that was improperly permitted over a defense objection and deprived him of his right to confront the witnesses against him. (Petition, Doc. No. 31 at 101-103.) Respondent acknowledges that the claim is preserved for habeas corpus review, but argues there is nothing unreasonable or contrary to federal law in the state court's resolution of the claim. (Return of Writ, Doc. No. 32 at 37.) LaMar counters that the Ohio Supreme Court's finding that the offending testimony was not hearsay was contrary to the holding of *Crawford v. Washington*, 541 U.S. 36 (2004).

Although LaMar's argument in his state court proceedings primarily addressed his claim in terms of the state evidentiary rule respecting hearsay evidence, he did make an

assertion that admission of the challenged testimony also violated his right to confront and cross-examine the witnesses against him. (Appendix, Vol. 10 at 198-99.) The state supreme court, however, never acknowledged or addressed the federal claim, concentrating exclusively on the state evidentiary issue instead. *State v. LaMar*, 95 Ohio St. 3d 181, 196-97, 767 N.E.2d 166, 2002-Ohio-2128 at ¶¶ 58-62 (2002). An examination of the record at the court of appeals level reveals that that court dealt with LaMar's federal claim in precisely the same manner, which is to say that it was ignored by the court of appeals. (Appendix, Vol. 7 at 192-94); *State v. LaMar*, No. 95CA31, 1998 WL 514548 at *13-14 (Ohio App. 4th Dist. Aug. 13, 1998)(unreported). Thus, even though LaMar presented his claim to both state courts, albeit in bare-bones fashion, neither addressed it, so it may be considered by this Court *de novo*. *Hawkins v. Coyle*, 547 F.3d 540, 546 (6th Cir. 2008), *citing Vasquez v. Jones,* 496 F.3d 564, 569 (6th Cir. 2007); *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003)(reasoning when "there are no results, let alone reasoning, to which this court can defer . . ., any attempt to determine whether the state court decision was contrary to, or involved an unreasonable application of clearly established federal law would be futile"); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003), *relying on Wiggins v. Smith,* 539 U.S. 510, 534-38 (2003).

Federal habeas corpus relief is only warranted where a violation of a state's evidentiary rule results in the denial of fundamental fairness and, therefore, a violation of

due process.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (stating "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Frank v. Mangum*, 237 U.S. 309, 331 (1915) (observing that the Fourteenth Amendment's due process guarantee applies to "the substance of right, and not to matters of form or procedure"); *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (observing that a claim contending a state court violated as state evidentiary rule is not cognizable on habeas corpus review).  Thus, whether the challenged evidence was admitted contrary to a state evidentiary rule is not itself a question for this Court.  Accordingly, the Court confines its review to LaMar's constitutional issue.

LaMar contends he was denied his constitutional right to confront the witnesses against him by the admission of Bass' testimony that an unidentified inmate approached a second unidentified inmate who was standing next to Bass near the L-6 doorway, told the second inmate LaMar was looking for him, and that the second inmate then walked toward L-6.  (Trial Tr. at 2157.)  He also claims a deprivation of his constitutional rights occurred by the admission of Bass' testimony that Derek Cannon approached him in the L-block corridor and asked him if he had seen LaMar.  *Id*. at 2158.  Finally, LaMar argues that Bass' testimony that he heard Cecil Allen tell LaMar to "[g]et your boys together and come on. Come with me," was admitted contrary to the United States Constitution.  *Id*. at 2160.

The Sixth Amendment of the federal constitution provides that "in all criminal

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.  In *Pointer v. Texas*, 380 U.S. 400, 403 (1965), the Supreme Court deemed that provision applicable to state criminal prosecutions through the Fourteenth Amendment's Due Process Clause.  At the time of LaMar's trial, the governing law respecting Confrontation Clause issues was set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004).  There, the circumstances were somewhat different from those in LaMar's case, as the prior statements of the unavailable witness in *Roberts* were from a person who had been called to testify by the defense at a preliminary hearing prior to trial.  *Roberts*, 448 U.S. at 58.  A transcript of that testimony was later introduced at trial to rebut an assertion made by the defendant during his own testimony.  *Id*. at 59.  The Supreme  Court identified two separate restrictions imposed by the Confrontation Clause on the range of admissible hearsay:  (1) "the Sixth  Amendment establishes a rule of necessity," which means that "the prosecution must either produce, or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant"; and (2) once the witness' unavailability has been demonstrated, the out-of-court statements must possess "indicia of reliability." *Id*. at 65-66. Because of the similar values intended to be protected by the hearsay rules and the Confrontation Clause, reliability may be found where the evidence falls within a "firmly rooted hearsay exception."  *Id*. at 66.  In other cases, the evidence may be admitted if it

possesses "particularized guarantees of trustworthiness. *Id.* After noting the vigorous intellectual discussion that had been taking place respecting the Confrontation Clause prior to *Roberts*, the Court stated that no commentator had demonstrated that the Court's prevailing analysis was in conflict with the Framers' intentions concerning the Confrontation Clause, and indicated its intention to stay the course. *Id.*

*Crawford*, however, is relevant to LaMar's claim only if its holding is retroactively applicable, since LaMar was tried long before *Crawford* was decided. In *Whorton v. Bockting*, 549 U.S. 406, 421 (2007), the Court held that although Crawford announced a "new rule" of criminal procedure, it did not fall within the *Teague v. Lane*, 489 U.S. 288 (1989), exception for "watershed" rules that would make the new rule applicable retroactively. Therefore, *Roberts* still guides this Court's analysis of LaMar's Confrontation Clause claim.[9]

Insofar as LaMar's challenge to Bass' testimony that an unidentified inmate told another unidentified inmate that LaMar was looking for the second unidentified inmate, no argument has been made by either party as to the speaking inmate's identification or

---

[9]Even if *Crawford* governed LaMar's case, as he claims in his Petition (Doc. No. 31 at 102), his claim would fail. *Crawford* itself recognized that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." 541 U.S. at 51; *see also Gendron v. Lafler*, No. 05-CV-74787-DT, 2007 WL 2005057 at *6 (E.D. Mich. July 10, 2007) (unpublished) (stating that "[t]estimonial statements do not include remarks made to family members or acquaintances," *citing Crawford*, 541 U.S. at 51-52, 54, 56; *United States v. Martinez*, 430 F.3d 317, 328-29 (6th Cir. 2005); *United States v. Stover*, 474 F.3d 904, 912-13 (6th Cir. 2007)). As nontestimonial statements, the other inmates' comments and questions to Bass would be subject to the state's hearsay rules, but not the Confrontation Clause. *Crawford*, 541 U.S. at 68.

unavailability. *Roberts*, 448 U.S. at 65-66. Nor has there been any discussion as to whether the out-of-court statement by the first inmate bore "indicia of reliability." *Id*. The same is true of the second statement LaMar cites from Bass' testimony concerning Derek Cannon's question to Bass as to whether Bass had seen LaMar. This Court need not grapple with those questions, however, as it is simply inconceivable that LaMar suffered prejudice from either of those two alleged violations of the Confrontation Clause.

The United States Supreme Court has long held that "a constitutional error does not automatically require a reversal of a conviction . . . [and] most constitutional errors can be harmless." *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991), *citing Chapman v. California*, 386 U.S. 18, 21-24 (1967). The Court has specifically recognized that violations of the Sixth Amendment Confrontation Clause are subject to harmless-error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). In *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), the Court observed that "[t]he standard for determining whether habeas relief must be granted is whether . . . the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict,'" *id.*, *quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946). The Supreme Court has also held that the *Brecht* standard governs a federal court's harmless-error review in habeas corpus cases. *Fry v. Pliler*, 551 U.S. 112, 120 (2007). Thus, in evaluating LaMar's claim to determine whether the asserted error was harmless, this Court simply answers whether LaMar has shown that the alleged error had a substantial and

injurious effect in determining the jury's verdict. *See Wilson v. Mitchell*, 498 F.3d 491, 503 (2007).

In spite of LaMar's characterization of Bass' testimony as "extremely relevant to the state's theory of the case," the statement of one inmate to another that LaMar was looking for him contributes little or nothing to the state's case. In addition, Cannon's question to Bass as to whether Bass had seen LaMar is not a statement at all, but an inquiry: Cannon asserted nothing with his question and it can only be inferred that Cannon did not at that moment know where LaMar was located, which is innocuous information. Bass' testimony regarding those two out-of-court statements of the unidentified inmate-declarant and Derek Cannon could have had no impact on the jury's verdict because they did not tend to prove any element of the offenses with which LaMar was charged. That may have rendered the statements irrelevant, but LaMar does not challenge them on that basis, and their admittance would be harmless in any case.

LaMar also fails to demonstrate prejudice from Bass' testimony that he heard Cecil Allen tell LaMar to get his boys together and go with Allen. LaMar makes no mention of Allen's availability or unavailability to testify, nor does he suggest that Allen's statement, testified to by Bass, either did or did not bear "indicia of reliability." *Roberts*, 448 U.S. at 65-66. Even if the Court were convinced that a Confrontation Clause violation occurred as a result of Bass' testimony concerning Allen's statement, however, no prejudice resulted and

any error was harmless, since there was evidence produced at trial and admitted without objection that linked Allen and LaMar together, and showed that Allen actually admitted LaMar and his group into the L-6 block shortly after the riot started. (Testimony of Stacey Gordon, Trial Tr. at 2610-11, 2653-54.) That testimony, more than Bass' report of Allen's statement to LaMar to "get his boys together," places LaMar in L-6, and demonstrates Allen's approval of LaMar's entrance into the L-6 block just before the murders occurred. Thus, Bass' testimony respecting Allen's statement to LaMar was not the strongest evidence admitted showing the relationship between Allen and LaMar, or demonstrating the cooperation between them concerning the events that occurred in the L-6 block.

LaMar has failed to demonstrate any violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution with regard to Bass' testimony. Had he done so, however, any error would be harmless as he has not shown prejudice from the alleged violation. Accordingly, his ninth ground for relief should be denied.

**Tenth Ground for Relief**

In his tenth ground for relief, LaMar contends the evidence presented at his trial was insufficient to sustain his convictions as a matter of law. (Petition, Doc. No. 31 at 104-10.) Respondent acknowledges that the claim was adjudicated on the merits in the state court, but argues that court's resolution of the claim was neither contrary to nor an unreasonable

application of federal law as determined by the United States Supreme Court.  (Return of

Writ, Doc. No. 32 at 38-39.)  LaMar alleges in his Traverse several ways in which the state

supreme court's resolution of his claim was contrary to federal law or based upon an

unreasonable determination of the facts.  (Doc. No. 43 at 92-93.)

In *In re Winship*, 397 U.S. 358 (1970), the United States Supreme Court held that "the

Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case

against conviction 'except upon proof beyond a reasonable doubt of every fact necessary

to constitute the crime with which he is charged.'"  *Jackson v. Virginia*, 443 U.S. 307, 315

(1979), *quoting Winship*, 397 U.S. at 364.  In *Stewart v. Wolfenbarger*, 595 F.3d 647 (6th Cir.

2010), the Sixth Circuit Court of Appeals summarized the law respecting claims of

insufficient evidence in the habeas corpus context as follows:

> A conviction is supported by sufficient evidence if, when
> "viewing the evidence in the light most favorable to the
> prosecution, *any* rational trier of fact could have found the
> essential elements of the crime beyond a reasonable doubt."
> *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (quoting
> *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in
> original)).  In a habeas proceeding, however, [a federal court]
> simply cannot conduct a de novo review of the state court's
> application of that rule, but must review its sufficiency-of-the-
> evidence decision under the highly deferential standard of
> [the] AEDPA.  *Id.*  [A habeas petitioner] can be granted habeas
> relief only if the [state court] unreasonably applied the *Jackson*
> standard.  *Id.*  [The federal court's] task is to "determine
> whether it was objectively unreasonable for [the state court] to
> conclude that a rational trier of fact, after viewing the evidence
> in the light most favorable to the state, could have found that

> [the petitioner] committed the essential element[s] of the [offense] beyond a reasonable doubt. . . ." *Nash v. Eberlin*, 258 Fed.Appx. 761, 765 (6th Cir. 2007).
>
> When reviewing whether the state court's determination was "objectively unreasonable," [the federal] court necessarily engages in a two-step analysis.  First, [it] must ask whether the evidence itself was sufficient to convict under *Jackson*.  The inquiry ends if the [court] determines that there was sufficient evidence to convict [the petitioner].  If [the court] find[s] that the evidence is insufficient to convict, [it] must then apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt.  The law therefore "commands deference at two levels." *Tucker [v. Palmer]*, 541 F.3d [652] . . ., 656 [(2008)].

*Stewart*, 595 F.3d at 653 (parallel citation omitted); *see Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).  In addition, "[t]he question 'is not whether a federal court believes the state court's determination . . . was incorrect[,] but whether that determination was unreasonable – a substantially higher threshold.'" *Knowles v. Mirzayance*, ___ U.S. ___, ___, 129 S.Ct. 1411, 1420 (2009), *quoting Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

LaMar presented the instant claim as three distinct propositions of law in the Ohio Supreme Court on direct appeal.  (Appendix, Vol. 10 at 213-20.)  This Court will consider the state court's decision in each in turn under the governing federal law cited above.

First, LaMar contended in the state court that there was insufficient evidence presented at trial to prove beyond a reasonable doubt that he caused Svette's death.  *Id*. at 213-16.  He acknowledged that Louis Jones testified that he saw LaMar hit Svette in the

head four to six times, *id*. at 213, but argued that other evidence submitted at trial showed

that Svette was alive when LaMar finished beating him and walked away, *id*. at 213-215.

The state supreme court rejected the claim, reasoning as follows:

> At least two witnesses testified that LaMar struck Svette's head multiple times with either a shovel or baseball bat. One of the witnesses added that LaMar even went back to Svette's cell to beat him a second time after noting that Svette was still alive. Furthermore, the forensic pathologist who testified for the state opined that Svette sustained four major blows to his head with a heavy object and that any one of those would have independently killed Svette. The jury was well within its province to infer that LaMar had struck one of those blows.
>
> The fact that others assaulted Svette and perhaps hastened his death does not undermine the sufficiency of the evidence to convict LaMar. Despite the actions of inmates Girdy and Frakes, who, according to witness testimony, finished Svette off, the evidence at trial supports an inference that LaMar's actions bore a causal connection to Svette's death. An offender who has inflicted injuries capable of causing death cannot escape culpability for homicide simply because intervening assailants have inflicted injuries that also contributed to the victim's death.

*State v. LaMar*, 95 Ohio St. 3d 181, 198, 767 N.E.2d 166, 2002-Ohio-2128 at ¶¶ 68-69 (2002)

(citations omitted). LaMar argues that the state court "assumes that LaMar struck one of

the blows that could have been responsible for Svette's death"; refers to unidentified

witness testimony that LaMar struck Svette several times,[10] and ignores testimony that

---

[10]One of the allegedly unidentified witnesses the court referred to in its opinion as having testified that LaMar hit Svette in the head four to six times happens to be the very same witness to which LaMar attributed that testimony in his Petition, Louis Jones. (Trial Tr. at 2736; Petition, Doc. No. 43 at 104-5.)

Svette was alive when LaMar stopped beating him; that Svette's injuries did not appear severe at that time; and that other inmates beat Svette after LaMar ceased.  (Traverse, Doc. No. 43 at 92.)  The problem with LaMar's argument is that it seems to equate the existence of contradictory or conflicting evidence with insufficient evidence to convict.

LaMar was indicted and convicted on two counts of aggravated murder with respect to William Svette's death.  (Appendix, Vol. 1 at 11-14; Vol. 6 at 18-19, 26-27.)  The statute setting forth the elements of those offenses is Ohio Rev. Code § 2903.01(A) and (B), which read in relevant part as follows:

> (A)  No person shall purposely, and with prior calculation and design, cause the death of another . . . .

> (B)  No person shall purposely cause the death of another . . . while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping . . . .

Here, LaMar challenges only the causation element of the two counts of aggravated murder relating to Svette.  (Petition, Doc. No. 43 at 104.)

At LaMar's trial, Anthony Walker testified that he saw LaMar hit Svette in the head with a bat; that in the photographs of Svette in death, he appeared more severely beaten than he did when LaMar was finished beating him; and that he also saw Eric Girdy strike Svette in the head twice with a bat following LaMar's attack.  (Trial Tr. at 2279, 2285, 2374-75.)  Louis Jones testified that LaMar struck Svette in the face with a shovel, began to move

away from Svette's cell, then went back into the cell to resume his attack on Svette, hitting him a total of four to six times with the shovel.  (Trial Tr. at 2733-36.)  Robert Bass testified that he saw inmate Freddy Frakes hit Svette's blanket-covered head with a bat after LaMar finished beating Svette.  (Trial Tr. at 2177-78.)  Dr. Leopold Buerger, who performed the autopsy on Svette, testified that Svette had sustained four blows to the front of his head, with multiple acute injuries to the lower forehead from one eye to the other, the nose, the cheek, both orbits of the eye sockets, the upper bone of the jaw, and the lower jawbone or mandible.  (Trial Tr. at 3235-36, 3238.)  Dr. Buerger also identified three skull fractures at the top of Svette's head which resulted from the blows to his forehead and face as well.  *Id*. at 3239.  Dr. Buerger determined that the injuries were inflicted by a blunt object, such as a bat or a shovel, rather than a sharp instrument.  *Id*. at 3240.  He testified that the injury to Svette's face was incompatible with survival, and that the skull fractures were also independently sufficient to cause death.  *Id*. at 3240-41.

Viewing that evidence in a light most favorable to the prosecution, this Court determines that a rational trier of fact could have found beyond reasonable doubt that LaMar's blows to Svette's head caused Svette's death.  *See Jackson*, 443 U.S. at 319.  In addition, the Ohio Supreme Court's similar conclusion is neither contrary to nor an unreasonable application of *Winship*, *supra*, and is not based upon an unreasonable determination of the facts as LaMar alleges.  28 U.S.C. § 2254(d).  LaMar contends that the

state supreme court merely assumed that one of LaMar's blows to Svette's head could have caused Svette's death, implies that the state court somehow failed its duty by referring to trial witnesses' testimony without identifying them by name, and alleges that the state court "seemed to ignore" evidence of additional attackers after LaMar finished beating Svette. (Traverse, Doc. No. 43 at 92.)  His arguments are in flat contradiction to the record. The Ohio court cited Dr. Buerger's testimony identifying blows to the face as the cause of Svette's death, and acknowledged that there was testimony offered at trial implicating other inmates in Svette's beating in addition to LaMar.[11]  *LaMar*, 95 Ohio St. 3d 198, ¶¶ 68 -69.  Furthermore, whether the state court cited witnesses by name in its opinion is irrelevant to the sufficiency of the evidence against LaMar.

The *Jackson* standard for federal habeas review of state convictions does not require that the trial record be exquisitely consistent in its entirety.  Were that the case, few if any convictions could withstand a challenge to the sufficiency of the evidence.  LaMar has not demonstrated that the evidence at his trial was insufficient to sustain his convictions for Svette's murder, nor has he shown that the Ohio Supreme Court's rejection of his claim of insufficiency of the evidence was an unreasonable application of federal law or based on an unreasonable determination of the facts.  Thus, the portion of his tenth ground for relief in which he challenges his convictions for the aggravated murder Svette should be denied.

---

[11]LaMar indicates that Eric Girdy entered a guilty plea to a charge that he murdered Svette as if that should exonerate him or cast doubt on his conviction.  (Traverse, Doc. No. 43 at 88 n.8.)  There is certainly no prohibition against two people being convicted of murder where both participated in the beatings that caused the victim's death.

Next, LaMar argues that there was insufficient evidence to support the specification that Dennis Weaver's murder was committed as part of a course of conduct involving the purposeful killing of two or more people.  (Petition, Doc, No. 31 at 106.)  He contends Weaver's murder was separated in time, place, and manner from the murders of Svette, Depina, Staiano, and Vitale.  *Id*. at 106-7.  Respondent summarizes LaMar's argument, and asserts that LaMar failed to "even attempt to articulate how the State court outcome is objectively unreasonable in fact or law," but provides no argument on the issue at all. (Return of Writ, Doc. No. 32 at 38-39.)

The specification of which LaMar was found guilty, and which he claims was not supported by sufficient evidence, provides in relevant part as follows:

> Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:
>
> . . . .
>
> (5)     . . . [T]he offense at bar was part of a course of conduct involving the purposeful killing of . . . two or more persons by the offender.

Ohio Rev. Code § 2929.04(A).  LaMar challenges only the "course of conduct" element of that specification.

The Ohio Supreme Court has expounded on the showing the state must make to

demonstrate that two offenses were part of the same "course of conduct," as follows:

> In [*State v.*] *Sapp*, [105 Ohio St. 3d 104, 822 N.E.2d 1239, 2004-
> Ohio-7008 (2004),] we held:
>
>> "The statutory phrase 'course of conduct' found in R.C.
>> 2929.04(A)(5) requires that the state establish some factual
>> link between the aggravated murder with which the
>> defendant is charged and the other murders or attempted
>> murders that are alleged to make up the course of conduct.
>> In order to find that two offenses constitute a single course
>> of conduct under R.C. 2929.04(A)(5), the trier of fact 'must
>> * * * discern some connection, common scheme, or some
>> pattern or psychological thread that ties [the offenses]
>> together.'"
>
> *Sapp*, 105 Ohio St. 3d 104, syllabus, quoting *State v. Cummings*
> (1992), 332 N.C. 487, 510.

*State v. Perez*, 124 Ohio St. 3d 122, 132, 920 N.E.2d 104, 2009-Ohio-6179 at ¶ 78 (2009).  The

state court has also recognized that "offenses can have significant differences in 'factual

circumstances and modi operandi,' and yet constitute a single course of conduct."  *Perez*,

124 Ohio St. 3d at 133, ¶ 80, *quoting Sapp*, 105 Ohio St. 3d 113, ¶ 58.  In *Sapp*, for instance,

there were numerous significant differences between the murders respecting the ages of

the victims, whether there were accomplices, whether the murders took place indoors or

outside, the weapons used, and the methods of killing the victims.  105 Ohio St. 3d at 113,

¶ 58.  In addition, the murders in *Sapp* were committed more than a year apart.  *Id*. at ¶ 57.

Those differences notwithstanding, the murders were held to be part of the same course

of conduct.  *Id*. at ¶¶ 58-61.

-90-

Although LaMar argues that Weaver's murder was committed pursuant to a scheme different from the other four murders, he fails to direct this Court's attention to any evidence in the record that suggests Weaver was killed for any reason other than that he was thought by LaMar to be a snitch, which is the same reason LaMar murdered at least three of the other four victims.  The record is, in fact, replete with testimony that all of the victims except Svette were murdered because they were, or were at least thought by LaMar to be, snitches.  (Trial Tr. at 2254, 2269, 2401, 2403-4, 2408, 2607-8, 2704-5, 2708, 2711, 2748, 2752-53, 2920, 2925, 2984, 2990-91.)  Most pointedly, perhaps, was Louis Jones' testimony that soon after the riot started, LaMar proposed to him that they should kill all the snitches, *id*. at 2704-5, 2711, and that after the first four murders, LaMar expressed regret that Weaver had not been inside the L-6 block when the others were murdered because he "would have killed him, too," *id.* at 2748.  Thus, the difference in time, place, and manner of killing LaMar contends distinguishes Weaver's murder from the others was more a consequence of opportunity rather than a fresh or unique motive to kill Weaver.  There was sufficient evidence presented at trial to support a finding that Weaver's murder was committed as part of LaMar's plan to kill all the snitches, which provides the "common scheme" or "common psychological thread" to tie Weaver's murder to the others. *See Sapp*, 105 Ohio St. 3d 104, syllabus, *quoting State v. Cummings*, 332 N.C. 487, 510, 422 S.E.2d 692 (1992).  *Accord*, *State v. McKnight*, 107 Ohio St. 3d 101, 124, ¶ 161, 837 N.E.2d 315 (2005).

Thus, the first step of the *Jackson* analysis weighs against LaMar.  *Jackson*, 443 U.S. at 319.

Given the ample evidence of LaMar's motivation in killing Weaver, Depina, Staiano, and

Vitale because they were or were believed to be snitches, this Court cannot say that the

Ohio Supreme Court's conclusion that a rational trier of fact could find Weaver was

murdered as part of a course of conduct to purposely murder two or more persons was

objectively unreasonable.  Consequently, the second step in the *Jackson* analysis also

disfavors LaMar's claim.  To the extent LaMar contends otherwise, therefore, his tenth

ground for relief should be denied.

Finally, LaMar argues that there was insufficient evidence to support his convictions

for committing the murders of Staiano, Svette, Depina, and Vitale in the course of

kidnapping them.  (Petition, Doc. No. 31 at 107-9.)  Respondent merely contends LaMar

failed to state how the Ohio court's decision respecting the matter was contrary to or an

unreasonable application of federal law.  (Return of Writ, Doc. No. 32 at 38-39.)  LaMar

counters that the state supreme court employed an erroneous standard in its review of his

claim.  (Traverse, Doc. No. 43 at 92-93.)

As the state supreme court explained, in order for LaMar to be found guilty on the

kidnapping specification, the state had to prove beyond a reasonable doubt that LaMar, by

force, threat, or deception, removed the victims from the places where he found them or

restrained their liberty to terrorize or inflict serious physical harm on them.  *State v. LaMar*,

95 Ohio St. 3d 181, 199, 767 N.E.2d 166, 2002-Ohio-2128 at ¶¶ 73-76 (2002), *citing* Ohio Rev.

Code §2905.01(A)(3).  Although somewhat lengthy, it is helpful to quote the state court's

decision respecting this part of LaMar's claim.

> In *State v. Maurer* [(1984)], 15 Ohio St. 3d 239, 242-243, this court
> considered a constitutional challenge to the validity of the R.C.
> 2929.04(A)(7) specification.  The defendant argued that "in
> virtually every aggravated murder the victim will be restrained
> from liberty for the purpose of terrorizing or the infliction of
> serious physical harm" and that the specification therefore
> violated the constitutional requirement that aggravating
> circumstances adequately distinguish between offenses that
> are death-eligible and those that are not.  See, generally,
> *Godfrey v. Georgia* (1980), 446 U.S. 420.  This court rejected the
> argument by interpreting the R.C. 2929.04(A)(7) specification
> to require proof of something more than a restraint or
> movement incidental to the commission of a murder.  That is,
> the court held that R.C. 2929.04(A)(7) requires "prolonged
> restraint, secretive confinement, or significant movement apart
> from that involved in the underlying crime in order to justify
> the application of the aggravating circumstance of
> kidnapping."  *Maurer*, 15 Ohio St. 3d at 243; see, also, *State v.
> Jenkins* (1984), 15 Ohio St. 3d 164, 197-198; *State v. Logan* (1979),
> 60 Ohio St. 2d 126, 135.
>
> LaMar argues that there was not enough evidence of either
> prolonged restraint, secretive confinement, or significant
> movement to sustain a conviction on the kidnapping
> specification.  For example, he argues, the evidence showed
> that Depina and Vitale were beaten inside their respective cells
> and in the range immediately in front of the cells.  As to the
> Staiano murder, LaMar points to evidence that Staiano tripped
> and fell as he tried to escape his cell, after which Taylor
> attacked him.  And with respect to the Svette murder, LaMar
> argues that there was no evidence suggesting that LaMar
> restrained Svette or removed him from his cell.  Accordingly,

LaMar contends that any restraint or movement was merely incidental to the beatings, distinguishing this case form others in which we have upheld convictions for the R.C. 2929.04(A)(7) specification.

If our focus were confined solely to the circumstances immediately preceding the murder of each victim, LaMar would have a substantial argument that any movement or restraint associated with any of them was incidental, at best, to the vicious assaults that caused their deaths.  But beyond the evidence of movement incidental to the killings themselves, there was evidence that rioting inmates confined their victims in various cells and would not allow them to escape to the recreation yard with the nonrioting inmates.   There was evidence that [Cecil] Allen, while each victim was locked in a cell, told LaMar and his group to "kill the snitches."  Thus, a reasonable jury could find that the inmates in control of L-6 confined suspected snitches for the purpose of terrorizing or inflicting serious physical harm.  Cf. _State v. Simko_ (1994), 71 Ohio St. 3d 483, 488-489 (finding sufficient evidence to support kidnapping specification when defendant restrained and terrorized victim for approximately a half-hour before murdering her as she tried to escape); _State v. Seiber_, 56 Ohio St. 3d, 4, 14-15 (kidnapping specification supported by evidence that, prior to shooting the victim, the defendant restrained bar patrons by ordering them on the floor and blocking exits).  In turn, a reasonable jury could conclude that LaMar assumed control over the victims' confinement after Allen relayed the order for LaMar to "kill the snitches."   Indeed, there was evidence  that LaMar ordered Grinnell to open each victim's cell, supporting the inference that LaMar had some measure of control over the physical location and movement of the victims.   Construing the evidence most strongly in the prosecution's favor, as we are required to do in a sufficiency-of-the-evidence inquiry, there was sufficient evidence that LaMar was at least an aider and abettor in the victim's confinement and thus capable of being "prosecuted and punished as if he were a principal offender" in the

> kidnappings. R.C. 2923.03(F); see, also, _State v. Bies_ (1996), 74
> Ohio St. 3d 320, 325. We therefore conclude that the trial court
> properly overruled LaMar's . . . motion for acquittal on the
> kidnapping specifications.

_LaMar_, 95 Ohio St. 3d at 199-201, ¶¶ 77-79 (parallel citations omitted). The Ohio court's

decision is an unreasonable application of federal law as determined by the United States

Supreme Court in _In re Winship_, 397 U.S. at 364, for the following reasons:

Recall that in _Jackson_, the Supreme Court held that the relevant question in

sufficiency-of-the-evidence challenges to state court convictions in federal habeas corpus

is "whether, after viewing the evidence in the light most favorable to the prosecution, _any_

rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." 443 U.S. at 319. The state court found LaMar became an aider and

abettor in the kidnappings of Svette, Depina, Vitale, and Staiano after he was given

permission to kill them. The record before this Court, however, contains no evidence of

a kidnapping of any of those four victims, as the state court apparently assumed had

occurred.

The Ohio Supreme Court accurately stated that after entering the L-6 block to

commit the murders, LaMar gave orders to other inmates to open certain cells so that his

plan to kill the men could be carried out. (Trial Tr. at 2266-70, 2279, 2718-26, 2732, 2738.)

But there was no testimony suggesting any of the men were put in the cells "by force,

threat, or deception" as required by Ohio Rev. Code § 2905.01(A). Instead, the record

contains uncontradicted evidence that the four victims were among those locked in cells by Siddique Hasan (fka Carlos Sanders) for their protection. Thomas Taylor was one of the men locked up by Hasan because some inmates were talking about killing him. (Trial Tr. at 2396.) Hasan assured him he would be safe in the cell in L-6, *id.*, and told him after the killings that he did not know how the killers got into L-6, *id.* at 2532. Stacey Gordon also testified that the prisoners who were locked in cells in L-6 were there for their own protection because word was circulating among the inmates that the "snitches" were going to be killed. *Id.* at 2608. Even if one were inclined to discount the testimony of those inmates, no evidence was presented that even suggested the "snitches" were locked in cells for any reason other than for their own protection. Thus, viewing the facts in a light most favorable to the prosecution, no rational trier of fact could find that the men were placed in the cells by force, threat or deception "to terrorize or inflict serious physical harm on them." See Ohio Rev. Code § 2905.01(A)(3). That they were eventually killed by LaMar, who had nothing to do with their having been locked up to begin with, does not retroactively transform their having been locked up for their protection into a kidnapping.[12]

_____

[12]Although the state court made no mention of LaMar's interactions with Thomas Taylor in its opinion, it is noted that the facts surrounding LaMar's locking Taylor in his cell after Taylor's murder of Staiano do not satisfy the requirements of the Ohio kidnapping statute either, and thus cannot be used to support LaMar's conviction on the challenged death specification. The Ohio law does not require the murder victim to have been the victim of the kidnapping or attempted kidnapping in order for an offender to be sentenced to death under Ohio Rev. Code § 2929.04((A)(7). Although Anthony Walker testified that Taylor stated he did not want to go back in his cell after Taylor killed Staiano at LaMar's direction (Trial Tr. at 2275, 2335), there was no testimony recounting any force used, threat uttered or threatening gesture made, or deception employed to put Taylor in the cell, not even from Taylor himself, *id.* at 2380-2499. The record provides no hint at all as to why Taylor was put back in his cell after Staiano's

The record is also devoid of any other act by LaMar that can be characterized as "prolonged restraint, secretive confinement, or significant movement apart from that involved in the underlying crime [of murder] in order to justify the application of the aggravating circumstance of kidnapping." *State v. Maurer*, 15 Ohio St. 3d 239, 243, 473 N.E.2d 768 (1984).  As was noted by the Ohio court in LaMar's case, the kidnapping specification "require[s] proof of something more than a restraint or movement incidental to the commission of a murder." *LaMar*, 95 Ohio St. 3d at 200.  The record in this case leaves no room for doubt that LaMar developed his plan to "kill the snitches" soon after the riot began and went about implementing it in an appallingly efficient and effective manner, wasting no time on "prolonged restraint, secretive confinement, or significant movement" other than what was necessary to carry out his plan to kill.

Evidence of a kidnapping was so lacking at LaMar's trial that no rational trier of fact could have found beyond a reasonable doubt that *any* element of Ohio's kidnapping statute was proved at his trial, even viewing the evidence in a light most favorable to the prosecution.  There being no evidence of a kidnapping, there is similarly no evidence that LaMar aided and abetted a kidnapping, as the Ohio Supreme Court found.  Thus, this Court finds that LaMar has satisfied the first prong of the *Jackson* test, and that the evidence produced at his trial was insufficient to convict him of having committed the murders of

_____

murder, making it impossible to find that he was put there for any purpose that might satisfy Ohio's kidnapping specification.

Depina, Svette, Vitale, and Staiano in the course of a kidnapping.

The state court's application of *Winship* to the facts of LaMar's case was objectively unreasonable. An application of federal law that is "objectively unreasonable" is different from an incorrect application of the law. *Williams v. Taylor*, 529 U.S. 362, 410 (2000). Here, this Court has no trouble concluding that the Ohio Supreme Court's conclusion that LaMar participated in at least one kidnapping as an aider and abettor was more than simply incorrect, it was objectively unreasonable. Beyond there being no support in the record to find the necessary facts to prove each element of Ohio's kidnapping statute, there was no evidence whatsoever of a kidnapping, either one initiated by LaMar or one he joined with others to maintain once the initial kidnapping had taken place. Thus, the second prong of *Jackson* has also been satisfied.

The record contains no evidence that LaMar participated in any kidnapping as it is defined in Ohio law. Having satisfied the test set forth in *Jackson*, LaMar has demonstrated that he was deprived of due process at his trial, and also that the Ohio Supreme Court's decision respecting the kidnapping specification was an unreasonable application of federal law as determined by the United States Supreme Court in the *Winship* case. That does not end this Court's inquiry, however. Now the Court must consider whether the error was harmless.

In *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993), the Supreme Court explained a

federal court's duty with regard to harmless error review as follows:

> Consistent with the jury-trial guarantee, the question . . . the reviewing court [is] to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks, we have said, to the basis on which "the jury *actually rested* its verdict." The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered – no matter how inescapable the findings to support that verdict might be – would violate the jury-trial guarantee.

*Id.*, quoting *Yates v. Evatt*, 500 U.S. 391, 404 (1991)(citations omitted), *disapproved of on other grounds, Estelle v. McGuire*, 502 U.S. 62, 73 n.4 (1991). Likewise in *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), the Court observed that "[t]he standard for determining whether habeas relief must be granted is whether . . . the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict,'" *quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946). Finally, the Supreme Court has held that the *Brecht* standard governs a federal court's harmless-error review in habeas corpus cases. *Fry v. Pliler*, 551 U.S. 112, 120 (2007). Thus, in evaluating LaMar's claim to determine whether the asserted error was harmless, this Court simply answers whether LaMar has shown that the alleged error had a substantial and injurious effect in determining the jury's sentencing verdict. *See Wilson v. Mitchell*, 498 F.3d 491, 503 (2007). This Court finds that the error respecting the

kidnapping specification did not have such an effect.

With regard to Depina, Svette, Staiano, and Vitale, LaMar was charged with two counts of aggravated murder for each killing, and each count had attached to it four aggravating circumstances, or capital specifications. (Appendix, Vol. 1 at 9-20.) Without reciting each in full, the specifications generally alleged that LaMar committed each murder while he was a prisoner in a detention facility, following a prior conviction for murder, as part of a course of conduct involving the killing of two or more individuals, and in the course of a kidnapping. *Id.* As noted above, LaMar was convicted on all counts and specifications. He has not challenged any of the specifications other than the "in the course of a kidnapping" specification, and this Court cannot agree with LaMar that elimination of the kidnapping specification in his sentencing determination had a substantial and injurious effect on the jury's verdicts for death. Of all of the aggravating circumstances, in fact, the kidnapping specification is the least weighty of the four.

LaMar has demonstrated that constitutional error occurred when he was found guilty of the kidnapping specifications without sufficient evidence to support the finding. Further, the Ohio Supreme Court's decision to the contrary was an unreasonable application of federal law as determined by the United States Supreme Court in *Winship*. He has failed, however, to show that the error had a substantial and injurious effect on his sentencing verdicts, and consequently he is not entitled to habeas corpus relief on his claim

that there was insufficient evidence to support the kidnapping specification.

None of LaMar's three insufficient-evidence arguments succeeds, and his tenth ground for relief should be denied as a result.

**Eleventh Ground for Relief**

In his eleventh ground for relief, LaMar contends admission of evidence pertaining to uncharged acts, specifically his attacks on inmates "Itchy" Walker and Andre Stockton, deprived him of a fair trial. (Petition, Doc. No. 31 at 110-12.) Respondent argues the claim is procedurally defaulted, and that the attacks on Walker and Stockton do not even constitute "other bad act" evidence. (Return of Writ, Doc. No. 32 at 37-38.) LaMar claims the issue was preserved by his having raised it as a claim underlying his ineffective assistance of appellate counsel claim in his application to reopen his direct appeal in the state court and that any procedural default is excused by appellate counsel's ineffectiveness. (Traverse, Doc. No. 43 at 95-97.) He urges this Court to address his claim *de novo*. *Id*.

As Respondent asserts, LaMar did not raise the instant claim as error on direct appeal in either the state court of appeals or the Ohio Supreme Court. (Appendix, Vol. 7 at 76-276; Vol. 10 at 81-274.) Since the claim is one that could have been decided on the record before the state courts and it was not raised, the claim is defaulted for federal habeas

corpus purposes. Failure to raise a constitutional issue at all on direct appeal is subject to the cause and prejudice standard of *Wainwright v. Sykes*, 433 U. S. 72 (1977). *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999); *Rust v. Zent*, 17 F.3d 155, 160-61 (6th Cir. 1994). LaMar offers as cause his appellate attorneys' ineffectiveness, referring the Court to his twenty-second ground for relief, *infra*. Because that claim fails, however, it can provide no excuse for LaMar's procedural default of the instant claim.

As in other grounds for relief, above, LaMar apparently believes raising the instant claim as an underlying instance of appellate counsel's ineffectivness in a state application to reopen his direct appeal preserves the underlying claim for habeas review. This Court has repeatedly rejected that proposition, *supra*. It fares no better here. Since LaMar failed to present the instant claim to the state courts, it is procedurally defaulted for habeas corpus purposes. Accordingly, LaMar's eleventh ground for relief should be denied.

Even if this Court were free to address LaMar's claim *de novo* as he has suggested, it would fail. A state trial court violates due process only if "admitting the evidence under state law violates 'fundamental conceptions of justice.'" *Webb v. Mitchell*, 586 F.3d 383, 397 (6th Cir. 2009), *quoting Dowling v. United States*, 493 U.S. 342, 352-53 (1990). As in *Webb*, LaMar "makes no attempt to show how the admission of [the other acts] evidence violated this standard." *Webb*, 586 F.3d at 397. Other than generic reference to "a fair trial and due

process of law," and rote mention of the "Fifth, Sixth, Eighth, and Fourteenth Amendments," LaMar relies exclusively on state criminal and evidentiary rules and state cases to support his claim. (Petition, Doc. No. 31 at 110-11.) Ohio law, in fact, allows the admission of evidence of "other crimes, wrongs, or acts" to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ohio R. Evid. 404(B). Upon a defense objection to testimony regarding LaMar's involvement in the beatings of Itchy Walker and Andre Stockton, the trial court allowed the evidence in to show proof of the "course of conduct" element of the capital specification appended to each of the nine counts of aggravated murder with which LaMar was charged. (Trial Tr. at 2261.) LaMar's further complaint that the prosecuting attorney failed to provide him with notice of the prosecution's intent to use the Walker/Stockton evidence is a matter of state law as well as meritless because the state rule allows only that the prosecutor "*may* give notice to the defendant" of his intent to use such evidence. Ohio R. Crim. Proc. 12(D)(1) (emphasis added). LaMar actually cites Ohio R. Crim. Proc. 12(D)(2), which provides that a defendant "may request notice of the prosecuting attorney's intention to use evidence in chief at trial, which evidence the defendant is entitled to discover under Crim. R. 16." He does not, however, provide any citation to the record, nor does he even allege, that he requested such notice of intent from the prosecutor. Thus, this Court has no reason to think that the prosecutor was obligated to provide such notice

under either sub-section of Ohio R. Crim. Proc. 12(D).  In any case, LaMar's contentions do not implicate the federal constitution.

LaMar procedurally defaulted his eleventh ground for relief by failing to raise it as error on direct appeal in the Ohio appellate and supreme courts.  Although he offers his appellate counsel's ineffectiveness as a cause for the default, he has not demonstrated that appellate counsel's performance was deficient, nor has he shown prejudice from the alleged error.  Including the claim as one underlying his state application to reopen his direct appeal does not save LaMar's claim from procedural default, either.  Accordingly, his eleventh ground for relief is procedurally defaulted without excuse, and should be denied.

**Twelfth Ground for Relief**

In his twelfth ground for relief, LaMar contends prosecutorial misconduct during all phases of his trial deprived him of a fair trial.  (Petition, Doc. No. 31 at 112-126.) Respondent acknowledges that the claim is preserved for habeas corpus review, but argues that LaMar's restatement of the same arguments he made in the state court falls short of meeting his burden under the AEDPA.  (Return of Writ, Doc. No. 32 at 44.)

LaMar has, as Respondent alleges, simply cut and pasted his argument from his briefs in the state courts into his Petition for federal habeas corpus relief as well as his

Traverse. His argument on the federal issue consists of four paragraphs, comprising slightly more than one page of text, most of which is a quotation from *Berger v. United States*, 295 U.S. 78 (1935), a case which this Court notes was brought to the United States Supreme Court on direct appeal from a federal conviction, unlike LaMar's procedural stance. (Traverse, Doc. No. 43 at 112-13.) LaMar also cites *Banks v. Dretke*, 540 U.S. 668 (2004), as a case that supports his claim, but there the sole instance of prosecutorial misconduct involved the withholding of exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). LaMar does not contend any of the instances of prosecutorial misconduct he alleges in the instant ground for relief violated the holding of *Brady*, however. Rather, his *Brady* claim is asserted in his first ground for relief, *supra*.

The Ohio Supreme Court parsed LaMar's claim into several sub-claims which can be summarized as follows:

1.  The prosecution ignored the trial court's order to provide transcripts of statements given by inmate witnesses;

2.  The prosecution repeatedly refused the trial court's orders to fully answer defense interrogatories;

3.  The prosecution failed to disclose summaries of inmate statements on confidentiality and inmate safety grounds;

4.  The prosecutor engaged in misconduct during *voir dire* by "getting into the facts" and improperly vouching for the credibility of prosecution witnesses;

5.    The prosecutor read from the indictment and autopsy reports during his opening statement;

6.    The prosecutor questioned trial court rulings on defense objections, asked improper questions and argued with witnesses, made inappropriate comments during trial and continued improper questioning even after the trial court sustained defense objections, and improperly delved into LaMar's prior murder conviction during trial;

7.    The prosecutor denigrated defense counsel, used gruesome photographs in an unfair manner, and implored the jury to return a guilty verdict on a capital specification simply so they could proceed to the penalty phase; and

8.    The prosecutor made improper arguments in the mitigation phase of the trial.

*LaMar*, 95 Ohio St. 3d, 190, ¶¶ 37-38, 121-83.  Although part or all of the fifth, seventh, and eighth instances cited were found to have been waived by trial counsel's failure to object to the challenged behavior and evaluated by the Ohio Supreme Court only for plain error,[13] Respondent has not advanced a procedural default defense as to those issues, leaving this Court free to address their merits in the first instance.

The Sixth Circuit has articulated the relevant standard for habeas claims of

_____

[13]The Sixth Circuit Court of Appeals has expressly and unequivocally held that a state court's plain-error review is not due deference under AEDPA because "[p]lain error analysis is more properly viewed as a court's right to overlook procedural defects to prevent manifest injustice, but *is not equivalent to a review of the merits*." *Lundgren v. Mitchell*, 440 F.3d 754, 765(6th Cir. 2006) (emphasis added).  *But cf. Fleming v. Metrish*, 556 F.3d 520, 539-40 (6th Cir. 2009) (finding that the state court's plain error review is an adjudication on the merits for habeas corpus purposes).

-106-

prosecutorial misconduct as follows:

> On habeas review, claims of prosecutorial misconduct are reviewed deferentially. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). To be cognizable, the misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id*. (citation omitted). Even if the prosecutor's conduct was improper or even "universally condemned," *id*., we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair. Once we find that a statement is improper, four factors are considered in determining whether the impropriety is flagrant: (1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial. *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). Under [the] AEDPA, this bar is heightened by the deference we give to the . . . [Ohio] Supreme Court's determination of . . . [Petitioner's] prosecutorial-misconduct claims. *See Macias v. Makowski*, 291 F.3d 447, 453-54 (6th Cir. 2002)("If this court were hearing the case on direct appeal, we might have concluded that the prosecutor's comments violated Macias's due process rights. But this case is before us on a petition for a writ of habeas corpus. So the relevant question is not whether the state court's decision was wrong, but whether it was an unreasonable application of clearly established federal law.").

*Bowling v. Parker*, 344 F.3d 487, 512-13 (6th Cir. 2003). In addition, an examination of alleged

prosecutorial misconduct is performed in the context of the trial as a whole. *United States*

*v. Beverly*, 369 F.3d 516, 543 (6th Cir. 2004), *citing United States v. Young*, 470 U.S. 1, 12 (1985)

and *United States v. Francis*, 170 F.3d 546, 552 (6th Cir. 1999).

LaMar's first three sub-claims contend the prosecution failed to provide the defense

with statements of the inmate witnesses the state intended to call, failed to answer interrogatories having to do with LaMar's claim of selective prosecution, and failed to turn over summaries of some inmates' statements. (Petition, Doc. No. 31 at 113-14.) The Ohio Supreme Court interpreted LaMar's claim as one asserting violations of the state's discovery provisions contained in Ohio R. Crim. Proc. 16. *LaMar*, 95 Ohio St. 3d at 190, ¶ 37. While LaMar challenges the Ohio court's decision respecting the prosecutor's conduct, he does not challenge the court's characterization of his claim as a discovery issue.

On direct appeal, the Ohio Supreme Court concluded that there was no reasonable probability that the outcome of LaMar's trial would have been different even if the prosecution had performed precisely as LaMar contends he should have respecting his first three sub-claims. *LaMar*, 95 Ohio St. 3d at 190, ¶ 38. In addition, since LaMar failed to produce credible evidence of selective prosecution, which was the subject of the interrogatories he claims the prosecutor should have responded to, the state court determined he was not entitled to discovery on that issue. *Id*.

A fundamental principle of federal habeas corpus review of state court convictions is that errors of state law are not cognizable in a federal habeas corpus proceeding. *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991). The Sixth Circuit Court of Appeals has indicated that discovery matters are governed by state law and do not implicate the federal constitution. *King v. Trippett*, 27 Fed. Appx. 506, 508, 2001 WL 1480878 at **2 (6th Cir. Nov. 13, 2001)

(unpublished opinion).  In addition, insofar as LaMar alleges the prosecutor failed to follow an order by the trial court to answer interrogatories or provide a list of inmates who had testified in other Lucasville cases, those complaints, too, are governed by state law.  If a state court is not willing to enforce its own order, this Court is certainly in no position to do so via habeas corpus.  Instead, this Court may grant the relief requested only if the "state court's error in interpreting or applying its own law has rendered the trial that convicted the [petitioner] . . . so fundamentally unfair as to have deprived [the petitioner] . . . of substantive due process in violation of the U[nited] S[tates] Constitution."  *Norris v. Schotten*, 146 F.3d 314, 329 (6th Cir. 1998), *citing Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993).

LaMar does not make that argument and instead simply states that the facts in his case are similar to those in *Berger* and that the state court's decision is contrary to the holding of that case.  *Berger* was, however, a case brought to the United States Supreme Court on direct appeal from a federal conviction.  295 U.S. 78.  The AEDPA requires more of a petitioner than is required of an appellant, especially where a habeas petitioner claims the state's failure to enforce its own law constituted a deprivation of his Fourteenth Amendment right to due process.  The question here is not whether the state court should have enforced its own orders, but rather whether the state court's failure to do so was an unreasonable application of clearly established federal law.

Even if LaMar has accurately characterized the facts of his case as similar to, or even "very similar" to those in *Berger*, he has not demonstrated that the Ohio Supreme Court's decision in his case was an "'objectively unreasonable' and not simply erroneous or incorrect" application of federal law. *See Williams v. Taylor* 529 U.S. 362, 409-11 (2000). LaMar's statement that the facts in his case and in *Berger* were sufficiently similar to dictate similar outcomes does not begin to establish that the misconduct in his case "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. at 181.  Accordingly, LaMar's first three sub-claims of his twelfth ground for relief should be denied.

In his fourth sub-claim, LaMar contends the prosecutor improperly stated during voir dire that LaMar engaged in "hands-on" killing and improperly vouched for the credibility of prosecution witnesses by stating that "a lot of them are very, very decent people that [sic] have made mistakes in the past." (Petition, Doc. No. 31 at 114.)  Even after a defense objection to that comment was sustained, the prosecutor went on to opine that a majority of the inmates caught up in the riot did not want to be involved.  *Id*.

The state supreme court found that the trial judge sustained a defense objection to the "hands-on" killing comment and admonished the jury that the prosecutor's statements are not evidence and should not be treated as such.  *LaMar*, 95 Ohio St. 3d at 210-11, ¶ 122. Consequently, it concluded that LaMar could not show prejudice from the prosecutor's

remark. The state court also determined that the prosecutor's comments generally characterizing the Lucasville inmates as decent people who wanted no part of the riot was not improper vouching for the credibility of prosecution witnesses, but rather legitimate exploration of the prospective jurors' attitudes toward witnesses who also happen to be inmates. *Id*. at 211, ¶ 124. In addition, since the witnesses called by LaMar in his defense were also inmates, the state court found that even if the prosecutor's remarks were error, it was harmless. *Id*.

LaMar does not address or challenge the specifics of the Ohio Supreme Court's conclusions, nor does he explain how he was prejudiced by the prosecutors statements. The prosecutor's brief mention of LaMar's "hands on" involvement in the murders could not have prejudiced the jurors against him since there was sworn testimony from several witnesses as to his active participation in the murders. In addition, the jurors were immediately informed after the statement was made that the prosecutor's comments are not evidence, as the state court noted. (Trial Tr. at 84); *LaMar*, 95 Ohio St. 3d at 211, ¶ 122. LaMar has not demonstrated that the state court's decision with regard to that comment was contrary to or an unreasonable application of federal law. The same is true of the prosecutor's alleged vouching for witnesses' credibility. Without exception, the witnesses who testified about LaMar's actual participation in the murders and his whereabouts during the riot were inmates. That is true of prosecution witnesses and it is true of defense

witnesses.  It is important to note that the prosecutor's statements did not single out any particular witness, but were spoken with regard to that general group of inmates who were in the recreation yard or the L-block during the riot; a group that included all of the inmate-witnesses to be sure, but many more inmates as well.  (Trial Tr. at 2204-5, 2225, 2702, 2749, 3035, 3165-66, 3347, 3377.)  Given that all of the witnesses to the murders were inmates, that the prosecutor's statements did not address the credibility of any specific witness or witnesses produced at the trial, and that both the prosecution and defense relied on inmate testimony, it is difficult to imagine what prejudice LaMar could have suffered as a result of the statements.  LaMar alleges, but does not demonstrate that the Ohio Supreme Court's similar conclusion was contrary to or an unreasonable application of federal law.  Although the Supreme Court did not address LaMar's contention that the prosecutor further vouched for a witness when he touted the experience of a law enforcement officer in his guilt-phase closing argument, LaMar raised it in the state court as well as in his habeas petition. (Appendix, Vol. 10 at 181; Petition, Doc. No. 31 at 115.)  Observing that a witness has fourteen years of experience and was the supervisor of the investigation of the riot, however, is not improper vouching for a witness' credibility, so the argument adds nothing to his sub-claim.  As such, he has failed to establish his entitlement to habeas corpus relief on his fourth sub-claim of his twelfth ground for relief.

Next, LaMar contends the prosecutor's reading from the indictment and autopsy

reports during his opening statement deprived him of a fair trial. (Petition, Doc. No. 31 at 115.) The state court observed that it is not improper for the prosecutor to read from the indictment in opening statement, reasoning that since the jury is permitted to have a copy of the indictment during their deliberations, no prejudice can flow from its reading during opening statements. *LaMar*, 95 Ohio St. 3d at 211-12, ¶ 127. In addition, the court noted that the jury was advised that neither the prosecutor's statements nor the indictment are evidence of guilt. *Id*.

The state court determined that LaMar had waived the issue respecting the prosecutor's reading from the autopsy reports by not objecting to the conduct at trial. *LaMar*, 95 Ohio St. 3d at 211, ¶ 126. The court proceeded to evaluate LaMar's claim under the plain error standard of review applicable to waived claims, and found none. *Id*. A state appellate court's review for plain error is enforcement, not waiver, of a procedural default. *Smith v. Bradshaw*, 591 F.3d 517, 522-23 (6th Cir. 2010); *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005); *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Hinkle v. Randle*, 271 F. 3d 239, 244 (6th Cir. 2001), *citing Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) (stating that plain error review does not constitute a waiver of procedural default). *But cf. Fleming v. Metrish*, 556 S.3d 520, 530-32 (6th Cir. 2009) (concluding that the state court's plain error review is an adjudication on the merits for habeas corpus purposes). Moreover, Ohio's doctrine of *res judicata* in criminal cases,

enunciated in *State v. Perry*, 10 Ohio St. 2d 175, 226 N.E. 2d 104 (1967), paragraph nine of the syllabus, has been found by the Sixth Circuit Court of Appeals to be an adequate and independent state procedural ground that may, if not excused, result in procedural default of a claim in federal habeas corpus. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007); *Mason v. Mitchell*, 320 F.3d 604, 628 (6th Cir. 2003); *Coleman v. Mitchell*, 268 F.3d 417, 427 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000). In addition, the Ohio courts have consistently enforced the rule. *State v. Cole*, 2 Ohio St. 3d 112, 113, 443 N.E.2d 169 (1982); *State v. Ishmail*, 67 Ohio St. 2d 16, 17-18, 423 N.E.2d 1068 (1981). Thus, it appears that LaMar procedurally defaulted that portion of his twelfth ground for relief alleging a deprivation of his federal constitutional rights as a result of the prosecutor's reading from the autopsy reports in opening statements. Respondent has not advanced the defense, however, so this Court will address the merits of the claim, a simple task since, even assuming the issue is one not exclusively of state evidentiary law, LaMar has cited no federal law making it inappropriate, much less an error of constitutional proportions, to read an indictment or quote from autopsy reports in opening statements. The substance of the prosecutor's statements was properly admitted through witnesses as evidence during the trial, and the jurors were cautioned that the prosecutor's statements were not evidence in the case. Thus, no prejudice to LaMar resulted from the prosecutor's reading from the indictment and autopsy reports in his opening statement. LaMar's fifth sub-claim

of his twelfth ground for relief should be denied.

In his sixth sub-claim, LaMar posits that the prosecutor's challenges to and failures to abide by trial court rulings, improper questions and comments, arguing with witnesses, and delving into LaMar's prior murder conviction during his trial constituted prosecutorial misconduct.  (Petition, Doc. No. 31 at 115-22, 124.)  Here, in as concise a fashion as is possible without sacrificing context, are the statements LaMar argues constitute prosecutorial misconduct:

1.   In the redirect of a prosecution witness, the prosecutor began by stating "Mr. Bass, as far as [defense counsel] intimating to the jury that perhaps. . . ."  After a defense objection, the trial court directed the prosecutor to rephrase his question.  (Trial Tr. at 2234-35.)

2.   During defense counsel's cross-examination of a prosecution witness on how the witness came to have a copy of his own statement to review prior to testifying, the prosecutor interrupted, stating "Judge, I will agree that if that's what [defense counsel] wants, I brought that over and I . . . . I gave it to him to review. . . . a day or so ago or two days ago."  A defense objection was not ruled upon by the trial judge, but the court acknowledged that the prosecutor provided the information defense counsel was trying to elicit from the witness.  (Trial Tr. at 2188-89.)

3.   As defense counsel questioned prosecution witness Thomas Taylor about the number of times and dates upon which he was interviewed prior to his testimony, the prosecutor interrupted, stating, "I'll stipulate I prepared my case and talked to every witness."  The trial court immediately stated, "No comments."  (Trial

Tr. at 2474.)

4.     During the prosecution's cross-examination of a defense witness, the prosecutor suggested the witness was not telling the truth, drawing a defense objection which was sustained. (Trial Tr. at 3359-60.)

5.     During the prosecution's cross-examination of another defense witness, Cory Perkins, the prosecutor asked the witness if he and LaMar had dealt drugs together, if LaMar finished high school, if the witness knew the person LaMar had killed previously, if the witness was in Cleveland when LaMar killed that person, if he had talked to LaMar about that murder, and whether he was testifying to help his friend LaMar out so he would not "get in trouble with this jury for what he really did." (Trial Tr. at 3394-96.) Each of those questions drew a defense objection, and each objection was sustained.

6.     The prosecutor asked a defense witness on cross-examination why he went into greater detail during his testimony than he did when giving his statements to police. The witness responded that he left out "just different things . . . that ain't really no big thing." The prosecutor stated, "What did you leave out? We'll decide if it's a big thing or not." An immediate defense objection was sustained on the ground that the prosecutor's comment was argumentative.

7.     At a bench conference, the trial court stated it would allow the prosecution to ask LaMar on cross-examination if he was a boxer. Instead, the prosecutor asked LaMar if, as a boxer, he was "trained to deliver a knockout blow." An objection was sustained. Undeterred, the prosecutor asked, "And as a boxer you have a killer instinct, don't you Mr. LaMar?" A second objection was sustained and the prosecutor was directed to go to a different line of questioning. (Trial

Tr. at 3596-97.)

The Ohio Supreme Court found the prosecutor's conduct improper and unprofessional, but held that because most of the offending questions and statements by the prosecutor drew objections that were sustained, the outcome of the trial was not affected by the prosecutor's misconduct. *LaMar*, 95 Ohio St. 3d at 213, ¶ 149. LaMar does not address the state court's finding that no prejudice resulted from the prosecutor's comments, other than noting that the facts in the *Berger* case are similar to those in his, and that a similar result should obtain. (Traverse, Doc. No. 43 at 112-13.)

The state court's finding that the prosecutor's statements were improper and unprofessional has not been challenged, and this Court agrees with the state court's characterization of the prosecutor's conduct. Thus, the next step for this Court is to determine whether the state court's determination that the remarks were not so flagrant that they rendered LaMar's entire trial fundamentally unfair was contrary to or an unreasonable application of federal law. *Bowling v. Parker*, 344 F.3d 487, 512-13 (6th Cir. 2003).

At the outset of LaMar's trial, the trial court explained to the jurors that it is their sworn duty to accept the law as it is given to them by the court. (Trial Tr. at 1961.) The trial court's preliminary instructions to the jurors also included the following:

> Remember that attorneys are not witnesses. And since it is
> your duty to decide the case solely on the evidence which you

see or hear in this case, you must not consider as evidence any statement of any attorney made during the trial.

. . .

If a question is asked and the objection to the question is sustained, you will not hear the answer; and you must not speculate as to what the answer might have been or as to the reason for the objection.  If an answer is given to a question and the Court then grants a motion to strike out the answer, you are to completely disregard such question and answer and not consider them for any purpose whatsoever.

A question in and of itself is not evidence and may be considered by you only as it supplies meaning to the answer.

(Trial Tr. at 1966-67.)

As noted above, and as the state court recognized, many of the defense's objections to the prosecutors' unprofessional conduct were sustained.  At the close of the guilt phase of LaMar's trial, the jurors were reminded by the trial court that "evidence is all the testimony received from the witnesses and the exhibits admitted during the trial, facts agreed to by counsel and any facts which the Court requires you to accept as true."  (Trial Tr. at 3832.)  The trial court also repeated its earlier instruction that statements or answers stricken by the court or that the jurors were ordered to disregard are not evidence and cannot be considered in their deliberations.  *Id*. at 3833.  The jurors were directed not to speculate about the answer to any such question.  *Id*. at 3833-34.

A jury is presumed to follow all of the trial court's instructions.  *Hall v. Vasbinder*, 563

-118-

F.3d 222, 238 (6th Cir. 2009), *citing United States v. Sivils*, 960 F.2d 587, 594 (6th Cir. 1992).

Thus, although the prosecutors' comments were deliberately made and could have misled the jury absent curative instruction, it is presumed that the jury followed the instruction to disregard those questions and comments to which objections had been sustained. This Court observes that the remaining comments, objections to which either were not made or were overruled, are not extensive, are unlikely to have misled the jurors, and although deliberately made, are significantly overwhelmed by the amount of evidence against LaMar. Accordingly, the guilt-phase statements by the prosecutors which LaMar challenges here were not flagrant and did not deprive him of his constitutional right to due process of law. LaMar's sixth sub-claim of his twelfth ground for relief should be denied.

Next, LaMar assails the conduct of the prosecutors during the guilt-phase closing arguments. (Petition, Doc. No. 31 at 121-22.) Specifically, LaMar contends the prosecutor denigrated the defense by saying defense counsel got very excited and put on a show, pointing out that defense counsel usually called LaMar by his first name as part of an "angle" to humanize LaMar, and repeatedly argued that the defense strategy was to criticize the prosecution's case even after an objection to that argument had been sustained. *Id*.

The state supreme court found the prosecutor's ridicule of the defense's effort to remind the jury that LaMar is a human being, and his juxtaposition of his "honest" case

with the defense's "insincere" case improper. *LaMar*, 95 Ohio St. 3d at 216, ¶ 167. When viewed in the context of the whole trial, however, the state court concluded that the result of LaMar's trial would not have been different without the improper conduct by the prosecutor in closing argument. *Id*. at ¶ 168. Again, LaMar does not explain how the state court's decision is contrary to or an unreasonable application of federal law except to state that the facts in his case are similar to those in *Berger, supra*, and should compel the same result. Because Berger's path to the United States Supreme Court was through direct appeal from a federal conviction, however, he did not have the added burden that the AEDPA imposes on LaMar, and so even if the facts of the two cases are as similar as LaMar contends, that alone does not compel similar results.

To succeed on his claim, LaMar would have had to demonstrate that the Ohio Supreme Court's decision was not just a different result from similar facts, but that the court's application of clearly established federal law was so far afield as to be "diametrically different, opposite in character or nature, or mutually opposed." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). That, LaMar has not done, and has not even attempted to do.

LaMar also contends the prosecutor used photographs of the victims inappropriately during closing arguments. (Petition, Doc. No. 31 at 122.) The Ohio Supreme Court observed that trial counsel did not object to the photographs at the time,

so all but plain error was forfeited, and concluded there was none.  *LaMar*, 95 Ohio St. 3d at 216, ¶ 169.  The court reasoned that "[t]he prosecutor focused his comments on what the photographs proved and did not make any emotional appeals to the jury to find LaMar guilty simply on the basis of what the photographs showed."  *Id*.

As noted above, a state appellate court's review for plain error is enforcement, not waiver, of a procedural default.  *Smith v. Bradshaw*, 591 F.3d 517, 522-23 (6th Cir. 2010); *Lundgren v. Mitchell,* 440 F.3d 754, 765 (6th Cir. 2006); *White v. Mitchell,* 431 F.3d 517, 525 (6th Cir. 2005); *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Hinkle v. Randle,* 271 F. 3d 239,244 (6th Cir. 2001), *citing Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) (stating that plain error review does not constitute a waiver of procedural default).  Plain error analysis is more properly viewed as a court's right to overlook procedural defects to prevent manifest injustice, but is not equivalent to a review of the merits.  *Paprocki v. Foltz*, F.2d 281, 284-85 (6th Cir. 1989).  *But cf. Fleming v. Metrish*, 556 F.3d 520, 530-32 (6th Cir. 2009)(finding that the state court's plain error review is an adjudication on the merits for habeas corpus purposes).  Although LaMar procedurally defaulted his claim that the prosecutor engaged in misconduct by misusing the photographs of the victims, Respondent has not raised the defense, so this Court will address the claim's merits.

As was noted in LaMar's eighth ground for relief, the photographic exhibits from his trial have not been made a part of the record before this Court.  Thus, his sub-claim

must be considered based solely on the transcript of the prosecutor's closing argument

relating to the photographs, which, in relevant part, reads as follows:

> You're also going to have other photos inside that were also described to you but you couldn't see. This used to be what Darrell Depina looked like. This is what he looked like after Keith LaMar killed him. That's what he looked like when he got taken out from L6 and put on the yard. Exhibit 24H is what he looked like when his wounds were cleaned up by the coroner and you can see them more fully.

> This was Bruce Vitale before he was killed by Keith LaMar. That's Bruce Vitale when he was taken out of the yard the night of the 11th. This is Bruce Vitale's ear that Dr. Stephens told you about. Mr. Toy told you that Dr. Stephens didn't see any puncture wounds, but he told you very clearly that there were puncture wounds on his neck but he really wasn't paying that much attention to those wounds because they were very superficial and he was more concerned about the trauma. [Exhibit] 26M is Bruce Vitale's skull after his scalp was peeled away to show the massive fractures in his head done by this man right here.

> [Exhibit] 22A was Albert Staiano. This was Albert Staiano when he left L block after Tony Taylor used a bat and a fire extinguisher on him at the direction of Keith LaMar. [Exhibit] 22G, Mr. Staiano's ear showing how badly beaten he was. And [Exhibit] 22D, his scalp, his head after it was shaved showing the massive injury caused by Tony Taylor at Keith LaMar's direction.

> I apologize for doing this, but it has to be done.

> This is William Svette. He was the 69-year-old man with the walker. He's the one that Lou Jones told you he – even after seeing what Keith LaMar had done to these people, he had the courage to take Keith LaMar's arm and say don't go back and

do it.  He couldn't stop him.  He couldn't stop him.

That's Mr. Svette at the coroner's lab.  These are the stellate, star-shaped wounds in Mr. Svette's neck.  I apologize in advance for showing you this, but this is Mr. Svette's head after Keith LaMar, Eric Girdy, and Frederick Frakes were finished with him.

This was Dennis Weaver while he was alive.  This is Dennis Weaver when he got removed from the cell.  You can see the toilet paper top shoved in his mouth.  You can't tell from this, but it went very deep in his mouth.  This is Mr. Weaver with the strings tied around his neck.  This is after the strings had been removed.  And, again, I apologize for showing you this, but this is the picture of his throat when the plastic bag that you can see in this photo, you can see how far down that plastic bag is shoved when you look at it in the jury room.

(Trial Tr. at 3814-16.)

LaMar claims the prosecutor "pointed out every gross injury he could" in his closing argument.  (Petition, Doc. No. 31 at 122.)  That may be true, but there is a reason why LaMar has not cited a case in which the United States Supreme Court has held that such argument is violative of the defendant's right to due process of law – it is because there is no case for that proposition.  The injuries sustained by the victims in LaMar's case were relevant to the mens rea element of the aggravated murder counts, and the photographs of the victims in life were relevant to their identification.  The prosecutor did not use particularly inflammatory language in describing the injuries, and for the most part, confined his argument to a factual description of the injuries shown in the photographs.

Accordingly, no prosecutorial misconduct occurred, and that portion of LaMar's seventh sub-claim of his twelfth ground for relief should be denied.

LaMar also contends the prosecutor engaged in misconduct by arguing that the only way to "get to the penalty phase" was for the jury to find LaMar guilty of aggravated murder and at least one of the capital specifications. (Petition, Doc. No. 31 at 122.) He acknowledges that the trial court sustained defense counsel's objections to that argument, *id.*, but does not explain how the state appellate court's finding that the trial court's instruction to the jury to disregard the prosecutor's statements dissolved any prejudice from the argument was contrary to or an unreasonable application of federal law. *See LaMar*, 95 Ohio St. 3d at 216-17, ¶ 170. Nor does this Court find it to be so. That the prosecutor's comments were deliberate is evidenced by his repetition of them even after the court sustained defense counsel's first objection. (Trial Tr. at 3824-25.) The statements were not an incorrect statement of the law, so were not likely to mislead the jurors. The trial court's sustaining of defense counsel's objections communicated to the jurors that the comments were not to be considered, especially when viewed in conjunction with the court's instruction that the statements of the attorneys is not evidence. (Trial Tr. at 3824-25, 3832-34.) A trial court's instructions are "presume[d] to have been effective unless there is an 'overwhelming probability' that they were ignored." *Scott v. Mitchell*, 209 F.3d 854, 879 (6th Cir. 2000), *quoting Richardson v. Marsh*, 481 U.S. 200, 208 (1987). LaMar has

-124-

presented no evidence to suggest that the jury in his case did not follow the instructions respecting the prosecutor's statements.  Accordingly, LaMar's claim that the prosecutor's comments that the only way to "get to the penalty phase" was to find him guilty of one or more aggravating circumstance amounted to a deprivation of his federal constitutional right to due process should be denied.

Each of the instances of alleged prosecutorial misconduct LaMar cites in his seventh sub-claim of his twelfth ground for relief fails.  Together, they fare no better as there is no prejudice to cumulate.  Consequently, LaMar's seventh sub-claim should be denied.

In his eighth sub-claim, LaMar contends that the prosecutor engaged in misconduct during the guilt phase of his trial by questioning LaMar and another witness, Cory Perkins, about a murder LaMar had previously committed, and in the mitigation phase by certain comments the prosecutor made during his closing argument.  (Petition, Doc. No. 31 at 122-25.)  The prosecutor's cross-examination of Cory Perkins was fully considered in this Court's discussion of LaMar's sixth sub-claim in the instant ground for relief, and will not be considered further.

LaMar argues the prosecutor's questions to him respecting the prior murder during cross-examination in the guilt phase of his trial was an attempt to "turn the fact that [he] faced life imprisonment prior to the riot into an aggravating circumstance" and an error of constitutional dimension.  The state supreme court found that the trial court sustained

a defense objection to the prosecutor's questions, and concluded that there was "nothing unduly prejudicial about the prosecutor's conduct in this respect." *LaMar*, 95 Ohio St. 3d at 214, ¶¶ 150-51.  In a broader sense, the Sixth Circuit Court of Appeals has repeatedly held that "the consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the Constitution." *Durr v. Mitchell*, 487 F.3d 423, 442 (6th Cir. 2007), *quoting Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003) (internal quotation marks omitted), *citing Barclay v. Florida*, 463 U.S. 939, 956-58 (1983); *Nields v. Bradshaw*, 482 F.3d 442, 451 (6th Cir. 2007); *Slagle v. Bagley*, 457 F.3d 501, 521 (6th Cir. 2006).  Thus, LaMar's argument is unavailing.

The comments LaMar contends constituted prosecutorial misconduct in the mitigation phase of his trial are that (1) plenty of people have come from a similar background as LaMar and led successful lives; (2) questioning whether the mitigation evidence lessens what LaMar did during the riot; (3) arguing that the prior killing was not random, but the result of a conscious choice by LaMar to shoot his friend in the heart; (4) noting that LaMar was a happy, well-adjusted child until the age of four or five; (5) that LaMar had a life sentence for the prior murder and "look what happened"; and (6) the mitigation evidence was greatly outweighed by the aggravating circumstances.  (Petition, Doc. No. 31 at 123.)  The Ohio Supreme Court held that since defense counsel failed to object to any of the challenged comments, all but plain error was waived.  *LaMar*, 95 Ohio

St. 3d at 217, ¶ 177. Respondent erroneously states the claim was adjudicated on its merits (Return of Writ, Doc. No. 32 at 44), but it is clear that the state court enforced the procedural rule that requires a contemporaneous objection to preserve an issue for appellate review. Ohio's contemporaneous objection rule — that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, as set forth in *State v. Glaros*, 170 Ohio St. 471, 166 N.E.2d 379 (1960), paragraph one of the syllabus; *see also State v. Mason*, 82 Ohio St. 3d 144, 162, 694 N.E.2d 932 (1998) — is an adequate and independent state ground. *Nields v. Bradshaw*, 482 F.3d 442, 451 (6th Cir. 2007); *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003), *citing Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854, 867 (6th Cir. 2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). As noted above, a state appellate court's review for plain error is enforcement, not waiver, of a procedural default. *Lundgren v. Mitchell,* 440 F.3d 754, 765 (6th Cir. 2006). As LaMar has offered no cause and prejudice to excuse the default, his claim is procedurally defaulted and should be denied on that ground.

Even if this Court were to consider the state court's discussion in conducting plain-error review of the claim, however, LaMar's argument would fail. The state court indicated that there was nothing improper in the prosecutor's arguments, and that in fact all were fair comment on the evidence presented, or a fair response to an argument made earlier by

the defense. *LaMar*, 95 Ohio St. 3d at 217-18, ¶¶ 178-80. Were this Court to apply the AEDPA to LaMar's claim, it would find no fault with the state court's decision. Indeed, even if the Court were to address the claim *de novo*, it would come to a similar conclusion.

All of the issues raised in LaMar's eighth sub-claim of his twelfth ground for relief have either been dealt with elsewhere in this Report and Recommendations, are meritless, or are procedurally defaulted without excuse. Having considered each of LaMar's eight sub-claims and concluded that all should be denied, there is no error or prejudice to cumulate that might warrant the extraordinary relief requested. Accordingly, LaMar's twelfth ground for relief should be denied.

**Thirteenth Ground for Relief**

In his thirteenth ground for relief, LaMar essentially advances again one of his prosecutorial misconduct sub-claims from his twelfth ground for relief, couching it sometimes in terms of trial court error. Specifically, LaMar argues that although the trial court properly instructed the jury that mitigating factors are relevant to the issue of whether LaMar should be sentenced to death, the prosecutor's comments questioning whether the mitigating evidence lessened LaMar's culpability during the riot basically overrode the court's instruction. (Petition, Doc. No. 31 at 127-30.) Respondent indicates the claim was adjudicated on the merits and rejected by the state supreme court, and that

LaMar's "mere restating of direct appeal arguments fails to address LaMar's burden under [the] AEDPA." (Return of Writ, Doc. No. 32 at 44.)  Undeterred, LaMar cuts and pastes his state-court arguments into his Traverse as well, then likens the prosecutor's comments in his case to those in a case in which habeas corpus relief was granted. (Traverse, Doc. No. 43 at 114-19.)

Here, in context, is the comment LaMar claims deprived him of a fair sentencing hearing (Mr. Tieger is the prosecuting attorney, and Mr. Carson is defense counsel):

> Mr. Tieger: The second decision you have to make is all of the testimony that you have heard over the last two days, number one, is that mitigating?  Does that lessen what he did?  Does that explain what he did or justify what he did?

> Mr. Carson: Objection, your Honor.  Can we approach the Bench?

> The Court: You may.

> (Bench conference was had.)

> Mr. Carson: Your Honor, Mr. Tieger is well aware that mitigation is neither an explanation or a justification for the offense, and that was a totally inappropriate comment to this jury.

> It is the second one he's made in this part of the argument, and we would ask for a mistrial.  He knows that mitigation is neither a justification or an explanation, and to stand up there and tell that jury is nothing short of outright attempt to further deprive Keith of a fair trial.

Mr. Tieger:  Judge, what is it?  I mean, that's exactly what it is.  I was trying to be fair to the Defense when I said that.  I wasn't trying to inflame them in any way, shape, or form.

The Court:  Just stick to the aggravating circumstances . . . .

(Bench conference concluded.)

The Court:  The jury [will] disregard the last remark.

. . .

Mr. Tieger:  There may be some mitigation in this case, but it certainly does not rise to nearly the level of the aggravating circumstances.  Nothing was presented that mitigated what he did, and any mitigation is greatly outweighed and absolutely eclipsed by the aggravating circumstances.

(Trial Tr. at 4292-93, 4302.)

The Ohio Supreme Court found that LaMar had overstated the significance of the comments since an objection to the first comment was sustained and the jury was instructed to disregard it, and the second comment did not warrant a mistrial.  *LaMar*, 95 Ohio St. 3d at 204-5, ¶¶ 91-92.  The court further held that in any case, if error occurred from the prosecutor's comments, it was cured by the trial court's instruction that the mitigating factors are "relevant to the issue of whether the Defendant should be sentenced to death."  *Id.*

LaMar argues the state court's decision is contrary to the federal law summarized

by the Sixth Circuit Court of Appeals in *DePew v. Anderson*, 311 F.3d 742 (6th Cir. 2002),

which is as follows:

> The Supreme Court has clearly established that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Lockett [v. Ohio]*, 438 U.S. [586 . . .,] 604 [(1978)] (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)). This means that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id*.

> This consideration of mitigating factors – required by the Eighth  Amendment – is necessary to allow the required individualized determination of whether a defendant should be sentenced to death. *Tuilaepa v. California*, 512 U.S. 967, 971-73 (1994); *Zant v. Stephens*, 462 U.S. 862, 878-79 (1983). The Supreme Court's "consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998).

> The Eighth Amendment mitigation requirement also applies to the actions of prosecutors. *See Caldwell v. Mississippi*, 472 U.S. 320[, 328-30](1985) (a prosecutor's comments that led the jury to believe that later an appellate court could mitigate the death sentence violates the Eighth Amendment because it misleads the jury as to its responsibility). When a prosecutor's actions are so egregious that they effectively "foreclose the jury's consideration of . . . mitigating evidence," the jury is unable to make a fair, individualized determination as required by the Eighth Amendment. *Buchanan*, 522 U.S. at 277. As a result, a

> prosecutor's comments violate the Eighth Amendment when
> they are so prejudicial as to "constrain the manner in which the
> jury was able to give effect: to mitigating evidence. *Id.*

*DePew*, 311 F.3d at 748.  In *DePew*, the Sixth Circuit found the prosecutor's evisceration of

the heart of the mitigation evidence presented by the defendant warranted habeas corpus

relief.  The prosecutor's conduct in that case, however, was substantially more outrageous

and prejudicial than the comments of which LaMar complains:

> [T]he prosecutor in this case openly declared at a pretrial
> hearing that he did not care whether the appellant received fair
> treatment. Later the prosecutor informed the jury of an alleged
> knife fight, which was not in evidence, and implied thereby
> that appellant was guilty of wrongdoing, of which there was
> absolutely no evidence. Further, the prosecutor commented to
> the jury on a subsequent conviction of appellant, unsupported
> by any evidence in the record, and then [after being
> admonished by the trial judge, who had previously warned
> against mention of such] told the jury that no such conviction
> existed.  The prosecutor then exhibited and commented on a
> totally irrelevant photograph [allegedly] depicting appellant
> next to a marijuana plant.  Further, the prosecutor, in his
> closing remarks at the penalty stage, told the jury that "[i]t's
> not necessarily true that if you get three counts of twenty to life
> that it would add up to sixty – that's not necessarily true."
> While this does not involve a total misstatement of the law, . .
> . it certainly could be construed as misleading.

*Depew*, 311 F.3d at 744-45, *quoting State v. DePew*, 38 Ohio St. 3d 275, 288, 528 N.E.2d 542,

556 (1988).

The prosecutor's two statements in LaMar's case can hardly be compared to the

egregious and inflammatory statements and conduct of the prosecutor in *DePew*.  Thus,

-132-

although LaMar has correctly identified the governing federal law, he fails to distinguish between these two very different factual scenarios.  Misconduct of the magnitude present in *DePew* cannot be corrected by sustaining an objection or giving a curative instruction to the jury to disregard such statements and conduct.  The comparatively minor prejudice that might have resulted from the prosecutor's first statement in LaMar's case, however, is easily cured by an instruction for the jury to disregard it and accurate instructions on how to properly use the mitigating evidence, both of which occurred at LaMar's trial.  The Sixth Circuit expressed "grave doubt" that the statements by the prosecutor in *DePew* failed to substantially sway the judgment of the jury and remanded the case for a new sentencing hearing.  *DePew*, 311 F.3d at 751.  No such doubt is present here, however.

LaMar has not demonstrated that the Ohio Supreme Court's decision in this matter was contrary to or an unreasonable application of federal law.  His thirteenth ground for relief should accordingly be denied.

**Fourteenth Ground for Relief**

In his fourteenth ground for relief, LaMar contends that the admission of all the guilt-phase evidence in the mitigation phase of his trial amounted to a violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal constitution.  (Petition, Doc. No. 31 at 130-34.)  Respondent submits in summary fashion

that the claim was adjudicated on the merits in the state court, but that the issue is one of state law not cognizable in federal habeas corpus.  (Return of Writ, Doc. No. 32 at 39.) LaMar contends that the practice he complains of "goes to the weighing process used in the penalty phase" and therefore implicates the Eighth and Fourteenth Amendments as has been recognized by the United States Supreme Court in *Zant v. Stephens*, 462 U.S. 862 (1983), *Woodson v. North Carolina*, 428 U.S. 280 (1976), and *Thompson v. Oklahoma*, 487 U.S. 815 (1988).  (Traverse, Doc. No. 43 at 124-25.)  LaMar acknowledges, however, that the jury was properly instructed that the murders themselves are not aggravating circumstances. (Petition, Doc. No. 31 at 132; Trial Tr. at 4307-10.)

The United States Supreme Court has rejected the notion that the circumstances of the crime should be excluded from the sentencer's consideration when determining whether to impose a death sentence.  *Tuilaepa v. California*, 512 U.S. 967, 975-76 (1994).  In *Payne v. Tennessee*, 501 U.S. 808, 822 (1991), the Court stated that although a capital defendant is entitled to individualized consideration when determining the appropriate sentence, it had never held or even suggested that the defendant "was to receive that consideration wholly apart from the crime which he had committed."  In *Zant v. Stephens*, 462 U.S. 862, 879, 885 (1983), in fact, the Supreme Court acknowledged that "[w]hat is important at the [penalty] selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime," although the Court

acknowledged that it is not and should not be an evidentiary free-for-all respecting aggravating circumstances either. Evidence that allows a jury to "draw adverse inferences from conduct that is constitutionally protected," such as belonging to the Aryan Brotherhood, the expression of unpopular political views, or the race, religion, or political affiliation of the defendant are in some cases "totally irrelevant to the sentencing process." *Zant*, 462 U.S. at 885; *compare Dawson v. Delaware*, 503 U.S. 159 (1992) (reversing death sentence where evidence of defendant's membership in the Aryan Brotherhood was introduced by the prosecution in the mitigation phase and had no relevance to the murder), *with Barclay v. Florida*, 463 U.S. 939, 948-51 (1983) (holding that a sentencing judge in a capital case might properly take into consideration the elements of racial hatred in the offense as well as the defendant's desire to start a race war because the evidence was relevant to several aggravating circumstances).

LaMar, however, makes no argument that any of the evidence produced in the guilt phase of his trial and admitted in the mitigation phase implicated constitutionally protected conduct. Instead, he argues that the state court failed to correctly consider its own precedent and state statutory law in evaluating the issue and that the penalty-phase weighing process was so imbalanced as a result that it deprived him of due process of law.

In *Cowans v. Bagley*, 624 F.Supp.2d 709, 811-13 (S.D. Ohio 2008), Judge Sargus discussed the propriety of a federal habeas court's review of a claim very similar to

LaMar's by acknowledging first that the state court interprets its own rules of evidence and

procedure, and that the federal court must defer to that interpretation in habeas corpus

review.  624 F.Supp.2d at 811.  Judge Sargus noted that under Ohio law, "the sentencer in

a capital case is required to consider, among other things, any evidence or testimony from

the trial that is relevant to the aggravating circumstances, any factors in mitigation, and the

nature and circumstances of the aggravating circumstances."  *Id*.  Though lengthy, it is

worthwhile to reproduce Judge Sargus' reasoning:

> The Ohio Supreme Court has clarified . . . that even though . .
> . [Ohio law] permit[s] repetition of much or all of what
> happened during the culpability phase, trial courts are not
> relieved [of] their duty to determine which culpability phase
> evidence is relevant to sentencing issues.  *See State v. Getsy*, 84
> Ohio St. 3d 180, 201, 702 N.E.2d 866 (1998) (holding that *State
> v. Gumm*, 73 Ohio St. 3d 413, 653 N.E.2d 253, syllabus (1994)
> "appears to require the trial court to determine what evidence
> is relevant"); *see also State v. Lindsey*, 87 Ohio St. 3d 479, 484-85,
> 721 N.E.2d 995 (2000) (holding that it was error for trial court
> to readmit guilt-phase evidence in toto without determining
> which evidence was relevant to penalty phase issues).
>
> Although this latter line of cases appears to militate in
> petitioner's favor, the Court takes notice of the fact that even in
> *Getsy*, where the Ohio Supreme Court held that a trial court
> was required to determine what culpability phase evidence
> was relevant in the penalty phase and that the trial court in
> that case had admitted evidence that was not relevant, the
> Ohio Supreme Court nonetheless held in conclusory fashion
> that the admission of that irrelevant evidence had not
> prejudiced the outcome of the appellant's case.  *Getsy*, 84 Ohio
> St. 3d at 201, 702 N.E.2d 866.  Similarly, the Ohio Supreme
> Court concluded in *Lindsey* that the trial court's error in

-136-

readmitting all of the culpability phase evidence without making a determination as to which evidence was relevant to the penalty phase issues did not prejudice the outcome of petitioner's sentencing hearing because evidence of bloody photographs of the victim, bloodstains in the appellant's vehicle, and bloodstains at a bar was relevant to the element of serious physical harm to the victim in the aggravated robbery death specification. *Lindsey*, 87 Ohio St. 3d at 485, 721 N.E.2d 995. . . . Thus, even assuming in the instant case that the trial court erred as a matter of state law in not determining the relevancy of culpability phase evidence before readmitting it in the mitigation phase, it does not stand to follow, and in fact seems highly unlikely, that such error would warrant reversal under state law.

Beyond that, this Court is also aware of at least two district court cases holding that any possible error in readmitting culpability phase evidence in the penalty phase, assuming it is error, was insufficient to warrant habeas corpus relief. *Davis v. Mitchell*, 110 F.Supp.2d 607, 626 (N.D. Ohio 2000) (finding no violation of clearly established federal law in the trial court readmitting in the penalty phase all evidence from the culpability phase), *rev'd on other grounds*, 318 F.3d 682 (6th Cir. 2003); *Morales v. Coyle*, 98 F.Supp.2d 849, 885 (N.D. Ohio 2000) (holding that any possible violation of state law in admitting into evidence at the penalty phase all exhibits from the culpability phase was insufficient to warrant habeas corpus relief).

The Court is not persuaded that petitioner's . . . claim warrants habeas corpus relief because the Court cannot find that the trial court's readmission in the penalty phase of all of the culpability phase evidence, or that the Ohio Supreme Court's decision finding no error therein, contravened or unreasonably applied clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). In the instant case, even if the trial court committed error as a matter of state law when it failed to determine or even consider, prior

-137-

to readmitting at the penalty phase all of the culpability phase evidence, whether that evidence was relevant to any penalty phase issues, *see, e.g., Getsy*, 84 Ohio St. 3d at 201, 702 N.E.2d 866; *Lindsey*, 87 Ohio St. 3d at 484-85, 721 N.E.2d 995, state law likewise dictates that the error could not possibly have prejudiced the outcome of petitioner's sentencing hearing and was therefore harmless.  If the trial court did not commit an error in state procedure and/or evidentiary law, much less one so egregious as to deny petitioner fundamental fairness in violation of his right to due process, then the Ohio Supreme Court's decision rejecting this claim did not contravene or unreasonably apply controlling federal law and petitioner is not entitled to habeas corpus relief.

A review of relevant Ohio law demonstrates to this Court that the categories of culpability phase evidence that prosecutors are permitted to reintroduce is broad and the discretion that trial courts have in determining what culpability phase evidence is relevant is wide.  Against that landscape, this Court is of the view that the culpability phase evidence that was readmitted for the mitigation phase, even if it included the likes of gruesome photographs and the electrical cord and purse strap that were at some point used in the killing of the victim, was relevant to sentencing issues such as the nature and circumstances of the aggravating circumstance.  Further, to the extent that any culpability phase evidence, such as a photograph of the victim while she was alive, had a tenuous connection, if that, to any sentencing issues, the Court is not persuaded – again, based on a review of relevant Ohio law – that any error in admitting such evidence was prejudicial to the outcome of petitioner's sentencing hearing. . . .  Based on the foregoing, the Court cannot find that petitioner has demonstrated a trial court error in state evidentiary law, much less an error so egregious as to deny petitioner fundamental fairness in violation of his right to due process under the Fourteenth Amendment.

*Cowans v. Bagley*, 624 F.Supp.2d 709, 812-14 (S.D. Ohio 2008).

The evidence LaMar claims deprived him of a fair sentencing hearing consists of photographas of the victims, the weapons used to murder them, and Svette's walker. (Petition, Doc. No. 31 at 131.)  Except for the walker, the evidence complained of is of the same nature as that allowed into evidence in the mitigation phase in the *Cowans* case, specifically, photographs of the victims and weapons or items used in the commission of the murders.  Even if the Court assumes that evidence and Svette's walker were irrelevant in the sentencing proceeding, LaMar has demonstrated no prejudice and instead merely speculates that the evidence was admitted solely to inflame the passions of the jury and to remind them of Svette's disability.  (Petition, Doc. No. 31 at 132.)  There is no evidence of such inflammation, however.

LaMar argues that the state supreme court failed to take account of a state case, *State v. Wogenstahl*, 75 Ohio St. 3d 344, 355 (1996), in which the court held that the nature and circumstances of the offense can only be considered for its mitigating value in the penalty phase of a capital trial.  (Traverse, Doc. No. 43 at 124.)  Ohio statutory law, however, requires that the nature and circumstances of the crime be placed on the mitigation side of the scales for whatever value they possess in the jury's weighing of aggravating circumstances and mitigating factors, and LaMar's jury was so instructed.  Ohio Rev. Code § 2929.04(B); (Trial Tr. at 4307-8).  In addition, the Ohio Supreme court has consistently held that "[a] prosecutor can legitimately refer to the facts and the nature and circumstances of

the offense, to refute any suggestion they are mitigating or to demonstrate why aggravating circumstances outweigh mitigating factors." *State v. Slagle*, 65 Ohio St. 3d 597, 612, 605 N.E.2d 916 (1992); *State v. Davis*, 116 Ohio St. 3d 404, 447, 880 N.E.2d 31 (2008); *State v. Frazier*, 115 Ohio St. 3d 139, 166, 873 N.E.2d 1263 (2007); *State v. Bryan*, 101 Ohio St. 3d 272, 298, 804 N.E.2d 433 (2004); *State v. Smith*, 87 Ohio St. 3d 424, 444, 721 N.E.2d 93 (2000); *State v. Sheppard*, 84 Ohio St. 3d 230, 238, 703 N.E.2d 286 (1998). It stands to reason that a prosecutor is also entitled to support his legitimate arguments that the nature and circumstances of the offense are devoid of mitigatory value with evidence such as photographs and the murder weapons.

LaMar correctly states that the Ohio Supreme Court concluded that the admission of Svette's walker was erroneous because the walker had "only a tenuous connection, if that, to any of the aggravating circumstances for which LaMar was convicted." (Traverse, Doc. No. 43 at 125); *LaMar*, 95 Ohio St. 3d at 203-4, ¶ 90. The state court further determined that because there was no emphasis whatsoever on the walker or Svette's need for it in the sentencing hearing, any error was harmless and that in any case the court's own independent weighing of the aggravating circumstances and mitigating factors would cure any error. *Id*. LaMar contends without any elaboration that decision violates *Ring v. Arizona*, 536 U.S. 584 (2002). The holding in *Ring*, however, is that the Sixth Amendment does not allow "a sentencing judge, sitting without a jury, to find an aggravating

circumstance necessary for the imposition of the death penalty," which does not describe LaMar's situation. 536 U.S. at 609. Instead, the constitutionality of appellate reweighing to salvage a death sentence after an invalid aggravating circumstance has been considered by a jury is established in *Clemons v. Mississippi*, 494 U.S. 738, 748-50 (1990), a case which LaMar does not mention.

Even assuming the instant claim involves an issue of federal law, this Court finds no conflict between the Ohio Supreme Court's decision respecting the instant issue and the holdings of the United States Supreme Court, nor did the state court unreasonably apply federal law in its denial of LaMar's claim. Accordingly, LaMar's fourteenth ground for relief should be denied.


**Fifteenth Ground for Relief**

In his fifteenth ground for relief, LaMar contends the trial court erred in failing to instruct the jury in the mitigation phase that one juror could prevent the death sentence, and by emphasizing the requirement of unanimity in the jury's sentencing recommendation. (Petition, Doc. No. 31 at 134-39.) Essentially, LaMar contends that the instructions given in the mitigation phase of his trial required the jurors to unanimously reject the death sentence before considering any of the life sentence options. *Id*. Respondent acknowledges the claim was adjudicated on its merits in the state court, but

-141-

argues that the United States Supreme Court has never required such instruction as a

constitutional matter.  (Return of Writ, Doc. No. 32 at 40.)  LaMar claims the state courts'

decisions ignored state law and Sixth Circuit precedent that prohibits a penalty-phase

instruction requiring jurors to unanimously find death an inappropriate penalty before

considering a life imprisonment option.  (Traverse, Doc. No. 43 at 131-33.)

Although both parties proceed here as if the claim were preserved for habeas corpus

review, it is not.  The state supreme court, which made the last reasoned decision

respecting the issue at hand, *see Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991), did not

address the merits of the claim and instead denied it for two reasons.  First, the jury

instructions complained of were "virtually identical to the proposed penalty-phase

instructions that LaMar's counsel submitted to the trial court," and "a party cannot take

advantage of an error that the party invited or induced the court to make" under the

"invited-error doctrine."  *LaMar*, 95 Ohio St. 3d 206, ¶ 102.  Second, and perhaps

predictably, defense counsel did not object to the jury instructions at the time they were

given, so all but plain error was waived, and the state supreme court found no such error.

*Id*., ¶¶ 103-4. As noted above, Ohio's contemporaneous objection rule — that parties must

preserve errors for appeal by calling them to the attention of the trial court at a time when

the error could have been avoided or corrected is an adequate and independent state

ground.  *Nields v. Bradshaw*, 482 F.3d 442, 451 (6th Cir.  2007).  In addition, a state appellate

court's review for plain error is enforcement, not waiver, of a procedural default, so LaMar's claim is procedurally defaulted.  Neither party addresses the default, nor does LaMar advance any suggestion of cause for the default and prejudice therefrom.  Even if LaMar had argued that his trial and appellate counsel's ineffectiveness should excuse the default, however, his argument would fail.

On direct appeal, LaMar did not raise his trial counsel's ineffectiveness for their proposing inadequate jury instructions in the mitigation phase, or their failure to object to the jury instructions given.  In addition, he did not cite trial counsel's ineffectiveness on that basis as one of the underlying grounds for his claim of ineffective assistance of appellate counsel when he made an application to reopen his direct appeal in the state court.  (Appendix, Vol. 21 at 8-17.)  Consequently, even if he had argued counsel's ineffectiveness as cause for the procedural default of his fifteenth ground for relief here, neither of those claims are preserved for habeas review as is required when ineffective assistance of counsel is offered as cause for a default.  *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000).  Nor has LaMar offered any proof of prejudice from the claimed error. Accordingly, LaMar's fifteenth ground for relief should be denied as procedurally defaulted without excuse.

Even if the claim had been properly preserved, however, it would be meritless.  At the mitigation phase, LaMar's jury was instructed in relevant part as follows:

-143-

You will consider all the evidence, , arguments, the statement of Keith LaMar, and all other information and reports which are relevant to the aggravating circumstances, which the Court will specify later, or to any mitigating factors including but not limited to the nature and circumstances of the offense and the history, character, and background of Keith LaMar and the following: If the Defendant was a participant in the offense but not the principal offender, the degree of the Defendant's participation in the acts that led to the death of the victim; any other factors that are relevant to the issue of whether the Defendant should be sentenced to death.

. . .

The prosecutor has the burden of proof beyond a reasonable doubt that the aggravating circumstances of which the Defendant is found guilty outweighs the factors in mitigation of imposing the death sentence.

To outweigh means to weigh more than, to be more important than.

The existence of mitigating factors does not preclude or prevent the death sentence if by proof beyond a reasonable doubt the aggravating circumstances outweigh the mitigating factors.

. . .

You shall make a finding for the sentence of death if you unanimously, all 12, find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors as to each given death.

If you do not so find, you shall unanimously, and that's all 12, make a finding for either a life sentence with parole eligibility after serving 20 full years of imprisonment or a life sentence

with parole eligibility after serving 30 full years of imprisonment.

Verdict forms with these three options will be furnished to you for each decedent.  You will consider each death and the aggravating circumstances as to that death separately.  The fact that you . . . unanimously agree on a sentence as to one death does not require you to impose the same sentence for any other death.  You must unanimously decide the sentence for the death of each decedent applying the instructions I have just given you and uninfluenced by your verdict as to any other death.

. . .

With regard to the verdict that you render, all 12 of you, each and every one of you must sign in ink on the lines provided for your signature, the foreperson signing on the 12th line under which is printed the phrase foreperson.

Your verdict must be unanimous.  That means that each and every one of you must agree to it.  Your verdict cannot be 11 to 1, 10 to 2, or 9 to 3, et cetera.  It must be 12 to 9.

Put nothing on the verdict forms which are not yours.

. . .

Each of you must decide this case for himself or herself, but you should do so only after discussion and consideration of this case with your fellow jurors.

(Trial Tr. at 4307-14.)

First, as is fully set forth in *Goff v. Bagley*, 601 F.3d 445, 456-61 (6th Cir. 2010), neither

state nor federal law at the time of LaMar's trial and direct appeals required that jurors be

instructed that a single juror could prevent imposition of the death penalty. For instance, LaMar cites *State v. Brooks*, 75 Ohio St. 3d 148, 661 N.E.2d 1030 (1996), as mandating just such an instruction, but LaMar's trial ended in July of 1995, months before the Ohio Supreme Court handed down *Brooks* in March of 1996. As noted in *Davie v. Mitchell*, 547 F.3d 297 (6th Cir. 2008), shortly after the *Brooks* decision, where the jury was instructed that they were required to unanimously find the death sentence inappropriate before considering a life option, *Brooks*, 75 Ohio St. 3d at 159, the Ohio Supreme Court rejected the contention that the "acquittal-first" doctrine applied to non-explicit instructions. *Davie*, 547 F.3d at 315, *citing State v. Davis* 76 Ohio St. 3d 107, 116-18, 666 N.E.2d 1099, 1109 (1996).

Imagining for the moment that the Ohio Supreme Court's discussion of the issue in the course of its plain error review is a reasonable approximation of how it might have decided the claim on its merits, it is neither contrary to nor an unreasonable application of federal law as of the time of the relevant state-court decision. The federal cases LaMar cites to support his claim are only tangentially related to his claim that the jury was erroneously instructed that they must first unanimously reject the death sentence before considering one of the life sentences. *See, e.g., Zant v. Stephens*, 462 U.S. 862, 878-79 (1983) (requiring an individualized sentencing determination); *Eddings v. Oklahoma*, 455 U.S. 104 , 113-14 (1982) (holding a sentencer cannot be precluded from considering relevant mitigating evidence); *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980) (stating a capital sentencing scheme must

provide a meaningful basis for distinguishing cases in which death is the appropriate sentence from those in which is it not); *Lockett v. Ohio*, 438 U.S. 586, 602-5 (1978) (holding that a sentencer cannot be precluded from considering mitigating factors); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (observing that death is different from other punishments); *Furman v. Georgia*, 408 U.S. 238 (1972) (stating that capital sentencing procedures may not create a substantial risk that death will be imposed arbitrarily or capriciously).  LaMar also cites *Mills v. Maryland*, 486 U.S. 367 (1988), as holding that an instruction requiring jurors to first unanimously reject a death sentence before considering other sentencing options runs afoul of the federal constitution.  (Petition, Doc. No. 31 at 138.)  Indeed, he correctly identifies a Sixth Circuit case that interpreted *Mills*' holding as such as well.  *Id.*, *citing Davis v. Mitchell*, 318 F.3d 682 (6th Cir. 2003).  The United States Supreme Court, however, has very recently stated that it has *never* found penalty-phase instructions requiring a jury to "unanimously reject a death sentence before considering other sentencing alternatives" unconstitutional, and expressly stated that "*Mills* says nothing about the matter."  *Smith v. Spisak*, 130 S.Ct. 676, 684 (2010).  Consequently, LaMar's claim, even if it were preserved, would fail.

LaMar's fifteenth ground for relief is procedurally defaulted without excuse and should be denied for that reason.  Even if it had been properly preserved, however, the claim is without merit and denial would be recommended in that instance as well.

**Sixteenth Ground for Relief**

LaMar next contends that his rights under the federal constitution were violated by the trial court's erroneous references in *voir dire* to the effect that the jury's sentencing verdict was a recommendation. (Petition, Doc. No. 31 at 140-47.) LaMar also argues the verdict forms provided to the jurors in the penalty phase erroneously characterized their sentencing verdicts as "recommendations." *Id*. Respondent correctly states the claim was adjudicated on its merits in the Ohio courts, but argues that the instructions given in LaMar's case were consistent with the relevant state statute, and that LaMar has not met his AEDPA burden. (Return of Writ, Doc. No. 32 at 41.) In his Traverse, LaMar introduces additional federal law in the form of *Romano v. Oklahoma*, 512 U.S. 1 (1994), and criticizes the state court for "limiting" its analysis to the law LaMar relied on in the state court and now cites in his habeas Petition. (Traverse, Doc. No. 43 at 141.)

LaMar identifies several instances in which the trial judge explained the nature of a capital trial to prospective jurors as a prelude to their being questioned in *voir dire*. (Petition, Doc. No. 31 at 140-141; Trial Tr., Vol. 7 at 7-8, 55-56, 899.) As part of that explanation, the judge told the prospective jurors that should the trial reach the second or sentencing phase, they would be called upon to make a sentencing recommendation. *Id*. What LaMar omits from his account of the trial judge's comments is that the prospective jurors were also instructed to search their consciences, beliefs, and attitudes and say

whether they could be fair and impartial knowing that there was a possibility that they "may have to consider a recommendation to the Court that the death penalty be imposed." (Trial Tr., Vol. 7 at 56.) The court also posed the following question to the prospective jurors: "If the facts justify it and the law provides, could you join with the other jurors and sign a verdict form knowing that it could lead to the Defendant's death?" *Id*. at 56-57.

LaMar similarly neglects to mention that at the close of the penalty phase of his trial, the jury was instructed that "you must decide the appropriate penalty" and that the jurors would "submit a finding to the Court whether or not the sentence of death shall be imposed upon Keith LaMar." (Trial Tr. at 4306.) Perhaps most relevant to the instant claim is the trial court's instruction to the jurors that "[y]ou should not allow yourself to impose a greater sentence than is deserved with the thought that the Judge will lessen the sentence, nor impose a lesser sentence than is deserved with the thought that the Judge will increase the penalty since the Court cannot increase the sentence." *Id*. at 4311-12. In addition, the jurors were told that they should make a finding of the "appropriate sentence assuming that it will, in fact, be carried out." *Id*. at 4312. Throughout the instructions given to the jury just prior to their penalty-phase deliberations, the trial court referred to the jury's sentencing recommendation as a "finding" or "verdict" and never once used the word "recommendation" or any variation of that term. As LaMar alleges, however, the verdict forms characterized the jury's sentencing verdicts as recommendations. (Trial Tr. at 4326-

28.)    Significantly, the law in Ohio identifies the sentencing jury's verdict as a recommendation.  Ohio Rev. Code § 2929.03(D)(2).

When LaMar presented the issue at hand to the Ohio Supreme Court on direct appeal, that court held as follows:

> The United States Supreme Court has held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." _Caldwell v. Mississippi_ (1985), 472 U.S. 320, 328-329.  Accordingly, the _Caldwell_ court reversed a defendant's death sentence because the prosecutor's argument had left jurors with a mistaken impression that Mississippi's appellate courts – and not the jury itself – would be the ones actually responsible for imposing a death sentence. See _id. at 331-333_.  To establish a _Caldwell_ violation, however, a defendant "'necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.'" _Buell v. Mitchell_ (C.A.6, 2001), 274 F.3d 337, 353, quoting _Dugger v. Adams_ (1989), 489 U.S. 401, 407.  LaMar cannot show that in this case.  There is no _Caldwell_ error in a case where, as here, a trial court's statements accurately reflect Ohio law and do not induce reliance on the appellate review process.  _State v. Durr_ (1991), 58 Ohio St. 3d 86, 93, 568 N.E.2d 674; see, also, _State v. Davie_, 80 Ohio St. 3d at 326-327, 686 N.E.2d 245.
>
> Moreover, the penalty-phase instructions belie any claim that the jury misapprehended its role in the sentencing process. The trial court specifically instructed the jury during the sentencing phase that it "should not * * * impose a greater sentence than is deserved with the thought that the Judge will lessen the sentence, nor impose a lesser sentence than is deserved with the thought that the Judge will increase the penalty since the Court cannot increase the sentence."  This instruction sufficiently informed the jury of its "awesome

-150-

responsibility" to evaluate the "appropriateness of death" without regard to what the court may or may not do when the jury has completed its evaluation. *Caldwell*, 472 U.S. at 330.

*LaMar*, 95 Ohio St. 3d at 207, ¶¶ 109-10.

LaMar argues that "[t]he Ohio Supreme Court limited its analysis to the Caldwell [sic] case, finding that since the instruction accurately reflected Ohio law, there was no error." (Traverse, Doc. No. 43 at 141.) In *Dugger v. Adams*, 489 U.S. 401, 407 (1989), however, the Supreme Court explicitly states that "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law" for a *Caldwell* claim to succeed. *See also Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). In LaMar's case, nothing the trial court said concerning the jury's role in determining LaMar's sentence misrepresented or in any way misstated Ohio law.

LaMar cites comments from two prospective jurors, only one of whom actually served on his jury, as support for his claim that the trial court's comments were prejudicial to him. First, he quotes a portion of Juror Barber's *voir dire* in which Barber asks if the trial judge would decide LaMar's punishment. (Petition, Doc. No. 31 at 142.) What he neglects to add, however, is that Barber's question was immediately answered in the negative. (Trial Tr. at 750.) Prospective Juror Best, who did not serve on the jury, indicated that the jury would turn the sentencing decision over to the judge who would "make a sentence." (Trial Tr. at 770.) Since Best did not serve on the jury, however, LaMar suffered no

-151-

prejudice from any misconception Best might have held.

LaMar has failed to demonstrate how the Ohio Supreme Court's decision rejecting his claim was contrary to or an unreasonable application of federal law, and this Court finds it to be in concert rather than conflict with the holdings of *Caldwell*, *Dugger*, and *Romano*, *supra*. Accordingly, LaMar's sixteenth ground for relief should be denied.

**Seventeenth Ground for Relief**

In his seventeenth ground for relief, LaMar contends that the trial court failed to instruct the jurors that they must make unanimous findings on LaMar's participation in the murders with regard to the capital specification requiring him to have been the principal offender or to have committed the offenses with prior calculation or design. (Petition, Doc. No. 31 at 147-48.) Respondent advances a procedural default defense and denies there is any "clearly established Federal law, as determined by the Supreme Court of the United States" requiring such an instruction as a federal constitutional matter. (Return of Writ, Doc. No. 32 at 39.) LaMar argues his claim was raised and therefore preserved for habeas corpus review in his application to reopen his direct appeal in the state court, but also claims his appellate counsel's ineffectiveness provides cause and prejudice to excuse any default. (Traverse, Doc. No. 43 at 142.)

LaMar does not contest Respondent's assertion that he failed to raise the instant

claim in the state courts on direct appeal or in his post-conviction proceedings, and as has been noted several times above, an application to reopen a direct appeal does not preserve the claims a petitioner argues his appellate counsel should have but did not raise on direct appeal; only the ineffective assistance of appellate counsel claim is preserved. Alternatively, LaMar contends his appellate counsel's ineffectiveness is cause for the default and that he suffered prejudice as a result.  (Traverse, Doc. No. 43 at 142.)  Because this Court finds no ineffectiveness in appellate counsel's failure to raise the instant claim as error on direct appeal in the state court in its consideration of LaMar's twenty-second ground for habeas corpus relief, appellate counsel's performance does not excuse LaMar's default.  Even if this Court were to agree that LaMar's appellate counsel should have raised the claim asserted here, however, and even if it sufficed as cause and prejudice for LaMar's default of the instant claim, he would not entitled to habeas corpus relief.

For each of the murders of Depina, Svette, Staiano, and Vitale, LaMar's jury convicted him of two counts of murder, one under Ohio Rev. Code § 2903.01(A), and one under Ohio Rev. Code § 2903.01(B), which read as follows:

> **2903.01**  **Aggravated murder; specific intent to cause death**
>
> (A)  No person shall purposely, and with prior calculation and design, cause the death of another . . . .
>
> (B)  No person shall purposely cause the

> death of another . . . while committing or
> attempting to commit, or while fleeing
> immediately after committing or
> attempting to commit kidnapping . . . .

For each of those eight counts of murder, LaMar was also charged with four capital

specifications, among them the following:

> **2929.04**       **Criteria for imposing death or imprisonment**
> **for a capital offense**
>
> (A)    Imposition of the death penalty for
> aggravated murder is precluded unless
> one or more of the following is specified
> in the indictment:
>
> . . .
>
> (7)    The offense was committed while the
> offender was committing, attempting
> to commit, or fleeing immediately
> after committing or attempting to
> commit kidnapping . . ., and either
> the offender was the principal
> offender in the commission of the
> aggravated murder or, if not the
> principal offender, committed the
> aggravated murder with prior
> calculation and design.

The Ohio Supreme Court has held that with respect to jury instructions on both the

principal offender and prior calculation and design elements of the capital specification set

forth above, an instruction that gives the alternatives to the jury in the same specification

disjunctively are proper.  *State v. Moore*, 81 Ohio St. 3d 22, 40, 689 N.E.2d 1, 17 (1998).

LaMar correctly cites *Moore* as having found error where the trial court did not instruct the jury that its decision must be unanimous on which alternative, principal offender or prior calculation and design, pertained to Moore's conduct in the commission of the murders. (Petition, Doc. No. 31 at 147-48); *Moore*, 81 Ohio St. 3d at 40.  The state supreme court also held, however, that where a unanimous guilty verdict is returned on a count in the indictment charging the murder was committed with prior calculation and design, the jury-instruction error is harmless.  *Id*.  When Moore presented his claim to the federal court in habeas corpus, the court's reasoning, relying on *Schad v. Arizona*, 501 U.S. 624, 631-633 (1991), echoed that of the state court.  *Moore v. Mitchell*, 531 F.Supp.2d 845, 907 (S.D. Ohio 2008).

In *Schad*, a non-habeas case, the Supreme Court considered the constitutional acceptability of a conviction obtained "under instructions that did not require the jury to [unanimously] agree on one of the alternative theories of premeditated and felony murder."  501 U.S. at 630.  Schad's jury "was unanimous in deciding that the State had proved what, under state law, it had to prove:  that [Schad] murdered either with premeditation or in the course of committing a robbery."  *Id*.  The Court described premeditation and the commission of a felony as being treated by the state law not as an independent element of first-degree murder, but rather as "mere means of satisfying a *mens rea* element of high culpability."  *Id*. at 639.  The same is true of Ohio's capital specification

-155-

containing the principal offender or prior calculation and design language. In the end, a plurality of the Court indicated that jury instructions requiring increased verdict specificity were desirable, but not constitutionally required. *Id*. at 645.

LaMar's circumstances are, for purposes of the instant ground for relief, identical to those in the *Moore* case, *supra*. Although LaMar's jury was not instructed in the penalty phase that it must unanimously find either that LaMar was the principal offender in Depina's, Svette's, Staiano's, and Vitale's murders or that he committed the murders with prior calculation and design, any error would be harmless because the jury had previously and unanimously found LaMar committed the murders with prior calculation and design in the guilt phase of the trial. Thus, even if LaMar had properly preserved his claim for habeas review, it would fail.

LaMar procedurally defaulted his seventeenth ground for relief by failing to raise it as error on direct appeal in the state courts. His claim of appellate counsel ineffectiveness is rejected in this Court's consideration of his twenty-second ground for relief, *infra*, so it provides no excuse for LaMar's procedural default. Accordingly, his seventeenth ground for relief should be denied as procedurally defaulted.

**Eighteenth Ground for Relief**

In his eighteenth ground for relief, LaMar contends he was improperly sentenced

on two counts of aggravated murder for each of his four victims, those being Depina, Svette, Staiano, and Vitale. (Petition, Doc. No. 31 at 148-50.) Respondent denies the claim was adjudicated on its merits in the state courts and states the matter is one concerning state law, as evidenced by LaMar's failure to cite any federal law in his claim. (Return of Writ, Doc. No. 32 at 41.) LaMar erroneously contends his raising the claim as one underlying his ineffective assistance of appellate counsel claim in his application to reopen his direct appeal preserved the issue for federal habeas review, and at the same time suggests his appellate counsel's ineffectiveness excuses any procedural default. (Traverse, Doc. No. 43 at 145-48.) LaMar acknowledges that the claim was not adjudicated on its merits in the state court, and invites this Court to address the issue *de novo*. *Id*. at 147.

As has been discussed above, a state application to reopen a direct appeal preserves only the ineffective assistance of appellate counsel claim presented therein, not the underlying claims. Therefore, LaMar's application to reopen his direct appeal in the state court does not preserve the claim he presents as his eighteenth ground for relief here. He also suggests his appellate counsel's ineffectiveness for failing to raise the instant claim as error on direct appeal in the state court should excuse his procedural default of the claim. Since this Court recommends denial of LaMar's ineffective assistance of appellate counsel claim in its discussion of his twenty-second ground for relief, below, the default is unexcused. Accordingly, LaMar's eighteenth ground for relief is procedurally defaulted

without excuse and should be denied.

Had the issue been preserved, however, it would nevertheless fail.  LaMar correctly argues that under Ohio law, imposing two or more death sentences for a single killing constitutes error.  (Petition, Doc. No. 31 at 150, *citing State v. Brown*, 38 Ohio St. 3d 305, 317-18, 528 N.E.2d 523 (1988)).  *See also* Ohio Rev. Code § 2941.25(A).  In *Brown*, the Ohio Supreme Court found the error to be merely procedural, and harmless as well.  38 Ohio St. 3d at 317-18.  LaMar contends, however, that unlike *Brown*, the error in his case was not mere "procedural error" because he was deprived of his Fifth Amendment "right to know what conviction he is appealing" and was forced to "appeal on all counts" involving the murders of Depina, Svette, and Vitale.  (Petition, Doc. No. 31 at 149-50.)  This Court is not familiar with an appellant's alleged Fifth Amendment right to "know what he is appealing," nor does it find any evidence of such a right in Supreme Court precedent, but it recognizes that the Double Jeopardy clause of that amendment protects against "cumulative punishments for convictions on the same offense."  *Ohio v. Johnson*, 467 U.S. 493, 500 (1984).

The United States Supreme Court has explained that the Double Jeopardy Clause's protection against multiple punishments protects only against the imposition of punishment in excess of that authorized by the legislature.  *Missouri v. Hunter*, 459 U.S. 359, 365-69 (1983).  In LaMar's case, "imposition of punishment in excess of that authorized by

the legislature" is impossible since only one death sentence can be carried out regardless of how many death sentences were imposed. Thus, any error from the alleged constitutional violation would be harmless.

LaMar's eighteenth ground for relief is procedurally defaulted without excuse and should be denied.

**Nineteenth Ground for Relief**

In his nineteenth ground for relief, LaMar contends his trial counsel provided ineffective assistance by failing to "effectively litigate" the matters set forth in his first and second grounds for relief, and by failing to "effectively litigate and preserve" the issues described in his third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, twentieth, twenty-first, and twenty-fourth grounds for relief. (Petition, Doc. No. 31 at 151-156.) Respondent denies the claim was adjudicated on its merits in the state courts (Return of Writ, Doc. No. 32 at 45), to which LaMar replies that the claim was raised in his application to reopen his direct appeal (Traverse, Doc. No. 43 at 149). As should be clear by now, a claim underlying an ineffective assistance of appellate counsel claim is not "raised" for purposes of preserving the underlying claim for habeas corpus review in federal court; only the ineffective assistance of appellate counsel claim is actually raised in an application to reopen a direct

appeal in the Ohio courts.  Ohio R. App. Proc. 26(B).  LaMar also suggests his appellate

counsel's ineffectiveness provides cause and prejudice for his failure to raise trial counsel's

ineffectiveness as error on direct appeal, but as has been noted above and recommended

below, LaMar has failed to demonstrate appellate counsel's ineffectiveness.  Consequently,

appellate counsel's performance cannot serve as cause for LaMar's default.  Accordingly,

LaMar's nineteenth ground for relief is procedurally defaulted and should be denied for

that reason.

A word here about the manner in which LaMar's claim has been presented is in

order.  In the approximately six pages comprising his nineteenth ground for relief, LaMar

merely repeats the following formula paragraph after paragraph:  "To the extent that

counsel failed to effectively litigate and preserve the claim of [judicial bias, selective

prosecution, joinder and severence, etc.; numerically identifies corresponding habeas

ground for relief], counsel's performance fell far below the prevailing professional norms

for counsel in a capital case, was unreasonable, and denied LaMar the effective assistance

of counsel in violation of the Fifth, Sixth, Eight, and Fourteenth Amendments."  While such

a paragraph might suffice as a heading for a habeas claim, it falls far short of satisfying a

habeas petitioner's burden as set forth in the AEDPA.  28 U.S.C. § 2254.  LaMar's

"argument" on the procedural default issue is similarly abrupt and halfhearted.  Even if

the claim had been presented to the state courts, therefore, and even if the state court

deigned to address whatever merits it might have been able to mine from LaMar's skeletal presentation of his claim, the manner in which the claim was set forth in LaMar's Petition here does not comply with Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts. Specifically, LaMar has not argued that there were any measures his trial counsel should have taken but did not take to preserve or "effectively litigate" the issues he enumerates. He has not stated the facts supporting his claim of trial counsel's ineffectiveness, and instead apparently expects this Court to glean such facts from the whole of his 212-page Petition. In addition, relying on a single sentence to defeat Respondent's claim of procedural default, especially when the sentence refers this Court to LaMar's inadequately presented twenty-second ground for relief (more on that below), is careless to say the least.

Because LaMar procedurally defaulted his ineffective assistance of trial counsel claim by failing to properly present it to the state courts, and because he has not demonstrated cause for the default or prejudice therefrom, his nineteenth ground for relief should be denied.

**Twentieth Ground for Relief**

In his twentieth ground for relief, LaMar contends his right to due process was

-161-

violated in the sentencing phase of his trial by the trial court's weighing of non-statutory aggravating circumstances, reliance on evidence outside the record, discounting of the mitigation evidence presented, and failure to explain why the aggravating circumstances outweighed the mitigating factors. (Petition, Doc. No. 31 at 156-66.) Respondent briefly acknowledges that the claim was adjudicated on its merits in the state court, but states that the Ohio Supreme Court rejected LaMar's contentions, that no talismanic phrases are required in a state trial court's sentencing opinion, and that LaMar has not explained how that court's decision was contrary to or an unreasonable application of federal law. (Return of Writ, Doc. No. 32 at 42.) LaMar expresses agreement with Respondent's statement regarding the requirements for a capital sentencing entry, but argues that the state trial court failed to follow the "broad guidelines and parameters for proper sentencing." (Traverse, Doc. No. 43 at 165.)

LaMar's entire claim is based upon the trial court's handling of its state statutory duty to independently weigh the aggravating circumstances and mitigating factors after the jury recommended death as the appropriate punishment for LaMar's offenses. Without any argument at all pertaining to the state supreme court's substantive rejection of his claim, LaMar merely states in his Traverse that "[t]he Ohio Supreme Court failed to apply the firmly established law regarding sentencing in a capital case, that is consistent in the cases of the United States Supreme Court." (Traverse, Doc. No. 43 at 165.) Nor does LaMar

address the United States Supreme Court's "clear principle" that even where a sentencer's determination of the appropriate punishment is skewed by an invalid factor, "constitutional harmless-error analysis or reweighing at the trial *or appellate level* suffices to guarantee that the defendant received an individualized sentence." *Stringer v. Black*, 503 U.S. 222, 232 (1992) (emphasis added); *see also, Brown v. Sanders*, 546 U.S. 212, 217 (2006); *Lambrix v. Singletary*, 520 U.S. 518, 531 (1997); *Sochor v. Florida*, 504 U.S. 527, 532 (1992); *Parker v. Dugger*, 498 U.S. 308, 320 (1991); *Clemons v. Mississippi*, 494 U.S. 738, 745-46 (1990). In addition, consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the Constitution. *Nields v. Bradshaw*, 482 F.3d 442, 451 (6th Cir. 2007), *quoting Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003).

In the Ohio Supreme Court's weighing of the aggravating circumstances and mitigating factors in LaMar's case, the court never mentioned the victims' anguish or begging for their lives, LaMar's uncharged beatings of two other inmates, or the particulars of any victim's injuries or criminal record, as did the trial court, and as forms the basis of LaMar's claim. *LaMar*, 95 Ohio St. 3d at 219-22, ¶¶ 184-97. In addition, the state supreme court identified and gave weight to mitigating factors of LaMar's background and his addiction to drugs while finding that the other statutory mitigating factors were inapplicable or insignificant. *Id*. at 221-22, ¶¶ 194-96. The state supreme court, unlike the trial court, did not comment on the fact that, as LaMar puts it, "some vague 'others'" who

spent their formative years in poverty and abuse, as did LaMar, managed to live their lives without committing murder.  (*See* Petition, Doc. No. 31 at 160-63.)  Although LaMar challenges the trial court's alleged failure to consider LaMar's diagnosis of a borderline personality disorder in mitigation, the Ohio Supreme Court found that the condition did not rise to the level of a mental disease or defect as specified by the mitigating factor set forth in Ohio Rev. Code § 2929.04(B)(3).  *LaMar*, 95 Ohio St. 3d at 222, ¶196.  LaMar also criticizes the trial court's failure to explain why it found the aggravating circumstances outweighed the mitigating factors.  (Petition, Doc. No. 31 at 164-65.)  The Ohio Supreme Court, however, engaged in a thorough discussion of the aggravating circumstances of which LaMar was found guilty, the mitigation evidence presented and the weight given to it, and its reason for concluding that the aggravating circumstances outweighed the mitigating factors.  *LaMar*, 95 Ohio St. 3d at 219-22, ¶¶ 184-97.

LaMar does not contest the Ohio Supreme Court's analysis in his Petition, only the trial court's sentencing opinion.  Thus, he has failed to demonstrate that the Ohio Supreme Court's independent weighing of the sentencing considerations was in any way contrary to federal law.  Accordingly, his twentieth ground for relief should be denied.

**Twenty-first Ground for Relief**

In his twenty-first ground for relief, LaMar argues he is actually innocent of the

murders of Svette, Depina, Vitale, Staiano, and Weaver. (Petition, Doc. No. 31 at 166-74.) Somewhat confusingly, Respondent purports to address LaMar's claim in two places in his return of writ. First, Respondent writes, with stunning disregard of grammatical convention, "[f]reestanding actual innocence claim non-cognizable in habeas proceedings." (Return of Writ, Doc. No. 32 at 34.) Second, Respondent states the claim was not adjudicated on the merits in the state courts, and his entire argument is contained in one allegation that LaMar "fails to meet any burden under any applicable rule." (Return of Writ, Doc. No. 32 at 48.) LaMar contends he did present the instant claim to the state courts, and that the state court addressed the merits of his claim, preserving it for habeas review. (Traverse, Doc. No. 43 at 166-75.)

LaMar directs this Court's attention to his twelfth and thirteenth propositions of law on direct appeal in the Ohio Supreme Court, and argues that those propositions raised his actual innocence claim. *Id*. at 166. In the first of them, LaMar argued that the trial court erred in denying his motion for a new trial based on newly discovered evidence – the same evidence he claims establishes his actual innocence here. (Appendix, Vol. 10 at 220-24.) That evidence consists of (1) a letter and an affidavit from inmate James Were stating he saw the homicides in the L-6 block and that LaMar was not among the attackers, and (2) letters written by prosecution witness Anthony Walker in which Walker stated his intent to testify falsely at LaMar's or another inmate's trial. (Petition, Doc. No. 31 at 167-69.)

In his thirteenth proposition of law before the Ohio Supreme Court, LaMar argued that the trial court erred in denying his request for a new trial based on the "devastating" cross-examination testimony from a defense witness. (Appendix, Vol. 10 at 224-27.) A claim of actual innocence, however, must establish that "in light of new [reliable] evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536-37 (2006), *quoting Schlup v. Delo*, 513 U.S. 298, 327 (1995). Since the entirety of the defense witness' testimony was before the jury, that part of LaMar's actual innocence claim does not involve any newly discovered evidence impacting the validity of LaMar's convictions or sentence, and it will not be considered further.

Assuming LaMar's motions for a new trial and appeals from their denials adequately raised his claim of actual innocence in the state court so as to preserve it, his similar claim here is meritless. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Thus, a claim of actual innocence has been described as "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera*, 506 U.S. at 404. As such, it is fairly characterized as "excusal of a procedural error" allowing consideration

-166-

of an independent constitutional claim challenging a conviction or sentence rather than a constitutional claim in and of itself. *Id.*

LaMar likens his circumstances to that in *Schlup*, *supra*. (Traverse, Doc. No. 43 at 173-75.) There, as here, the petitioner's actual innocence claim depended on the validity of the petitioner's ineffective assistance of counsel and *Brady* claims. *Schlup*, 513 U.S. at 315; (Traverse, Doc. No. 43 at 175.) In other words, if the constitutional claims are invalid, arguing actual innocence is useless in habeas corpus. This Court has recommended, however, that LaMar's claims of ineffective assistance of counsel and prosecutorial misconduct, including his *Brady* claims, be denied. *See* First, Twelfth, and Nineteenth Grounds for Relief, *supra*. In addition, LaMar's rather sparse argument seems to have turned the *Schlup* analysis on its head: he appears to argue that "tying" his actual innocence claim to constitutional violations provides a means by which this Court may address his actual innocence claim rather than actual innocence being a gateway through which this Court might address his constitutional claims. (Traverse, Doc. No. 43 at 175.) Such topsy-turvy argument is unavailing.

LaMar's actual innocence argument misconstrues the holdings of *Herrera*, *Schlup*, and *House*, and fails to state a claim cognizable in habeas corpus. Accordingly, his twenty-first ground for relief should be denied.

**Twenty-second Ground for Relief**

In his twenty-second ground for relief, LaMar claims he was deprived of his constitutional right to effective assistance of counsel in his first appeal of right in the state court. (Petition, Doc. No. 174-176.) Respondent contends the claim is procedurally defaulted as well as fatally flawed in the manner of presentation to this Court. (Return of Writ, Doc. No. 32 at 46.) LaMar acknowledges his ineffective assistance of appellate counsel claim was untimely in the state court, but claims he established good cause for taking his claim to the state court out of time. (Traverse, Doc. No. 43 at 176.) Paradoxically, LaMar argues that since the state court denied his claim on procedural grounds, there was no adjudication on the merits and that this Court is therefore "free to review the claim de novo." *Id*. at 179. He also contends that the Ohio rule respecting the timeliness of applications to reopen direct appeals under Ohio R. App. Proc. 26(B) was not an independent and adequate state ground upon which the state court could rely at the time of his application. *Id*. at 181-83.

The Ohio rule pertaining to applications to reopen direct appeals provides that "[a]n application for reopening shall be filed in the court of appeals where the appeal was decided within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time." Ohio R. App. Proc. 26(B). As the Ohio Supreme Court noted, however, "LaMar waited five years before filing his

-168-

application." *State v. LaMar*, 102 Ohio St. 3d 467, 468, 2004-Ohio-3976 at ¶ 5 (2004). Thus, in order to obtain a merits decision on the claim that his appellate counsel were ineffective, LaMar would have had to demonstrate good cause for the delay. LaMar attempted to do so by arguing that he was represented by the same attorneys who represented him on direct appeal, and that they could not be expected to raise their own ineffectiveness. (Appendix, Vol. 21 at 8-9.) While agreeing with LaMar's general proposition, the state supreme court rejected that argument because there was no legitimate reason why LaMar could not have filed his application to reopen without the assistance of counsel. *LaMar*, 102 Ohio St. 3d at 468, 2004-Ohio-3976 at ¶8-9.[14]

The Ohio Supreme Court's decision identified the state procedural rule applicable to LaMar's application to reopen his direct appeal, Ohio R. App. Proc. 26(B), and applied it in his case, thereby satisfying the first two prongs of the *Maupin* analysis for determining whether a habeas claim has been procedurally defaulted. It is the third prong that causes concern, as LaMar recognizes in his Traverse.

The third prong of the *Maupin* test asks if the state procedural rule relied upon is an "adequate and independent" state ground on which the state may rely to preclude federal habeas corpus review. *Maupin*, 785 F.2d at 138. To be adequate, a state procedural rule

---

[14]The Sixth Circuit Court of Appeals has very recently held, however, that "a petitioner does not have cause for procedural default in filing a collateral motion or application concerning ineffective assistance of counsel because he continues to be represented on direct appeal by the counsel of whose assistance he wishes to complain." *Tolliver v. Sheets*, 594 F.3d 900, 930 (2010).

-169-

must be "firmly established and regularly followed" at the time it is applied to a

petitioner's case. *Ford v. Georgia*, 498 U.S. 411, 424 (1991); *Fautenberry v. Mitchell*, 515 F.3d

614, 640 (6th Cir. 2008). LaMar filed his application on November 19, 2003, and the Ohio

Supreme Court denied it on August 11, 2004. In a 2007 Report and Recommendations in

another capital habeas corpus case, this Court summarized the Ohio Supreme Court's

enforcement of the timeliness requirement of Ohio R. App. Proc. 26(B) as follows:

> The Sixth Circuit Court of Appeals recently performed a
> searching review of the Ohio Supreme Court's enforcement of
> the timeliness requirement of Ohio R. App. Proc. 26(B). The
> court noted that "[f]or several years following the enactment
> of . . . Rule 26(B), the Ohio Supreme Court regularly enforced
> the rule's timeliness requirements," citing nine cases spanning
> the years between 1995 and 2000. *Franklin v. Anderson*, 434 F.3d
> 412, 420 (6th Cir. 2006). The court went on to observe, however,
> that in 2000 the state court began addressing applications to
> reopen on their merits in spite of their untimeliness, even when
> a state appellate court had already denied the application on
> timeliness grounds. *Franklin*, 434 F.3d at 420-21 (citing
> nineteen Ohio Supreme Court decisions from 2000 to 2004 in
> support). The Ohio Supreme Court reversed course again and
> began to affirm dismissals of applications to reopen in capital
> cases on timeliness grounds in more recent years. *Id*. at 421
> (citing three 2004 supreme court cases in support).

*Henness v. Bagley*, No. 2:01-cv-043, 2007 WL 3284930 at *58 (S.D. Ohio, Oct. 31, 2007)

(unpublished). Adding to the complexity of the status of the Ohio rule at the time of

LaMar's application is the fact that LaMar's case is one of the three 2004 cases cited by the

Sixth Circuit in *Franklin* as indicating the Ohio Supreme Court's swing back toward

enforcement of the timeliness requirement in capital cases. *Franklin*, 434 F.3d at 421. More particularly, the Sixth Circuit cited *State v. Gumm*, 103 Ohio St. 3d 162, 814 N.E.2d 861 (2004), LaMar's case, and *State v. Myers*, 102 Ohio St. 3d 318, 810 N.E.2d 436 (2004), as the three cases indicating the state court's move toward enforcement of the timeliness requirement of Ohio R. App. Proc. 26(B). *Gumm* was decided on September 22, 2004, after LaMar's case, so it has no bearing on whether the timeliness requirement of Ohio R. App. Proc. 26(B) was "firmly established and regularly followed" at the time the court denied LaMar's application. In *Myers*, although it was decided prior to LaMar's case, the court denied the application as both untimely and meritless. *See Franklin*, 434 F.3d at 421 (observing that the court affirmed dismissal as the application was both untimely and meritless). Thus, the Ohio Supreme Court enforced the timeliness requirement in LaMar's case after waiving it in at least nineteen capital cases, and relying on it as only part of the basis for their denial of an application in another case.

The Sixth Circuit has commented that "[a] petitioner must show more than an occasional act of grace by a state court in excusing or disregarding a state procedural rule in order for a federal court to conclude that the state procedural rule is inadequate because [it has been] inconsistently applied." *Hutchinson v. Bell*, 303 F.3d 720, 737 (6th Cir. 2002), citing *Coleman v. Mitchell*, 268 F.3d 417, 429 (6th Cir. 2001) (internal quotation marks omitted). The reverse must be true as well. After waiving the timeliness requirement of

Ohio R. App. Proc. 26(B) in at least nineteen capital cases over a four-year period, enforcing it in one case prior to LaMar's does not suffice to establish the rule as "firmly established and regularly followed," for habeas corpus purposes even though the Ohio court enforced the rule in this particular case. Therefore, LaMar's ineffective assistance of appellate counsel claim, presented to the state courts in his application to reopen his direct appeal, is not procedurally defaulted because the rule relied upon by the state court was not, at the time of his application and the Ohio Supreme Court's denial of the application, a firmly established state ground.

In his Petition, after stating without citation his understanding of appellate counsel's duty in a capital case,[15] LaMar contends as follows:

> Appellate counsel on the direct appeal of right unreasonably failed to raise or completely assert all the available arguments supporting the constitutional [sic]. Petitioner incorporates the allegations of these claims to the extent the Court determines that these were claims not raised on direct appeal and could have been fully and fairly raised on direct appeal.

(Petition, Doc. No. 31 at 175.) LaMar alleges his counsel had no tactical or strategic reason for foregoing "these claims" and suggests that counsel's ineffectiveness was caused by "limitations on resources and time available to counsel."

---

[15]In his post-evidentiary hearing brief, LaMar cites federal law for the proposition that "[a]ppellate counsel must act as an advocate and support the cause of his client to the best of his ability," *Anders v. California*, 386 U.S. 738 (1967); *Penson v. Ohio*, 488 U.S. 75 (1988). Such general requirements, without more specificity, provide little support for LaMar's claim. In addition, he cites the 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, which were not in existence at the time of his direct appeal in the state court.

LaMar's bare-bones allegations do not satisfy his burden under the AEDPA and the Rules Governing Section 2254 Cases in the United States District Courts.  It is not the duty of this Court to identify which claims could have been but were not raised on direct appeal in the state courts, nor is this Court inclined to take it upon itself to determine to what claims LaMar refers when he uses the indistinct term "these claims."  Does he mean the claims set forth in his habeas corpus Petition?  Those he identified in his application to reopen his direct appeal in the state court?  "All available" claims?  A habeas corpus petition must be pled with a level of specificity well beyond stating that somewhere, there are some undefined claims that appellate counsel should have raised in the state court and did not.  LaMar's lack of particularity in his ground for relief would put this Court in the position of being his advocate, searching through the record to find claims his appellate counsel should have presented to the state court.  That, this Court will not do.  Nor will it guess at the meaning of LaMar's reference to "these claims."  The law places no duty on this Court to do either.  *See In re Kennedy*, 249 F.3d 576, 579 n.3 (6th Cir. 2001) (commenting that "it is not the Court's duty to search the record for relevant materials"); *Shorts v. Battholomew*, No. 06-5877, 2007 WL 3037268 at **3 (6th Cir. Oct. 17, 2007) (unpublished) (stating that a court need not scour the record for a party who has failed to do so on his own behalf); *Freeman v. Everson*, No. 01-3424, 2001 WL 1555941 at **3 (6th Cir. Dec. 3, 2001) (unpublished) (noting that "this court is not required to search the record to find factual

support for plaintiff's conclusory allegation"); *Lewless v. Secretary of Health and Human Services*, 25 F.3d 1049, 1994 WL 201887 at *4 (6th Cir. May 23, 1994) (unpublished)(stating that inviting a court to search the record to find support for claims is not proper procedure, and that the court is not obligated to consider unsupported, inadequately developed claims).

Although LaMar's claim is not procedurally defaulted, he has failed to develop it so as to enable this Court to consider any merit the claim might possess.  Accordingly, his twenty-second ground for relief should be denied.

**Twenty-third Ground for Relief**

In his twenty-third ground for relief LaMar contends Ohio's procedure for raising ineffective assistance of counsel claims in the state courts is constitutionally inadequate and deprived him of his rights to due process and equal protection under the law.  (Petition, Doc. No. 31 at 176-85.)  Respondent argues the claim was not adjudicated on its merits in the state court and denies there is Supreme Court law to support LaMar's claim.  (Return of Writ, Doc. No. 32 at 46.)  LaMar counters that he raised the claim in his appeal from the state court of appeals' denial of his application to reopen his direct appeal, but does not speak to Respondent's argument that the claim was not adjudicated on its merits.

(Traverse, Doc. No. 43 at 184.)  Instead, he repeats his entire argument from his Petition,[16] acknowledges that the Ohio Supreme Court did not reach the merits of his claim because his application was untimely, and urges this Court to consider the claim *de novo*.  *Id*. at 192. As discussed in LaMar's twenty-second ground for relief, *supra*, the Ohio Supreme Court denied his application to reopen his direct appeal on timeliness grounds.  For the reasons stated therein, specifically because the state rule was not at the time of LaMar's application firmly established and regularly followed in capital cases, this Court finds that the instant claim is not procedurally defaulted.

LaMar's arguments essentially claim that during the time that his application to reopen his direct appeal could have been filed in compliance with the timeliness requirement of Ohio R. App. Proc. 26(B), he was represented by the same counsel who represented him on direct appeal.  (Petition, Doc. No. 31 at 176-85.)  He argues that counsel could not be expected to raise their own ineffectiveness, that there was no cooperation between the Ohio Public Defender's Office and his post-conviction counsel in coordinating the filing of his application, and he claims that he should not have been expected to file his application *pro se* within the time limits set by the Ohio rule.  *Id*.

The Sixth Circuit Court of Appeals has concluded that Ohio's "Rule 26(B) application process does not give rise to any federal constitutional right cognizable on

---

[16]Such repetition is a tiresome, irksome, and wasteful practice LaMar engaged in throughout his Traverse with admirable, yet ultimately self-defeating consistency.

habeas." *Lopez v. Wilson*, 426 F.3d 339, 354 (6th Cir. 2005) (*en banc*). As a collateral matter rather than part of a direct appeal, there is no federal constitutional right to counsel, effective or otherwise, in Ohio R. App. Proc. 26(B) proceedings. *Tolliver v. Sheets*, 594 F.3d 900, 929 (6th Cir. 2010); see also *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) (holding that "the right to appointed counsel extends to the first appeal of right, and no further"). LaMar decries the Ohio Supreme Court's suggestion that LaMar could have "retained new attorneys," which, considering LaMar's circumstances at the time, does seem to be an insensitive remark, but it does not give rise to a federal constitutional issue. *See LaMar*, 102 Ohio St. 3d at 469, ¶ 7. The state court correctly observed that LaMar could have filed his application to reopen his direct appeal *pro se*. He claims not to have had the ability or know-how to do so, but that, too, fails to raise an issue under the federal constitution.

For all of the reasons stated above, LaMar's twenty-third ground for relief should be denied.

**Twenty-fourth Ground for Relief**

In his twenty-fourth ground for relief, LaMar argues that Ohio's proportionality review of death sentences does not comport with the federal constitution's requirement of a fair and impartial review. (Petition, Doc. No. 31 at 185-92.) Respondent acknowledges the claim has been preserved for habeas corpus review, but contends LaMar has failed to

raise a claim cognizable in habeas corpus as proportionality review is not required by the United States Constitution. (Return of Writ, Doc. No. 32 at 47.) LaMar counters that since the Ohio Supreme Court "summarily overruled this issue," there has been no adjudication on the merits, presumably encouraging this Court to address the issue *de novo*. (Traverse, Doc. No. 43 at 200.)

Whether this Court addresses LaMar's claim under the standard set forth in 28 U.S.C. § 2254(d), or *de novo*, the result is the same. There is no requirement of comparative proportionality review under the United States Constitution. *Buell v. Mitchell*, 274 F.3d 337, 368 (6th Cir. 2001), *citing Pulley v. Harris*, 465 U.S. 37, 44-51 (1984). *See also Smith v. Mitchell*, 348 F.3d 177, 214 (6th Cir. 2003); *Wickline v. Mitchell*, 319 F.3d 813, 824 (6th Cir. 2003); *Coleman v. Mitchell*, 268 F.3d 417, 453 (6th Cir. 2001). LaMar has cited no Supreme Court law that invalidates or calls into question the Sixth Circuit's repeated holdings that proportionality review of death sentences is not constitutionally required. Accordingly, his twenty-fourth ground for relief should be denied.

**Twenty-fifth Ground for Relief**

Finally, LaMar contends that Ohio's death penalty statutes are unconstitutional on their face and as applied. (Petition, Doc. No. 31 at 192.) Respondent concedes the claim is preserved for review, but argues LaMar has only regurgitated the arguments he advanced

in the state court, and has not met his burden under the AEDPA of demonstrating how that court's decision was contrary to or an unreasonable application of federal law. (Return of Writ, Doc. No. 32 at 47-48.) As he did in his twenty-fourth ground for relief, LaMar suggests that since the state courts summarily denied his claim, there has been no adjudication on the merits, and he urges this court to address the claim *de novo*. (Traverse, Doc. No. 43 at 219.)

LaMar presented his claim that the Ohio death penalty scheme is unconstitutional to the Ohio Supreme Court on direct appeal and that court denied the claim on the basis that the law was settled at the time that LaMar presented the issue to the court and there was no reason to reexamine the court's previous determination that the Ohio statutes are constitutional. *LaMar*, 95 Ohio St. 3d 181, 183, 767 N.E.2d 166, 2002-Ohio-2128 at ¶¶ 22-23 (2002). The court also stated it had considered all of LaMar's arguments concerning the constitutionality of the Ohio statutes. *Id*. Thus, the Ohio Supreme Court's decision rejecting LaMar's claim was an adjudication on the merits for habeas corpus review purposes, and the deferential standard set forth in 28 U.S.C. § 2254(d) is applicable. *Hawkins v. Coyle*, 547 F.3d 540, 547 (6th Cir. 2008).

LaMar first argues that the Ohio statutes are unconstitutional because they provide prosecutors with "virtually uncontrolled discretion" in deciding whether to capitally indict a suspect. (Petition, Doc. No. 31 at 195-96.) That claim should be denied on the authority

of *Gregg v. Georgia*, 428 U.S. 153, 199 (1976); *Cooey v. Coyle*, 289 F.3d 882, 922 (6th Cir. 2002).

Next, he claims the Ohio death penalty scheme operates in a racially discriminatory manner. (Petition, Doc. No. 31 at 196.) That claim should be denied on the authority of *McCleskey v. Kemp*, 481 U.S. 279, 293-94 (1987); *Cooey*, 289 F.3d at 923.

Next, LaMar appears to claim that Ohio cannot or has not shown a legitimate and compelling state interest in effectuating its death penalty statutes. (Petition, Doc. No. 31 at 196-97, 207-10.) For support for his proposition, he cites a concurring opinion in a Massachusetts state court decision, *Commonwealth v. O'Neal*, 367 Mass. 440, 327 N.E.2d 662 (Mass. 1975), *opinion supplemented by Commonwealth v. O'Neal*, 369 Mass. 242, 339 N.E. 2d 667 (1975), and an opinion from a Utah state court in which the authoring justice concurred in part and dissented in part, *State v. Pierre*, 572 P.2d 1338 (Utah 1977). He also cites Justice Blackmun's dissent in *Callins v. Collins*, 510 U.S. 1141 (1994). LaMar cites no federal law on point, and the constitutionality of a state's use of capital punishment has long been established. *Gregg v. Georgia*, 428 U.S. 153 (1976). This claim should be denied.

LaMar contends the Ohio statutes are unconstitutional because they do not require a conscious desire to kill or premeditation and deliberation as the culpable mental state before the death penalty may be imposed. (Petition, Doc. Nod. 31 at 198.) LaMar has cited no federal law to support his claim, because none exists. This claim, too, should be denied on the authority of *Tison v. Arizona*, 481 U.S. 137, 158 (1987).

Next, LaMar contends that the Ohio law contravenes the federal constitution because it does not require the state to prove the absence of mitigating factors, and that death is the only appropriate penalty. (Petition, Doc. No. 31 at 198.) He further argues that the Ohio scheme fails to provide sufficient guidance for weighing the aggravating circumstances against the mitigating factors, and that the sentencer is not required to identify the mitigating factors found to exist. *Id*. at 198, 203. On the authority of *Blystone v. Pennsylvania*, 494 U.S. 299 (1990), LaMar's claim should be denied. *See Cooey*, 289 F.3d at 923.

LaMar also contends Ohio's death penalty scheme is unconstitutional because it permits proof of the aggravating circumstances to be made in the guilt phase of trial rather than the sentencing phase. (Petition, Doc. No. 31 at 199, 201.) That claim should be denied on the authority of *Tuilaepa v. California,* 512 U.S. 967, 971-72 (1994), where the Supreme Court held proof of eligibility for the death sentence, in other words aggravating circumstances, can be made at either phase of a bifurcated capital trial. *See also Cooey*, 289 F.3d at 924 (finding no constitutional violation on the authority of *Lowenfield v. Phelps*, 484 U.S. 231, 244-45 (1988)).

Next, LaMar argues that Ohio's death penalty statutes allow an aggravating circumstance to duplicate an element of aggravated murder, which fails to narrow the class of individuals eligible for capital punishment. (Petition, Doc. No. 31 at 200.) Although he

cites *Lowenfield v. Phelps*, 484 U.S. 231 (1988), for support for his claim, the Sixth Circuit Court of Appeals has evaluated the same claim and rejected it on the same authority. *Cooey*, 289 F.3d 927.  LaMar's claim should be denied for the reasons stated by the Sixth Circuit in *Cooey*, *supra*.

LaMar also advances the familiar claim that Ohio's death penalty statutes impose an impermissible risk of death on defendants who exercise their right to a trial by jury. (Petition, Doc. No. 31 at 201.)  Since LaMar relies on the same source for support here as have other capital habeas petitioners before him, namely Justice Blackmun's concurrence in *Lockett v. Ohio*, 438 U.S. 586 (1978), it should suffer the same fate – denial.  *Cooey*, 289 F.3d at 924-5.

LaMar contends the mandatory submission of any presentence investigation report or mental evaluation requested by a capital defendant in preparation for the mitigation phase of trial violates his right to effectively present his case in mitigation.  (Petition, Doc. No. 31 at 202.)  That claim has been denied in the past, and should be denied in LaMar's case as well.  *Cooey*, 289 F.3d at 925.

LaMar next argues that Ohio inadequately evaluates capital sentences to assure that they are neither inappropriate, excessive, or disproportionate. (Petition, Doc. No. 31 at 202-5.)  His claim should be denied on the authority of *Pulley v. Harris*, 465 U.S. 37 (1984); *Cooey*, 289 F.3d at 928.

Finally, LaMar contends the Ohio death penalty scheme is unconstitutional because it fails to permit a life sentence when the aggravating circumstances outweigh the mitigating factors, which he equates with a mandatory death sentence. (Petition, Doc. No. 31 at 207.) This claim should be denied on the authority of *Proffitt v. Florida*, 428 U.S. 242, 258 (1976). *See also Williams v. Bagley*, 380 F.3d 932, 964-65 (6th Cir. 2004); *Buell v. Mitchell*, 274 F.3d 337, 367-68 (6th Cir. 2001).

Each of LaMar's challenges to the constitutionality of Ohio's death penalty statutes is meritless. Accordingly, his twenty-fifth ground for relief should be denied.

## CONCLUSION

The Magistrate Judge has fully considered each of LaMar's grounds for relief and determined that none warrant the relief he requests. Therefore it is respectfully recommended that Petition for a writ of habeas corpus be denied.

July 29, 2010.

s/ **Michael R. Merz**
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays,

Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).